## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

NADA NICHOLSON, As Personal
Representative of the Estate of TIA L.
DARROW,

      Plaintiff,

vs.                                                                No. CIV 16-0164 JB/KK

THE EVANGELICAL LUTHERAN
GOOD SAMARITAN SOCIETY, INC.,
d/b/a GOOD SAMARITAN - FOUR
CORNERS VILLAGE,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the Motion and Brief for Summary

Judgment on all Claims Asserted by Plaintiff, filed March 10, 2017 (Doc. 48)("MSJ"); and (ii)

Good Samaritan's *Daubert* Motion and Memorandum to Exclude Testimony of Dr. Jane

Winston, filed March 10, 2017 (Doc. 49)("Motion to Exclude").  The Court held a hearing on

June 27, 2017.  The primary issue is whether Defendant Evangelical Lutheran Good Samaritan

Society, Inc. ("Good Samaritan"), is entitled to summary judgment as a matter of New Mexico

law, because Plaintiff Nada Nicholson, personal representative for the Estate of Tia L. Darrow,

fails to amass sufficient evidence proving that failing to timely call 911 emergency responders,

or otherwise promptly respond when Darrow's tracheostomy tube became dislodged, caused

Darrow's death.  Because the Court concludes that Nicholson has met her burden in establishing

a material factual dispute, the Court denies Good Samaritan's MSJ.  Genuine factual issues exist

that "can be resolved only by a finder of fact because they may reasonably be resolved in favor

of either party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 477 U.S. 242, 250 (1986).

## FACTUAL BACKGROUND

Darrow died subsequent to various events, beginning with the dislodgment of her tracheostomy tube at Good Samaritan's Four Corners Village facility. Nicholson purports to dispute a large number of Good Samaritan's assertions of fact provided in its MSJ. Accordingly, the Court will provide a brief synopsis of the background facts giving rise to this case for ease of readership and context.

1.    **Background Facts Giving Rise to the Complaint.**

The Court will take its background facts from: (i) Nicholson's Complaint for Medical Negligence resulting in Wrongful death, filed March 7, 2016 (Doc. 1)("Complaint"); and (ii) Plaintiff's Response to Defendant's Motion and Brief for Summary Judgment on all Claims Asserted by Plaintiff (Document No. 48), filed April 4, 2017 (Doc. 54)("Response"). The Court realizes the background facts are largely Nicholson's version of events, and does not adopt them as the truth, but rather incorporates them into its opinion only to provide background for the Court's Resolution of Good Samaritan's MSJ.

Decedent Darrow, a Colorado resident, was fifty-nine years old in September, 2014. See Complaint ¶¶ 1, 7 at 1-2. She suffered right-sided weakness from a prior stroke, chronic obstructive pulmonary disease, hyperlipidemia, obesity, gastroesophageal reflux, and hypertension. See Response at 2. San Juan Regional Medical Center admitted Darrow on June 12, 2014, with respiratory failure. See Response at 2. Upon admission, Darrow underwent a tracheostomy. See Response at 2. Darrow was then transferred to the San Juan Rehabilitation Hospital on July 17, 2014, where the tracheostomy tube was removed. See Response at 2. She subsequently developed cardiac arrest, but was resuscitated, and attending medical staff reinserted the tracheostomy tube. See Response at 2; Complaint ¶ 5, at 2. San Juan

Rehabilitation Hospital readmitted Darrow on July 28, 2014, after she developed a blood clot in her lung.  See Response at 2; Complaint ¶ 6, at 2.

Darrow was next transferred to the Good Samaritan facility on August 14, 2014.  See Response at 2.  On September 9, 2014, her tracheostomy tube became dislodged while Good Samaritan staff were changing Darrow's clothes.  See Response at 2.  Darrow then experienced shortness of breath, and Good Samaritan staff members were unable to reinsert the tracheostomy tube.  See Response at 2; Complaint ¶ 8, at 2.  When non-emergency Emergency Medical Services personnel arrived, they attempted cardiopulmonary resuscitation, because at some point Darrow had stopped breathing.  See Response at 2-3; Complaint ¶ 8, at 2.  An advanced medical team was called, and Darrow was transported to San Juan Regional Medical Center upon becoming pulseless, blue, and anoxic.  See Response at 3; Complaint ¶ 8, at 2.  Darrow died on September 20, 2014, and her discharge summary lists the cause of death as severe anoxic brain damage and cardiopulmonary arrest.  See Response at 3; Complaint ¶¶ 9-10, at 2-3.

### 2. **The Undisputed Facts as Good Samaritan's MSJ and the Record Establish.**

Darrow's tracheostomy tube was dislodged on the morning of September 9, 2014, and, prior to emergency medical personnel's arrival, "Tia Darrow was able to breathe through her nose and mouth or stoma even though her trach tube was not in place."  MSJ ¶ 1, at 3-4 (asserting this fact).[1]  "On the morning of September 9, 2014, Tia Darrow was provided

---

[1]See Response ¶ 1, at 3 (purporting to dispute this fact).  In particular, Nicholson, see Response ¶ 1, at 3, disputes Good Samaritan's assertion that, prior to the arrival of emergency medical personnel, "Tia Darrow was able to breathe through her nose and mouth or stoma even though her trach tube was not in place," MSJ ¶ 1, at 3-4 (citing Deposition of Nurse Lara Greenamyer at 36:9-15 (taken February 13, 2017), filed March 10, 2016 (Doc. 48-1)("Greenamyer Depo.")("[S]he was breathing fine.  She wasn't in any distress."); Greenamyer Depo. at 42:5-43:19 (responding to the question whether Darrow was having difficulty breathing without her tracheostomy tube, Greenamyer states: "Tia Darrow wasn't cyanotic, which means blue.  She was pinkish.  She -- her oxygen saturations were good.  We monitored those

constantly that morning. And she wasn't complaining of distress," and the "stoma . . . the opening that the doctors ma[d]e in [her] neck . . . can still let oxygen in and out."); Greenamyer Depo. at 54:18-56:12 ("I knew that Tia could breath[e] through her mouth. She was not blue in color. She wasn't complaining of any distress."). Nicholson's Response disputes the MSJ's assertion that Darrow was able to breathe through her nose and mouth or stoma even though her tracheostomy tube was not in place, asserting that it "was also noted by Nurse Greenamyer that Ms. Nicholson was having difficulty breathing and [had] low oxygen stats. Nurse Greenamyer wrote these findings off as due to 'anxiety,' but the decrease in [] Darrow's breathing function ultimately caused Nurse Greenamyer to call EMS again and request an urgent response." Response ¶ 1, at 3 (citing Greenamyer Depo. at 73 -75 (taken February 13, 2017), filed with the Response on April 7, 2017 (Doc. 54-2)(discussing: (i) Nurse Greenamyer's decision to request emergency services, because she determined Darrow's "respiratory rate could increase with anxiety," Greenamyer Depo. at 74:26-75:21; (ii) Greenamyer's statement to emergency services that Darrow was having some difficulty breathing "but her oxygen saturation is fine," Greenamyer Depo. at 75:16-21; and (iii) Greenamyer's deposition testimony that at one point in the morning before her death Darrow's oxygen saturation fell to 85%, after emergency services were first contacted, see Greenamyer Depo. at 73:13-21 (explaining that as she waited for the nonemergency response, she was filling out paperwork and speaking to Darrow's doctor over the phone, and was called back to Darrow's room due to the 85% reading)); Greenamyer Depo. at 169 ("She had respiratory distress in her past, I would guess that is why most people have a trach.")). See Hypoxemia, The Mayo Clinic (December 25, 2015)("Normal pulse oximeter readings usually range from 95 to 100 percent. Values under 90 percent are considered low.").

Nicholson's Response also cites to the Deposition of Nada Nicholson at 89:5-22 (taken October 20, 2016), filed April 7, 2017 (Doc. 54-1)("Nicholson Depo.")(stating that Nicholson had information that Darrow had pressed her call light when her tracheostomy tube fell out on September 9, 2014, and that "she couldn't breathe"). Thus, essentially, the Response seeks to provide evidence for the fact that Darrow on occasion had trouble breathing exasperated by her anxiety, and that her oxygen saturation fell below 85% at one point on the morning of her death. See Response ¶ 1, at 3. Good Samaritan replied to Nicholson's Response, essentially arguing that the evidence proffered in the Response -- that Darrow was having some difficulty breathing, despite her oxygen saturation levels remaining around normal -- does not meaningfully refute the MSJ's assertion that "Tia Darrow was able to breathe through her nose and mouth or stoma even though her trach tube was not in place." Defendant's Reply on Motion for Summary Judgment on All Claims Asserted by Plaintiff at 2-3, filed April 20, 2017 (Doc. 65)("Reply")("The complete testimony Plaintiff refers to instead actually supports UMF 1: that Tia Darrow was able to breathe from the time her trach came out until shortly after the EMTs arrived at Good Samaritan."). The Reply provides, first, that the evidence Nicholson cites from the Nicholson Depo., wherein she asserted that Darrow "couldn't breathe," does not reflect Nicholson's personal knowledge of the asserted fact, because Nicholson concedes she "wasn't there." Reply at 3 (citing Nicholson Depo. at 160:8-12, filed with the Reply on April 20, 2017 (Doc. 65-1)("I wasn't there.")). The Court thus cannot take into consideration this nonadmissible evidence, because Nicholson does not have personal knowledge of her assertion. See Fed. R. Evid. 602. The Reply also argues that on the "brief instance when the folds of her neck briefly obstructed her stoma," and her oxygen saturation dropped to 85%, the Response neglects to alert the Court

that Greenamyer also testified: "I went in the room and repositioned my patient, and moved the oxygen source to her mouth because her head was down, and . . . folding over the opening on her neck, and I moved the oxygen, bumped it up a liter, and reassessed and her oxygen went up to 93[%]." Reply at 3 (citing Greenamyer Depo. at 73:17-25, filed with the Reply on April 20, 2017 (Doc. 65)). Good Samaritan also argues that, regarding the Nicholson Response's citation to testimony from Greenamyer that Darrow's anxiety might exasperate any difficulties she was having breathing, the Court should highlight Greenamyer's statement that, although Darrow was "experiencing some anxiety which is causing her difficulty breathing," "her oxygen saturation [wa]s fine." Reply at 4 (citing Greenamyer Depo. at 73:13-75:25). Ultimately, then, Good Samaritan contends that it is undisputed that "Tia Darrow was able to breathe through her nose and mouth or stoma even though her trach tube was not in place." MSJ ¶ 1, at 3-4. See Reply at 2-4. Good Samaritan's Reply contends that Nicholson's Response has not identified evidence to the contrary, and has proffered only that Darrow may have had trouble breathing and an oxygen saturation that dropped to 85% one time in the morning before Darrow died. See Reply at 2-4.

Regarding the litigants' tasks when litigating a motion for summary judgment, the Local Rules for the United States District Court for the District of New Mexico require:

> **Statement of Material Facts.** The moving party must file with the motion a written memorandum containing a short, concise statement of the reasons in support of the motion with a list of authorities relied upon (the "Memorandum"). A party opposing the motion must file a written memorandum containing a short, concise statement of the reasons in opposition to the motion with authorities (the "Response"). The moving party may file a written reply memorandum with authorities (the "Reply").

> • The Memorandum must set out a concise statement of all of the material facts as to which the movant contends no genuine issue exists. The facts must be numbered and must refer with particularity to those portions of the record upon which the movant relies.

> • The Response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist. Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed. All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted. The Response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion. Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies.

supplemental oxygen through her stoma and/or her mouth from the time that her trach tube was

dislodged through the time of her collapse."  MSJ ¶ 2, at 4 (asserting this fact)(citing Deposition

of Nurse Lara Greenamyer at 65:23-66:5 (taken February 13, 2017), filed March 10, 2016 (Doc.

48-1)("Greenamyer Depo.")("She had supplemental oxygen the whole time.")).  See Response ¶

2, at 3 (choosing not to admit or deny this fact).  Greenamyer -- Darrow's nurse -- and another

nurse unsuccessfully attempted to reinsert Darrow's tracheostomy tube, and "[a]t the time that

RN Greenamyer was trying to reinsert Ms. Darrow's trach and attend[] to issues regarding

--------

- The Reply must contain a concise statement of those facts set forth in the Response which the movant disputes or to which the movant asserts an objection.  Each fact must be lettered, must refer with particularity to those portions of the record upon which the movant relies, and must state the letter of the non-movant's fact.  All material facts set forth in the Response will be deemed undisputed unless specifically controverted.

D.N.M. LR-Civ. 56.1(b).  Here, as mentioned, Nicholson has purported to dispute the MSJ's assertion that "Tia Darrow was able to breathe through her nose and mouth or stoma even though her trach tube was not in place," by proffering evidence that Darrow suffered trouble breathing during the morning of her death.  Response ¶ 1, at 3.  Trouble breathing is not the same as being capable of breathing, and the Court is left with needing to determine whether evidence in the record suggesting that "Tia Darrow was [not] able to breathe through her nose and mouth or stoma [when] her trach tube was not in place" specifically controverts Good Samaritan's asserted fact.  Indeed, it appears on the record cited that Nurse Greenamyer recognized Darrow's trouble breathing on one occasion, an occurrence she attributed to Darrow's anxiety, and on that occasion -- where Darrow's oxygen saturation dropped to 85% -- there is evidence that Greenamyer was able to successfully readjust Darrow's body in such a manner that Darrow experienced an increase in oxygen saturation to acceptable levels.  Greenamyer testified "I went in the room and repositioned my patient, and moved the oxygen source to her mouth because her head was down, and . . . folding over the opening on her neck, and I moved the oxygen, bumped it up a liter, and reassessed and her oxygen went up to 93[%]." Greenamyer Depo. at 73:17-25. The Court therefore concludes that the Response has not specifically controverted the asserted fact, and will deem it undisputed that "Tia Darrow was able to breathe through her nose and mouth or stoma even though her trach tube was not in place," on the morning of her death, even though it may have been more difficult than had she enjoyed the assistance of her tracheostomy tube in addition to the other medical assistance Greenamyer provided.  MSJ ¶ 1, at 3-4.

insertion (including looking for a replacement trach and cleaning the dislodged trach for reinsertion), Ms. Darrow was not in respiratory distress, had normal coloration, [] and was able to communicate," MSJ ¶ 3, at 4 (asserting this fact).[2]  "After determining that Ms. Darrow's

---

[2]See Response ¶ 3, at 3 (purporting to dispute this fact).  In particular, Nicholson, see Response ¶ 3, at 3, disputes Good Samaritan's assertion:

> At the time that RN Greenamyer was trying to reinsert Ms. Darrow's trach and attending to issues regarding insertion (including looking for a replacement trach and cleaning the dislodged trach for reinsertion), Ms. Darrow was not in respiratory distress, had normal coloration, had normal oxygen saturation, and was able to communicate,

MSJ ¶ 3, at 4 (citing Greenamyer Depo. at 43:2-19 (providing Greenamyer's testimony regarding her assessment whether Darrow was experiencing any "difficulty breathing" without her tracheostomy tube, which was that Darrow "wasn't cyanotic, which means blue.  She was pinkish.  She -- her oxygen saturations were good.  We monitored those constantly that morning.  And she wasn't complaining of any distress," and she was able to respond capably to Greenamyer's questions); Greenamyer Depo. at 52:6-15 ("So when I left the room where my patient was, she was fine.  She was oxygenating and her color was good, her pulse ox were up in the normal range."); Greenamyer Depo. at 54:3-5 ("So when I left the room to go get another nurse to help me, my patient was in good condition, no respiratory distress noted.")).  Nicholson's Response purports to dispute the assertion that,

> [a]t the time that RN Greenamyer was trying to reinsert Ms. Darrow's trach and attending to issues regarding insertion (including looking for a replacement trach and cleaning the dislodged trach for reinsertion), Ms. Darrow was not in respiratory distress, had normal coloration, had normal oxygen saturation, and was able to communicate,

by providing that the "Plaintiff denies this Statement of Fact based upon the facts set forth in response to Plaintiff's Statement of Fact No. 1, and the additional facts set forth below." Response ¶ 3, at 3.  Regarding Nicholson's vague reference to "the additional facts set forth below," the Court notes that there are no particularly referenced facts in the Response.  The local rules require: "Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed.  All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted."  D.N.M. LR-Civ. 56-1(b).  The Court, then, is left to consider only the evidence to which Nicholson "refer[s] with particularity."  Turning to Nicholson's response to Good Samaritan's first asserted fact, see supra at 3-6 n.1, the response is: (i) that Greenamyer knew Nicholson had suffered from respiratory distress, and noted on the day of her death that "Nicholson was having difficulty breathing and low oxygen stats"; and (ii) that Greenamyer ultimately -- in the end -- upgraded a non-emergency EMS response request.

trach could not be reinserted at Good Samaritan's facility, RN Greenamyer initiated a transfer to

the hospital by calling 911 and requesting a nonemergent transport."  MSJ ¶ 4, at 4 (asserting this

_____

See Response ¶ 1, at 3   (citing Greenamyer Depo. at 73-75 (discussing: (i) Greenamyer's decision to request emergency services, because she determined Darrow's "respiratory rate could increase with anxiety," Greenamyer Depo. at 74:26-75:21; (ii) Greenamyer's statement to emergency services that Darrow was having some difficulty breathing "but her oxygen saturation is fine," Greenamyer Depo. at 75:16-21; and (iii) Greenamyer's deposition testimony that at one point in the morning before her death, after she had requested nonemergency services, Darrow's oxygen saturation fell to 85%, see Greenamyer Depo. at 73:13-21); id. at 169 ("She had respiratory distress in her past, I would guess that is why most people have a trach.")). Nicholson, accordingly, has cited the Court evidence that Darrow had some difficulty breathing and that at one point on the morning of her death her oxygen saturation fell to 85%.  Good Samaritan then argues: "*None* of Plaintiff's 'evidence' in response to UMF 1 disputes the fact that Ms. Darrow was not in respiratory distress, had normal color and oxygen saturation, and was able to communicate while RN Greenamyer was attending to reinsertion of the trach."  Reply ¶ 3, at 4 (emphasis in original).

The Court agrees with the Reply's argument regarding the Response's failure to specifically controvert the MSJ's proffered evidence that, "[a]t the time that RN Greenamyer was trying to reinsert Ms. Darrow's trach and attending to issues regarding insertion (including looking for a replacement trach and cleaning the dislodged trach for reinsertion), Ms. Darrow was not in respiratory distress, had normal coloration [] and was able to communicate."  Reply ¶ 3, at 4.  Nicholson has merely proffered, to those points, evidence that Darrow experienced some measure of difficulty breathing.  See Response ¶ 3, at 3.  Nicholson's Response has also proffered, however, evidence that Darrow's oxygen saturation, at one point in the morning, was not normal, as it fell to 85% before Greenamyer was able to reposition Darrow's body and then bring her oxygen saturation levels back to normal.  See Greenamyer Depo. at 73:13-21.  The Court, however, is not asked to weigh the evidence at the summary judgment stage, as Good Samaritan apparently seeks.  The Court must conclude, therefore, that there is seemingly a dispute regarding whether Darrow "had normal oxygen saturation," because there is evidence that her oxygen saturation did indeed drop to 85% at one point that morning.  Greenamyer Depo. at 73:13-21.  The Court, accordingly, cannot soundly conclude, as the Reply requests that the Court conclude, that Nicholson has not specifically controverted the blanket assertion that Darrow "had normal oxygen saturation" with evidence in the record.  Whether that dispute is material to the Court's analysis, however, is an item of consideration which the Court will address later in its analysis of the MSJ's merits.  See O'Brien v. Mitchell, 883 F. Supp. 2d 1055, 1058 n.1 (D.N.M. 2012)(Browning, J.).  In sum, the Court deems undisputed and admitted the MSJ's assertion: "At the time that RN Greenamyer was trying to reinsert Ms. Darrow's trach and attending to issues regarding insertion (including looking for a replacement trach and cleaning the dislodged trach for reinsertion), Ms. Darrow was not in respiratory distress, had normal coloration, [] and was able to communicate."  MSJ ¶ 3, at 4.  The Court alternatively deems disputed the assertion's clause that Darrow "had normal oxygen saturation."

fact and asserting the call occurred at 7:42:59 a.m., see 911 Incident Report at 1-3 (dated September 26, 2016), filed March 10, 2017 (Doc. 48-3)(" 911 Incident Report"). See Response ¶ 4, at 4 (not disputing these facts). "At the time that RN Greenamyer initiated a non-emergency transfer, Ms. Darrow was not in respiratory distress, was breathing normally, and was adequately oxygenated," and "[a]fter calling for non-emergent transport, RN Greenamyer again assessed Ms. Darrow and observed that she was still adequately oxygenating and [was] not in respiratory distress." MSJ ¶¶ 5-6, at 4 (asserting these facts).[3] "After calling for a non-emergency transport,

---

[3]See Response ¶ 5, at 3-4 (purporting to dispute these facts). Nicholson, see Response ¶ 5, at 3-4, disputes Good Samaritan's two following assertions: (i) "[a]t the time that RN Greenamyer initiated a non-emergency transfer, Ms. Darrow was not in respiratory distress, was breathing normally, and was adequately oxygenated," MSJ ¶ 5, at 4 (citing Greenamyer Depo. at 56:20-63:20 (providing a portion of Greenamyer's testimony where she discusses her first telephone call to 911 -- coming around what she believed, with low certainty, to be 7:40 a.m. -- after being unsuccessful three times at reinserting the tracheostomy tube, and, in part, corroborating Greenamyer's assessment that Darrow was breathing normally and that Darrow's situation "was not emergent at this time. My patient was not in any distress. Her oxygen saturation was good. And I just needed to have her trach put back in because that is what was needed to be done")); and (ii) "[a]fter calling for non-emergent transport, RN Greenamyer again assessed Ms. Darrow and observed that she was still adequately oxygenating and not in respiratory distress," MSJ ¶ 6, at 4 (citing Greenamyer Depo. at 63:23-64:6 (stating this fact). Nicholson's Response purports to dispute these two assertions of fact, in tandem, "based upon the facts set forth in response to Plaintiff's Statement of Fact No. 1, and the additional facts set forth below." Response ¶ 5, at 3-4. Good Samaritan's Reply argues that the Response's retort "provides no evidence that Ms. Darrow was in respiratory distress at the time RN Greenamyer called for non-emergency transport." Reply ¶ 5, at 5. Good Samaritan's Reply asserts: "The undisputed evidence rules out Plaintiff's unsupported dispute, and establishes that Tia Darrow's $O_2$ saturation was 93% at 8:12 a.m., and that *after* RN Greenamyer's second call, at 8:14 a.m., Ms. Darrow was still breathing normally, had normal coloration, had normal oxygen saturation, and was able to communicate." Reply ¶ 5, at 5 (emphasis in original)(citing Greenamyer Depo. at 63:23-64:26; 911 Incident Report at 1-3 (indicating that by 7:44:37 a.m. non-emergency transport was requested, and that by 8:14:33 a.m. emergent transport was instead requested, because "PT having anxiety -- difficulty breathing")). Good Samaritan also argues that the Response has made no attempt to dispute the asserted fact that Greenamyer reassessed her patient after her initial 911 call, and reached the same conclusions in her assessment.

Unlike the Court's assessment of Nicholson's identical Response described supra n.2, the MSJ has identified, in these assertions of fact, two specific times of assessment during which Greenamyer has stated that: (i) "Ms. Darrow was not in respiratory distress, was breathing normally, and was adequately oxygenated," MSJ ¶ 5, at 4; and (ii) "she was still adequately

RN Greenamyer called Dr. Uche Obisike, Ms. Darrow's physician."  MSJ ¶ 7, at 5 (asserting this fact)(citing Greenamyer Depo. at 68:1-5; Deposition of Dr. Uche Obisike at 49:12-51:3 (taken October 21, 2016), filed March 10, 2017 (Doc. 48-2)("Obisike Depo.")).  See Response ¶ 6, at 4 (not disputing this fact).[4]  "Sometime after RN Greenamyer called for non-emergency transport,

_____

oxygenating and not in respiratory distress," MSJ ¶ 6, at 4.  Nicholson's Response does not provide evidence which specifically refutes these facts, mustering only the same evidence on which Nicholson has relied previously that Darrow had some difficulty breathing the morning of her death, and the Court thus concludes that the assertions of fact are undisputed.  Nicholson does not properly dispute the evidence by simply pointing to evidence earlier in the brief.  Accordingly, the Court deems undisputed: (i) "[a]t the time that RN Greenamyer initiated a non-emergency transfer, Ms. Darrow was not in respiratory distress, was breathing normally, and was adequately oxygenated," MSJ ¶ 5, at 4; and (ii) "[a]fter calling for non-emergent transport, RN Greenamyer again assessed Ms. Darrow and observed that she was still adequately oxygenating and not in respiratory distress," MSJ ¶ 6, at 4.

[4]Good Samaritan's MSJ also asserts: "Dr. Obisike told RN Greenamyer that Ms. Darrow 'could breathe fine through her mouth, and just have a nonemergent transport come.'"  MSJ ¶ 7, at 5 (citing Greenamyer Depo. at 68:1-5 (providing that, in response to the question whether Dr. Obisike alternatively recommended emergency transport, Greenamyer's testimony is that Dr. Obisike "told [her] she could breathe fine through her mouth, and just have a nonemergent transport come"); Obisike Depo. at 49:12-51:3 (testifying that Darrow was not in distress and that he wanted her to go to the emergency room to have the tracheostomy tube reinserted, because Good Samaritan had been unable to reinsert it themselves)).  Nicholson's Response disputes this assertion, stating:

> Plaintiff denies Defendant's Statement of Fact No. 7 based upon the facts set forth in response to Plaintiff's Statement of Fact No. 1, and the additional facts set forth below.  Additionally this Statement of Fact is denied as it misrepresents Dr. Obisike's testimony where he says he wanted the trach reinserted as Ms. Darrow was clearly in respiratory Distress.  It is also denied because the factual assertions are based on hearsay, not on the personal knowledge of Dr. Obisike. . . .  These facts are also denied because Dr. Obisike wanted the trach replaced as soon as possible.

Response ¶ 6, at 4 (citing Obisike Depo. at 49-50 (providing Dr. Obisike's testimony that Darrow "was not in distress at the time I was called," and "[m]y understanding, the trach got pulled out.  And I didn't think she should have the trach out at the time.  I wanted it reinserted since there is a mention that they couldn't do it themselves.  So you want her to go to the ER where they had the capacity to do it"); Obisike Depo. at 51 (providing Dr. Obisike's testimony that he wanted the trach back in "[a]s soon as it was practical and possible")).  Good Samaritan's

---

Reply, then, identifies the obvious -- that Dr. Obisike's testimony, to which Nicholson cites, does not appear to support her contentions and that Nicholson has thus failed to muster any evidence negating Good Samaritan's assertion. See Reply ¶ 6, at 4. First, the Court notes -- as it did supra nn.1-3 -- that Nicholson's evidence in support of her response to Good Samaritan's first assertion of fact establishes that Darrow had some difficulty breathing and that at one point, on the morning of her death, her oxygen saturation fell to 85%. See Response ¶ 1, at 3. Here, Good Samaritan is asserting: "Dr. Obisike told RN Greenamyer that Ms. Darrow 'could breathe fine through her mouth, and just have a nonemergent transport come.'" MSJ ¶ 7, at 5. Nicholson has argued that the proffered assertion embodies a hearsay statement, because Good Samaritan seeks to use evidence of Dr. Obisike's instruction to Greenamyer through Greenamyer's testimony. Good Samaritan's Reply does not attempt to argue that this statement is not hearsay, such as by arguing that the MSJ's assertion of fact, "Dr. Obisike told RN Greenamyer that Ms. Darrow 'could breathe fine through her mouth, and just have a nonemergent transport come,'" MSJ ¶ 7, at 5, is, at its core, only seeking to establish the effect hearing it had on Greenamyer, nor does Good Samaritan identify any other admissible evidence on the record, see Reply ¶ 7, at 5-6. Good Samaritan's Reply instead refines Good Samaritan's assertion to focus on "whether Dr. Obisike told RN Greenamyer that nonemergency transportation was appropriate." Reply ¶ 7, at 5-6. In that regard, the Obisike Depo. establishes that Dr. Obisike considered Darrow not to be in respiratory distress and that, while he wanted the tracheostomy tube to be reinserted at the ER "as soon as practical and possible," because the patient "wasn't in distress" Dr. Obisike testified that Darrow was not experiencing an "emergency medical situation." Obisike Depo. at 49:24-50:3 (answering the question "[d]id you consider, based upon what you have in your records and what you might remember, this was an emergency medical situation," by stating "I don't have independent recollection, but there's a mention here that she wasn't in distress"). Dr. Obisike testified that Darrow "was not in distress at the time I was called," and

> [m]y understanding, the trach got pulled out. And I didn't think she should have the trach out at the time. I wanted it reinserted since there is a mention that they couldn't do it themselves. So you want her to go to the ER where they had the capacity to do it.

Obisike Depo. at 49:16-50:25. See Obisike Depo. at 51:9-10 (providing Dr. Obisike's testimony that he wanted the trach back in "[a]s soon as it was practical and possible").

Ultimately, Dr. Obisike has not testified directly in confirmation of Greenamyer's testimony regarding what he said to her on their telephone call regarding requesting transport for Darrow. Taking Dr. Obisike's testimony in the manner most favorable to Nicholson, the Court cannot conclude that the evidence Good Samaritan proffers in support of the assertion "Dr. Obisike told RN Greenamyer that Ms. Darrow 'could breathe fine through her mouth, and just have a nonemergent transport come,'" MSJ ¶ 7, at 5, satisfies the local rules. The evidence instead suggests that Dr. Obisike was not overly concerned about the speed with which the tracheostomy tube was reinserted -- as long as it was as soon as practical and possible -- and that, Dr. Obisike does not consider a tracheostomy tube-less patient, whom is not suffering from respiratory distress, to present an emergency medical situation. The Court thus deems Good Samaritan's assertion disputed, as to the way it is presently phrased, because it lacks admissible

RN Greenamyer observed that Ms. Darrow was having some anxiety," and,

> [a]t that time, Ms. Darrow was still breathing adequately, had pink coloration, and
> had normal oxygen saturation. . . .   On account of Ms. Darrow's anxiety, RN
> Greenamyer called 911 and requested that the call be changed from nonemergent
> to emergent. . . .   At the time that RN Greenamyer made her second 911 call, Ms.
> Darrow's oxygen saturation was still within normal limits.

MSJ ¶ 8, at 5 (asserting this fact).[5]  After making her second call to 911, upgrading the non-

---

evidence in the manner the statement is presented -- which is for the truth of the matter.

[5]See Response ¶ 7, at 4 (purporting to dispute this fact).  In particular, Nicholson, see
Response ¶ 7, at 4, disputes Good Samaritan's assertion:

> At that time, Ms. Darrow was still breathing adequately, had pink coloration, and
> had normal oxygen saturation. . . .   On account of Ms. Darrow's anxiety, RN
> Greenamyer called 911 and requested that the call be changed from nonemergent
> to emergent. . . .   At the time that RN Greenamyer made her second 911 call, Ms.
> Darrow's oxygen saturation was still within normal limits.

MSJ ¶ 8, at 5 (citing Greenamyer Depo. at 73:10-75:3 (testifying that Greenamyer -- after
making the initial nonemergency transport request and speaking with Dr. Obisike -- made
another "assessment" of Darrow, "going back in the room probably three or four maybe five
times while I filled out this form," and that on the occasion when she visited in response to
Darrow's drop in oxygen saturation to 85%, she rectified her oxygen saturation back to 93% and
observed Darrow thereafter "breathing adequately.  She was unhappy about having to go to the
hospital.  She was pinkish in color, her normal pink"; and also testifying that after this series of
events, "I decided to call the EMS number again . . . and change her status . . . to emergent based
on her anxiety level."); Greenamyer Depo. at 75:4-76:25 (describing Greenamyer's 911 call,
wherein she indicated that she wished to upgrade the "nonemergent transport," because "[s]he is
experiencing some anxiety which is causing her difficulty breathing but her oxygen saturation is
fine").  Nicholson disputes Good Samaritan's assertions here by providing: "Plaintiff denies
Defendant's Statement of Facts No[]. 8 [] based upon the facts set forth in response to Plaintiff's
Statement of Fact No. 1, and the additional facts set forth below."  Response ¶ 8, at 4.  As the
Court concluded, see supra nn.2-4, Nicholson's response to Good Samaritan's first asserted fact
essentially was: (i) that Greenamyer knew Nicholson had suffered from respiratory distress, and
noted on the day of her death that "Nicholson was having difficulty breathing and low oxygen
stats"; and (ii) that Greenamyer ultimately -- in the end -- upgraded a non-emergency EMS
response request.  See Response ¶ 1, at 3  (citing Greenamyer Depo. at 73-75 (discussing: (i)
Greenamyer's decision to request emergency services, because she determined Darrow's
"respiratory rate could increase with anxiety," Greenamyer Depo. at 74:26-75:21; (ii)
Greenamyer's statement to emergency services that Darrow was having some difficulty
breathing "but her oxygen saturation is fine," Greenamyer Depo. at 75:16-21; and (iii)

emergency request, "RN Greenamyer returned to Ms. Darrow's room and observed that Ms.

Darrow's breathing was adequate and that her oxygen saturation was normal." MSJ ¶ 9, at 5

(asserting this fact).[6]   "Approximately three minutes after RN Greenamyer requested that the

_____

Greenamyer's deposition testimony that at one point in the morning before her death, after she
had requested nonemergency services, Darrow's oxygen saturation fell to 85%, see Greenamyer
Depo. at 73:13-21); id. at 169 ("She had respiratory distress in her past, I would guess that is
why most people have a trach.")).  Nicholson, accordingly, has cited evidence that Darrow had
some difficulty breathing and that at one point on the morning of her death her oxygen saturation
fell to 85%.  This evidence does not refute Good Samaritan's assertion that, at the time when
Greenamyer observed Darrow's anxiety increase, shortly after she had caused Darrow's oxygen
saturation to return to 93%,

> Ms. Darrow was still breathing adequately, had pink coloration, and had normal
> oxygen saturation. . . .  On account of Ms. Darrow's anxiety, RN Greenamyer
> called 911 and requested that the call be changed from nonemergent to emergent.
> . . .  At the time that RN Greenamyer made her second 911 call, Ms. Darrow's
> oxygen saturation was still within normal limits.

MSJ ¶ 8, at 5.  Nicholson cannot properly rely on an oxygen saturation level earlier in the day to
dispute saturation levels generally.  The Court concludes, as Good Samaritan's Reply urges, see
Reply ¶ 8, at 6, that the evidence establishes -- from the time after Greenamyer caused Darrow's
oxygen saturation to rise back to 93% until when she assessed Darrow's anxiety level and chose
to upgrade the nonemergency transport -- Good Samaritan's assertions.  Accordingly, the Court
deems undisputed Good Samaritan's following assertion:

> At that time, Ms. Darrow was still breathing adequately, had pink coloration, and
> had normal oxygen saturation. . . .  On account of Ms. Darrow's anxiety, RN
> Greenamyer called 911 and requested that the call be changed from nonemergent
> to emergent. . . .  At the time that RN Greenamyer made her second 911 call, Ms.
> Darrow's oxygen saturation was still within normal limits.

MSJ ¶ 8, at 5.

   [6]See Response ¶ 7, at 4 (purporting to dispute this fact).  Nicholson, see Response ¶ 7, at
4,  disputes the Good Samaritan MSJ's assertion that, at this time, Greenamyer "observed that
Ms. Darrow's breathing was adequate and that her oxygen saturation was normal," MSJ ¶ 9, at 5
(citing Greenamyer Depo. at 78:1-8 (testifying that Darrow's status after making the upgrade call
to 911 was as follows: "Her breathing was adequate.  Her oxygen sats were good.  I did inform
my CNA to let me know if she drops below 90").  Nicholson disputes this assertion of fact by
arguing: "Plaintiff denies Defendant's Statement of Facts No[]. [] 9 based upon the facts set forth
in response to Plaintiff's Statement of Fact No. 1, and the additional facts set forth below."

EMS response be upgraded to emergent, three EMTs arrived." MSJ ¶ 10, at 5 (asserting this fact). See Response ¶ 8, at 4 (not disputing this fact). Soon thereafter, the Basic Life Support ("BLS"), M10 team, EMTs -- but not the Advanced Life Support ("ALS") team with paramedic EMTP Ryan Carey -- "arrived in Ms. Darrow's room, Ms. Darrow was alert, had normal color, and was not exhibiting any respiratory distress. . . . When the EMTs arrived in Ms. Darrow's room, Ms. Darrow's care was turned over to the EMTs." MSJ ¶ 11, at 5-6 (asserting this fact)(citing Declaration of Nurse Callie Shriver ¶ 6, at 2; ¶ 4, at 1 (executed February 27, 2017), filed March 10, 2017 (Doc. 48-4)("Shriver Decl."); Declaration of Certified Nursing Assistant Sylvia Pontius ¶ 8, at 2 (executed March 8, 2017), filed March 10, 2017 (Doc. 48-5)("Pontius Decl."); Greenamyer Depo. at 95:18-96:13).[7]  "Approximately one minute after the EMT[]s

---

Response ¶ 8, at 4. As the Court concluded, see supra nn.2-5, Nicholson's response to Good Samaritan's first asserted fact essentially was: (i) that Greenamyer knew Nicholson had suffered from respiratory distress, and noted on the day of her death that "Nicholson was having difficulty breathing and low oxygen stats"; and (ii) that Greenamyer ultimately -- in the end -- upgraded a non-emergency EMS response request. See Response ¶ 1, at 3 (citing Greenamyer Depo. at 73-75 (discussing: (i) Greenamyer's decision to request emergency services, because she determined Darrow's "respiratory rate could increase with anxiety," Greenamyer Depo. at 74:26-75:21; (ii) Greenamyer's statement to emergency services that Darrow was having some difficulty breathing "but her oxygen saturation is fine," Greenamyer Depo. at 75:16-21; and (iii) Greenamyer's deposition testimony that at one point in the morning before her death, after she had requested nonemergency services, Darrow's oxygen saturation fell to 85%, see Greenamyer Depo. at 73:13-21; id. at 169 ("She had respiratory distress in her past, I would guess that is why most people have a trach.")). Nicholson, accordingly, has cited evidence that Darrow had some difficulty breathing and that at one point on the morning of her death her oxygen saturation fell to 85%.

This evidence does not refute Good Samaritan's assertion that, at the time after making the upgraded 911 call when Greenamyer observed Darrow's condition, Darrow's "breathing was adequate and that her oxygen saturation was normal." MSJ ¶ 9, at 5. The Court concludes, as Good Samaritan's Reply urges, see Reply ¶ 9, at 6, that the evidence establishes that Greenamyer observed Darrow's condition after she made the upgrade 911 call, and "observed that Ms. Darrow's breathing was adequate and that her oxygen saturation was normal." MSJ ¶ 9, at 5. Accordingly, the Court deems this fact regarding Greenamyer's observation undisputed.

[7]See Response ¶ 9, at 4 (purporting to dispute this fact). Nicholson, see Response ¶ 9, at

4, purports to dispute the Good Samaritan MSJ's assertion that, "[w]hen the EMTs arrived in Ms. Darrow's room, Ms. Darrow was alert, had normal color, and was not exhibiting any respiratory distress," but does not dispute the assertion that, "[w]hen the EMTs arrived in Ms. Darrow's room, Ms. Darrow's care was turned over to the EMTs," MSJ ¶ 11, at 5-6 (citing Shriver Decl. ¶ 6, at 2 (providing that Shriver entered Darrow's room with three emergency medical personnel, and observed that "Ms. Darrow was alert and looked anxious, but had normal color and was not exhibiting any respiratory distress when we entered the room"); Shriver Decl. ¶ 4, at 1 (providing that, according to Shriver, "[c]are of Ms. Darrow was yielded to the emergency personnel when they arrived in the room"); Pontius Decl. ¶ 8, at 2 (providing that Pontius "was in the room with Tia when the first emergency crew arrived. At the time that they arrived, I had not left the room or Tia's side for at least fifteen minutes. Three emergency personnel came into the room and Tia's care was transferred to them. Immediately prior to their arrival, I had been sitting with Tia holding her hand and talking with Tia. Tia was breathing and communicating with me immediately prior to and at the time of the emergency crew's arrival. Tia was continuing to receive supplemental oxygen at the time the emergency crew arrived"); Greenamyer Depo. at 95:18-96:13 (testifying: "Once the EMS enters the patient's room it is their patient," and the nursing department "stands down")). Nicholson's Response disputes this assertion by generally stating: "These facts are directly controverted by the Emergency Medical Services Report . . . and the San Juan Regional Medical Center documents . . . ." Response ¶ 9, at 4 (citing generally to Emergency Medical Services Radio Report at 1-6 (dated September 9, 2014)(authored and signed by EMTP Ryan Carey, paramedic in second EMT Crew -- Advanced Life Support ("ALS") team -- to arrive on scene), filed April 7, 2017 (Doc. 54-3)("EMT Carey Report")(highlighting for the Court: (i) "Shortly after arrival the pt loses pulses"; (ii) "The pt's trach tube reportedly pulled out during a clothing change and is in respiratory distress and ventilation are being assisted via BVM [Bag Valve Mask] on ALS [Advanced Life Support] Arrival"; (iii) "The pt arrests and BLS [Basic Life Support] is done prior to ALS arrival. Pulses return and then the pt loses pulses again we get her loaded into the ambulance"; (iv) "Arrive [at 8:25:00 a.m.] to find the pt attended by the M10 Crew [the first BLS EMT team to arrive, responding to the nonemergency transport request, and incapable of ALS response]. They report that the pt went pulseless and they did CPR. The pt now has pulses and is being assisted via BVM"; (v) Darrow is "Mental Status Unresponsive" from 8:25:00 a.m. until 8:59:00 a.m.; (vi) Darrow is "Cyanotic" at 8:35:00 a.m.; and, finally, (vii) Carey explains in a narrative summary that "M10 was dispatched to Good Samaritan for a medical transport for a pt with a 'tube fell out.' When they arrive they reportedly find the pt to be cyanotic, her trach tube displaced, and struggling to breath[e]. M10 immediately calls for ALS help."); San Juan Regional Medical Center Departmental Report at 1-2 (dated September 9, 2014)(authored by both Dr. Patrick Martin and Dr. Jarrad Francis Maiers), filed April 7, 2017 (Doc. 54-4)("San Juan Report")(highlighting for the Court: (i) one physician's statement that "[p]atient was changing clothes this morning and dislodged her trach. The nursing home personnel was not able to put the trach back in, as a result, the patient became profoundly dyspneic and then apneic. When EMS arrived, patient was blue and pulseless"; and (ii) another physician's impression of Darrow's vital signs that when care began at the hospital, "[t]he symptoms have been occurring for 30 minute(s). The symptom(s) is/are severe. Context/precipitation: trach fell out. 59 year old female at the nursing home where staff was changing her clothing and her trach fell out.

EMS was called and a BLS unit arrived on scene and found pt apneic and pulseless")).

The Reply does not concede that Nicholson's Response disputes its assertion that, "[w]hen the EMTs arrived in Ms. Darrow's room, Ms. Darrow was alert, had normal color, and was not exhibiting any respiratory distress. . . .  When the EMTs arrived in Ms. Darrow's room, Ms. Darrow's care was turned over to the EMTs," MSJ ¶ 11, at 5-6, see Reply ¶ 11, at 6-11. Instead, Good Samaritan argues:

> This is the crux of Plaintiff's effort to create a fact dispute.  Plaintiff asserts that an EMS record . . . and a San Juan Regional Medical Center record . . . are evidence that Ms. Darrow was blue and pulseless upon the EMT's arrival at Good Samaritan, and thus creates a factual dispute regarding Ms. Darrow's condition when EMTs first arrived in Ms. Darrow's room.  But the documents themselves show that the information on which Plaintiff relies is rank hearsay which cannot be used to create a dispute of fact.  Indeed, the internal inconsistencies in [the EMT Carey Report] and [the San Juan Report] themselves exactly demonstrate the purpose behind the hearsay rule, which disallows such unreliable evidence to controvert summary judgment.

Reply ¶ 11, at 6.  In this case, Good Samaritan contends:

> The issue with Plaintiff's "evidence" is not the documents themselves, which, despite being hearsay, could likely be placed into evidence at trial.  Rather the issue is with Plaintiff's proffer of the documents for their contents: hearsay statements regarding Ms. Darrow's supposed condition which, the documents make clear, were made (if by anyone at all) by persons other than the authors of the documents.

Reply ¶ 11, at 7.  Good Samaritan explains that, regarding the EMT Carey Report, Carey

> arrived on scene *after* Ms. Darrow's care had been transferred to the first-arriving EMTs.  It is undisputed that the first EMS crew (M10) arrived at 8:15 a.m. . . . The EMS log shows Mr. Carey arrived at 8:24:22 . . . and Mr. Carey's first entry on the document Plaintiff relies upon reflects that at 8:25 a.m., Mr. Carey "Arrived to find the pt attended by the M10 crew.  They report that pt went pulseless and they did CPR."

Reply ¶ 11, at 7 (emphases in original)(quoting EMT Carey Report at 2).  Accordingly, Good Samaritan asserts that Carey had no personal knowledge of events between 8:15 and 8:25 a.m. See Reply ¶ 11, at 8.  Good Samaritan's Reply primarily identifies

> Mr. Carey's statement in the narrative section of his report that M10 "reportedly find the pt to be cyanotic, her trach tube displaced and struggling to breath[e]" that Plaintiff is relying upon to attempt to create a disputed issue of fact regarding Ms. Darrow's condition when M10 arrived. . . .  Notably, there is no attribution in

_____

> Mr. Carey's report regarding *who* supposedly said that Ms. Darrow was cyanotic when M10 arrived.  This statement is thus at best an unattributed hearsay statement (something M10, dispatch, or another later arriving EMT might have allegedly said to Mr. Carey) -- and at worst is pure speculation on the part of Mr. Carey -- a person who has no personal knowledge about what occurred prior to his arrival.

Reply ¶ 11, at 8 (emphasis in original)(quoting EMT Carey Report at 5).  Good Samaritan also identifies an inconsistency within the report, explaining that contrary to the statement that M10 found Darrow "to be cyanotic, her trach tube displaced and struggling to breath[e]," the EMT Carey Report also states: "Shortly after arrival the pt loses pulses"; and "They [M10] report the pt went pulseless and they did CPR," EMT Carey Report at 2.  See Reply ¶ 11, at 8.  Additionally, although there is a representation in Carey's report that, "upon arrival M10 'immediately calls for ALS help,'" the "dispatch log contradicts this representation and establishes that M10 did not call for ALS help until 8:22 a.m. -- seven minutes after they arrived on scene at 8:15 a.m.," a fact Good Samaritan further argues is inconsistent with a finding that Darrow was "blue and pulseless upon arrival" of M10.  Reply ¶ 11, at 8 (quoting EMT Carey Report at 5)(citing 911 Incident Report at 2 (providing that "M10 full code now" occurred at 8:22:06 a.m.)).  Good Samaritan's position, then, is that Carey's report's "hearsay descriptions in [the EMT Carey Report] of what occurred prior to his arrival thus suffer from reliability issues because they are internally inconsistent statements, as well as inconsistent with the EMTs' own logs of what occurred."  Reply ¶ 11, at 8-9.

Good Samaritan's Reply also addresses Nicholson's proffers in the San Juan Report, arguing they "contain similar unattributed inadmissible hearsay statements."  Reply ¶ 11, at 9.  First, Good Samaritan discusses Dr. Martin's statements in the San Juan Report at 1-2: "Patient was changing clothes this morning and dislodged her trach.  The nursing home personnel was not able to put the trach back in, as a result, the patient became profoundly dyspneic and then apneic.  When EMS arrived, patient was blue and pulseless," and explains that according to this report Dr. Martin formed his impression based on "history . . . obtained from nursing staff as well as ER personnel."  Reply ¶ 11, at 9 (citing San Juan Report at 2).  Next, the Reply addresses Dr. Maier's statements in the San Juan Report at 1-2: "The symptoms have been occurring for 30 minute(s).  The symptom(s) is/are severe.  Context/precipitation: trach fell out.  59 year old female at the nursing home where staff was changing her clothing and her trach fell out.  EMS was called and a BLS unit arrived on scene and found pt apneic and pulseless," and explains that Dr. Maier's record mistakenly -- because Darrow's was unconscious -- states that Dr. Maier obtained his history and vitals based on Darrow's self-given history.  Reply ¶ 11, at 9 (citing San Juan Report at 2).  Good Samaritan's Reply, based upon the content and nature of these statements in the San Juan Report, then argues "neither record identifies *who* supposedly said that Ms. Darrow was cyanotic when M10 arrived, and neither record is from a person with personal knowledge of what occurred when M10 arrived.  It appears that Dr. Maier received some information from Mr. Carey and Dr. Martin received some information from nurses at the hospital and staff."  Reply ¶ 11, at 9 (emphasis in original).  Accordingly, Good Samaritan vehemently maintains that Nicholson's response has failed to identify admissible evidence in the record which supports Nicholson's argument that Darrow was in respiratory distress, had

become pulseless, or had become cyanotic before the M10 EMT team arrived on the scene at 8:15:42 a.m.  See Reply ¶ 11, at 9-10.  Instead, Good Samaritan avers that the evidence in the Response consists of hearsay statements, contained within the San Juan Report and the EMT Carey Report, upon which Nicholson relies to "prove that Ms. Darrow was blue when M10 arrived"; yet, Good Samaritan urges, the potential declarants of those statements who may have had personal knowledge -- perhaps EMTs on the initial M10 team -- have not testified by deposition, or otherwise declared, that the San Juan doctor's or EMT Carey's representations that Darrow was cyanotic before 8:15:42 a.m. are accurate.  Reply ¶ 11, at 9-10.

The Court agrees that, in its review of the record evidence which Nicholson cites, the precise moment in time when Darrow became distressed, pulseless, and cyanotic, is likely an important issue in resolving this case.  Good Samaritan has identified evidence -- which the Court concludes Nicholson has not refuted -- suggesting that once the EMTs arrived in Darrow's room, they became Darrow's primary caregiver.  See Greenamyer Depo. at 95:18-96:13 (testifying: "Once the EMS enters the patient's room it is their patient," and the nursing department "stands down"); Shriver Decl. ¶ 4, at 1(providing that, according to Shriver, "[c]are of Ms. Darrow was yielded to the emergency personnel when they arrived in the room").  Good Samaritan has also identified evidence which suggests that at that exact moment, when the EMT M10 team entered Darrow's room and took over her care, "Ms. Darrow was alert, had normal color, and was not exhibiting any respiratory distress."  Shriver Decl. ¶ 6, at 2 (providing that Shriver entered Darrow's room with three emergency medical personnel, and observed that "Ms. Darrow was alert and looked anxious, but had normal color and was not exhibiting any respiratory distress when we entered the room"); Pontius Decl. ¶ 8, at 2 (providing that Pontius "was in the room with Tia when the first emergency crew arrived.  At the time that they arrived, I had not left the room or Tia's side for at least fifteen minutes.  Three emergency personnel came into the room and Tia's care was transferred to them.  Immediately prior to their arrival, I had been sitting with Tia holding her hand and talking with Tia.  Tia was breathing and communicating with me immediately prior to and at the time of the emergency crew's arrival.  Tia was continuing to  receive supplemental oxygen at the time emergency crew arrived").  In her blanket objection to this assertion, Nicholson has referred the Court to the San Juan Report at 1-2 and the EMT Carey Report at 1-6, authored by a member of the second EMT team to arrive at Good Samaritan and two physicians who received Darrow at the hospital after transport, which contain notes and statements which represent the possibility that the EMT M10 took over Darrow's care after she had become distressed, pulseless, and cyanotic.  Response ¶ 9, at 4 (citing generally to EMT Carey Report at 1-6 (highlighting for the Court: (i) "Shortly after arrival the pt loses pulses"; (ii) "The pt's trach tube reportedly pulled out during a clothing change and is in respiratory distress and ventilation are being assisted via BVM [Bag Valve Mask] on ALS [Advanced Life Support] Arrival"; (iii) "The pt arrests and BLS [Basic Life Support] is done prior to ALS arrival.  Pulses return and then the pt loses pulses again we get her loaded into the ambulance"; (iv) "Arrive [at 8:25:00 a.m.] to find the pt attended by the M10 Crew.  They report that the pt went pulseless and they did CPR.  The pt now has pulses and is being assisted via BVM"; (v) Darrow is "Mental Status Unresponsive" from 8:25:00 a.m. until 8:59:00 a.m.; (vi) Darrow is "Cyanotic" at 8:35:00 a.m.; and, finally, (vii) Carey explains in a narrative summary that "M10 was dispatched to Good Samaritan for a medical transport for a pt with a 'tube fell out.'  When they arrive they reportedly find the pt to be cyanotic, her trach tube

arrived in Ms. Darrow's room, Ms. Darrow's lips began to turn blue, Ms. Darrow stated that she

could not breathe, and Ms. Darrow collapsed."    MSJ ¶ 12, at 6 (asserting this fact).    See

Response ¶ 9, at 4 (purporting to dispute this fact)(citing Emergency Medical Services Radio

Report at 1-6 (dated September 9, 2014)(authored and signed by EMTP Ryan Carey, paramedic

in second EMT Crew -- ALS team -- to arrive on scene), filed April 7, 2017 (Doc. 54-3)("EMT

Carey Report"); San Juan Regional Medical Center Departmental Report at 1-2 (dated

September 9, 2014)(authored by both Dr. Patrick Martin and Dr. Jarrad Francis Maiers), filed

April 7, 2017 (Doc. 54-4)("San Juan Report")).[8]    "Prior to the arrival of the EMTs, RN

---

displaced, and struggling to breath[e].  M10 immediately calls for ALS help."); San Juan Report
at 1-2 (highlighting for the Court: (i) a statement by a physician that "[p]atient was changing
clothes this morning and dislodged her trach.  The nursing home personnel was not able to put
the trach back in, as a result, the patient became profoundly dyspneic and then apneic.  When
EMS arrived, patient was blue and pulseless"; and (ii) another physician's impression of
Darrow's vital signs being, "[t]he symptoms have been occurring for 30 minute(s).  The
symptom(s) is/are severe.  Context/precipitation: trach fell out.  59 year old female at the nursing
home where staff was changing her clothing and her trach fell out.  EMS was called and a BLS
unit arrived on scene and found pt apneic and pulseless")).  This case is not one where the Court
is called to consider, perhaps, the effect on the secondary EMT team and hospital physicians of
information indicating that Darrow was distressed, pulseless, and cyanotic before the EMT M10
team began its care.  Nicholson identifies the representations that Darrow was distressed,
pulseless, and cyanotic before the EMT M10 team began its care in the San Juan Report and the
EMT Carey Report as proof of the truth of those representations.  The Court cannot, however,
look past the fact that neither of the three authors of the San Juan Report and the EMT Carey
Report had personal knowledge of Darrow's status when the EMT M10 team arrived in
Darrow's room; instead, the three authors simply restate as their own the reports of persons
whose care of Darrow preceded their own.  The Court, accordingly, cannot consider the authors
of the San Juan Report's, and the EMT Carey Report's, "[h]earsay testimony . . . because a third
party's description of a witness' supposed testimony is 'not suitable grist for the summary
judgment mill.'"  Wright v. Simmons v. City of Okla. City, 155 F.3d 1264, 1268 (10th Cir.
1998).  Because Nicholson has not, therefore, proffered admissible evidence which refutes Good
Samaritan's evidence supporting its assertion that, "[w]hen the EMTs arrived in Ms. Darrow's
room, Ms. Darrow was alert, had normal color, and was not exhibiting any respiratory distress. . .
.  [Or that w]hen the EMTs arrived in Ms. Darrow's room, Ms. Darrow's care was turned over to
the EMTs," MSJ ¶ 11, at 5-6, the Court deems that asserted fact undisputed.

[8]Nicholson, see Response ¶ 9, at 4, purports to dispute the Good Samaritan MSJ's

Greenamyer and other Good Samaritan employees were constantly checking on Ms. Darrow's oxygen saturation on the morning of September 9, 2014."[9]  MSJ ¶ 13, at 6 (asserting this fact).[10]

---

assertion that: "Approximately one minute after the EMT[]s arrived in Ms. Darrow's room, Ms. Darrow's lips began to turn blue, Ms. Darrow stated that she could not breathe, and Ms. Darrow collapsed."  MSJ ¶ 12, at 6 (citing Shriver Decl. ¶¶ 7-9, at 2 (stating that Shriver observed, after entering the room with the EMT M10 team, that in approximately one minute Darrow's lips started looking cyanotic, Darrow's oxygen saturation dropped to 85%, and Darrow then alerted all personnel that she could not breathe right before her face turned purple and she passed out)). Nicholson's Response purports to dispute this assertion by generally providing: "These facts are directly controverted by the Emergency Medical Services Report . . . and the San Juan Regional Medical Center documents . . . ."  Response ¶ 9, at 4 (citing generally to EMT Carey Report at 1-6 (highlighting for the Court: (i) "Shortly after arrival the pt loses pulses"; (ii) "The pt's trach tube reportedly pulled out during a clothing change and is in respiratory distress and ventilation are being assisted via BVM [Bag Valve Mask] on ALS [Advanced Life Support] Arrival"; (iii) "The pt arrests and BLS [Basic Life Support] is done prior to ALS arrival.  Pulses return and then the pt loses pulses again we get her loaded into the ambulance"; (iv) "Arrive [at 8:25:00 a.m.] to find the pt attended by the M10 Crew.  They report that the pt went pulseless and they did CPR.  The pt now has pulses and is being assisted via BVM"; (v) Darrow is "Mental Status Unresponsive" from 8:25:00 a.m. until 8:59:00 a.m.; (vi) Darrow is "Cyanotic" at 8:35:00 a.m.; and, finally, (vii) Carey explains in a narrative summary that "M10 was dispatched to Good Samaritan for a medical transport for a pt with a 'tube fell out.'  When they arrive they reportedly find the pt to be cyanotic, her trach tube displaced, and struggling to breath[e].  M10 immediately calls for ALS help."); San Juan Report at 1-2 (highlighting for the Court: (i) one physician's statement that "[p]atient was changing clothes this morning and dislodged her trach.  The nursing home personnel was not able to put the trach back in, as a result, the patient became profoundly dyspneic and then apneic.  When EMS arrived, patient was blue and pulseless"; and (ii) another physician's impression of Darrow's vital signs when care began at the hospital, "[t]he symptoms have been occurring for 30 minute(s).  The symptom(s) is/are severe.  Context/precipitation: trach fell out.  59 year old female at the nursing home where staff was changing her clothing and her trach fell out.  EMS was called and a BLS unit arrived on scene and found pt apneic and pulseless")).

The Court considers Nicholson's same proffer of evidence <u>supra</u> n.7, and concludes that the Court cannot properly consider the San Juan Report, and the EMT Carey Report, author's "[h]earsay testimony . . . because a third party's description of a witness' supposed testimony is 'not suitable grist for the summary judgment mill.'"  <u>Wright v. Simmons v. City of Okla. City</u>, 155 F.3d at 1268.  Because Nicholson has not, therefore, proffered admissible evidence which refutes Good Samaritan's evidence supporting its assertion that, "[a]pproximately one minute after the EMT[]s arrived in Ms. Darrow's room, Ms. Darrow's lips began to turn blue, Ms. Darrow stated that she could not breathe, and Ms. Darrow collapsed," MSJ ¶ 12, at 6, the Court deems that asserted fact undisputed.

[9]<u>See</u> Response ¶ 9, at 4 (purporting to dispute this fact).  Nicholson, <u>see</u> Response ¶ 9, at

4, purports to dispute the Good Samaritan MSJ's assertion that, "[p]rior to the arrival of the EMTs, RN Greenamyer and other Good Samaritan employees were constantly checking on Ms. Darrow's oxygen saturation on the morning of September 9, 2014." MSJ ¶ 13, at 6 (citing Greenamyer Depo. at 47:17-48:8 (testifying that Darrow was "constantly under assessment" for her oxygen saturation using "a pulse oximeter . . . that was always on her finger" and gave a reading "every minute," and that Darrow's oxygen saturation was always at the normal range when Greenamyer was the nurse in the room monitoring)). Nicholson's Response purports to dispute this assertion by generally providing: "These facts are directly controverted by the Emergency Medical Services Report . . . and the San Juan Regional Medical Center documents . . . ." Response ¶ 9, at 4 (citing generally to EMT Carey Report at 1-6 (highlighting for the Court: (i) "Shortly after arrival the pt loses pulses"; (ii) "The pt's trach tube reportedly pulled out during a clothing change and is in respiratory distress and ventilation are being assisted via BVM [Bag Valve Mask] on ALS [Advanced Life Support] Arrival"; (iii) "The pt arrests and BLS [Basic Life Support] is done prior to ALS arrival. Pulses return and then the pt loses pulses again we get her loaded into the ambulance"; (iv) "Arrive [at 8:25:00 a.m.] to find the pt attended by the M10 Crew. They report that the pt went pulseless and they did CPR. The pt now has pulses and is being assisted via BVM"; (v) Darrow is "Mental Status Unresponsive" from 8:25:00 a.m. until 8:59:00 a.m.; (vi) Darrow is "Cyanotic" at 8:35:00 a.m.; and, finally, (vii) Carey explains in a narrative summary that "M10 was dispatched to Good Samaritan for a medical transport for a pt with a 'tube fell out.' When they arrive they reportedly find the pt to be cyanotic, her trach tube displaced, and struggling to breath[e]. M10 immediately calls for ALS help."); San Juan Report at 1-2 (highlighting for the Court: (i) one physician's statement that "[p]atient was changing clothes this morning and dislodged her trach. The nursing home personnel was not able to put the trach back in, as a result, the patient became profoundly dyspneic and then apneic. When EMS arrived, patient was blue and pulseless"; and (ii) another physician's impression of Darrow's vital signs when care began at the hospital, "[t]he symptoms have been occurring for 30 minute(s). The symptom(s) is/are severe. Context/precipitation: trach fell out. 59 year old female at the nursing home where staff was changing her clothing and her trach fell out. EMS was called and a BLS unit arrived on scene and found pt apneic and pulseless")).

The Court considers Nicholson's same proffer of evidence supra nn.7-8, and concludes that the Court cannot properly consider the San Juan Report, and the EMT Carey Report, author's "[h]earsay testimony . . . because a third party's description of a witness' supposed testimony is 'not suitable grist for the summary judgment mill.'" Wright v. Simmons v. City of Okla. City, 155 F.3d at 1268. Because Nicholson has not, therefore, proffered admissible evidence which refutes Good Samaritan's evidence supporting its assertion that, "[p]rior to the arrival of the EMTs, RN Greenamyer and other Good Samaritan employees were constantly checking on Ms. Darrow's oxygen saturation on the morning of September 9, 2014," MSJ ¶ 13, at 6, the Court deems that asserted fact undisputed.

[10]Good Samaritan next asserts: "Plaintiff has no evidence of what caused Ms. Darrow to suddenly stop breathing on September 9, 2014." MSJ ¶ 14, at 6 (citing Deposition of Dr. Jane Winston at 50:24-51:15 (taken December 1, 2016), filed March 10, 2017 (Doc. 48-6)("Winston Depo.")(testifying, in response to a question regarding whether she had an opinion -- in her

It cannot be determined "without speculating whether secretions or an airway obstruction or something else caused Tia Darrow to stop breathing." MSJ ¶ 15, at 6 (asserting this fact).[11]

---

review of the records -- why Darrow stopped breathing when her oxygen saturation had been at 93%: "I don't have a particular opinion about that")). Nicholson disputes this assertion, providing: "Plaintiff denies Defendant's Statement of Fact[] No[]. 14[]. Dr. Winston clearly opined that the Defendant's employee's actions 'led to the prolonged period without oxygen that caused Ms. Darrow's severe anoxic brain damage and death.'" Response ¶ 10, at 4 (citing Report by Jane Winston, M.D., F.A.A.F.P., C.M.D., passim (delivered October 7, 2016), filed April 7, 2017 (Doc. 54-5)("Dr. Winston Report")("It is my opinion, based on reviewing these records, that the Good Samaritan Society Four Corners staff failed to act promptly and appropriately when Ms. Darrow's tracheostomy tube was dislodged and she developed respiratory distress. Staff members interviewed indicated that they were not aware of the facility's policies and procedures regarding tracheostomy dislodgment management, and did not receive formal training in tracheostomy care and management. . . . Their actions led to the prolonged period without oxygen that caused Ms. Darrow's severe anoxic brain damage and death."); Winston Depo. at 6:9-21, filed with the Response on April 7, 2017 (Doc. 54-6)(testifying Dr. Winston had not changed her opinion in the Dr. Winston Report at the time of the deposition); Winston Depo. at 19:10-20 (testifying to the same opinion). Good Samaritan, in its Reply, argues that the evidence proffered to dispute its assertion "has no bearing on the medical cause of Ms. Darrow's breathing loss. Plaintiff cannot escape the fact that her own expert conceded that she did not 'have a particular opinion' about why Ms. Darrow suddenly stopped breathing when her oxygen saturation had been at 93%." Reply ¶ 14, at 11-12 (emphasis in original). The Court disagrees with the contention that Good Samaritan Reply's assertion has not been disputed; in its Response, Nicholson has proffered Dr. Winston's expert testimony, which suggests that the general cause of Darrow being in the position and circumstance where her oxygen saturation fell from 93%, impacting her eventual severe anoxic brain damage and death, was Good Samaritan staff's "failure to act promptly and appropriately when Ms. Darrow's tracheostomy tube was dislodged," because "[t]heir actions led to the prolonged period without oxygen that caused Ms. Darrow's severe anoxic brain damage and death." Good Samaritan did not initially assert that Nicholson has no evidence as to the precise medical reason of what caused Darrow to stop breathing. The Court notes, for clarity's sake, that, supra n.1, it was asked by the parties to consider the fact that, after Greenamyer called 911 for nonemergency transport, Darrow's body became positioned in such a way that it caused her oxygen saturation to fall to 85%. That occasion is evidence on the record. The Court, accordingly, deems Good Samaritan's assertion of fact -- "Plaintiff has no evidence of what caused Ms. Darrow to suddenly stop breathing on September 9, 2014," MSJ ¶ 14, at 6 -- disputed.

[11]See Response ¶ 10, at 4 (purporting to dispute this fact). Nicholson, see Response ¶ 10, at 4, purports to dispute the Good Samaritan MSJ's assertion: "Plaintiff's expert was unable to determine without speculating whether secretions or an airway obstruction or something else caused Tia Darrow to stop breathing." MSJ ¶ 15, at 6 (citing Deposition of Dr. Jane Winston at 86:19-87:2 (taken December 1, 2016), filed March 10, 2017 (Doc. 48-6)("Winston

Good Samaritan's "employees[, though,] waited over twenty (20) minutes after describing Ms. Darrow's condition to EMS personnel as non-emergent, before deciding to upgrade it to an emergency situation." Response ¶ 11,[12] at 5 (asserting this fact). See Reply ¶ AF 1,[13] at 12 (not

_____

Depo.")(testifying there was "no evidence one way or the other to tell us" whether she had secretions blocking her airway); Winston Depo. at 132:18-22 (testifying she would be "speculating as to whether the ineffectiveness or apparent ineffectiveness of the bagging reflected an obstruction or an improper use of equipment or something else"); 147:2-148:14 (testifying that the purpose of the tracheostomy tube is to "keep the entrance into the trachea open or patent," and also indicating that a patient could eventually be weaned off of a tracheostomy tube as the stoma, or entrance to the trachea, matured; and also testifying that here, the stoma was not immature, but that it would be speculation "to say that it was not able to remain patent"); 129:3-21, 124:7-13 (testifying that Dr. Winston did not know exactly why the EMTs were unable to resuscitate Darrow by using an Ambu bag to deliver oxygen, but suggesting it could have been unsuccessful due to a trachea blockage or improper use of equipment). Nicholson disputes this assertion, providing: "Plaintiff denies Defendant's Statement of Fact[] No[]. []15. Dr. Winston clearly opined that the Defendant's employee's actions 'led to the prolonged period without oxygen that caused Ms. Darrow's severe anoxic brain damage and death.'" Response ¶ 10, at 4 (citing Dr. Winston Report, passim ("It is my opinion, based on reviewing these records, that the Good Samaritan Society Four Corners staff failed to act promptly and appropriately when Ms. Darrow's tracheostomy tube was dislodged and she developed respiratory distress. Staff members interviewed indicated that they were not aware of the facility's policies and procedures regarding tracheostomy dislodgment management, and did not receive formal training in tracheostomy care and management. . . . Their actions led to the prolonged period without oxygen that caused Ms. Darrow's severe anoxic brain damage and death."); Winston Depo. at 6:9-21 (testifying Dr. Winston had not changed her opinion in the Dr. Winston Report at the time of the deposition); Winston Depo. at 19:10-20 (testifying to the same opinion)). The evidence that Nicholson proffers supports an argument regarding a general cause for Darrow being in a position where she would be unable to breathe. The evidence does not, however, particularly dispute Good Samaritan's assertion regarding Dr. Winston's inability to take a position as to the exact medical reason why Darrow stopped being able to breathe and could not be resuscitated. In that regard, Good Samaritan has made an accurate assertion regarding Dr. Winston's testimony, and, Nicholson has not refuted that testimony with contrary evidence. See D.N.M. LR-Civ. 56(b). Accordingly, the Court deems Good Samaritan's assertion -- "Plaintiff's expert was unable to determine without speculating whether secretions or an airway obstruction or something else caused Tia Darrow to stop breathing," MSJ ¶ 15, at 6 -- undisputed.

[12]The Response numbers anew, beginning with "¶ 1," its proffer of additional material facts. See Response at 5-6. The Response ended its responses to the assertions in Good Samaritan's MSJ with ¶ 10. For ease of reading, the Court will instead refer to the Response's proffers of additional facts as beginning with "¶ 11."

disputing this fact).[14]  A "lack of oxygen for four (4) to six (6) minutes can cause severe brain

_____

[13]The Reply responds to the Response's proffers of additional material facts with paragraphs labeled "AF 1" through "AF 9."

[14]The Response asserts: "After the EMS was notified that this was an emergent situation, it took only about three (3) minutes for advanced life support to arrive at Defendant's facility." Response ¶ 12, at 5 (citing Greenamyer Depo. at 85 (testifying that she logged, after her "call for nonemergent transfer, upgraded to emergent when resident became anxious.  [And t]he EMTS arrived 8:18, three minutes after status upgrade to emergent.").  The Reply disputes this assertion, because the cited Greenamyer testimony is regarding "when the first EMT[]s arrived," and not the advanced life support crew, of which EMT Carey was a member.  Reply ¶ AF 2, at 12-13 (arguing that according to the 911 Incident Report at 1-3, "the first crew to arrive was M10 which was not an ALS crew[; t]he actual evidence regarding various arrivals establishes: (1) RN Greenamyer requested an emergency response at 8:13:48 a.m.; (2) M10, the crew that had been dispatched as a result of RN Greenamyer's 7:43 a.m. call, arrived on scene at 8:15:42 a.m.; [and] (3) Ryan Carey, the first ALS responder, arrived on scene at 8:24:22 a.m.").  The 911 Incident Report confirms that Nicholson's assertion is inaccurate, because Carey and the advanced life support team arrived on scene at 8:24:22 a.m., whereas the M10 EMT team arrived, about three minutes after the emergency upgrade, at 8:13:48 a.m.  The Court, accordingly, does not adopt the Response's assertion that, "[a]fter the EMS was notified that this was an emergent situation, it took only about three (3) minutes for advanced life support to arrive at Defendant's facility," Response ¶ 12, at 5, because it is inaccurate.  The Court concludes, however, that the record bears out that the Reply's timeline of events is accurate and supported by the evidence.

Nicholson's Response also asserts: "By the time EMS responded, they noted Ms. Darrow was cyanotic, shortly after which she became pulseless."  Response ¶ 13, at 5 (citing generally to EMT Carey Report at 1-6 (highlighting for the Court: (i) "Shortly after arrival the pt loses pulses"; (ii) "The pt's trach tube reportedly pulled out during a clothing change and is in respiratory distress and ventilation are being assisted via BVM [Bag Valve Mask] on ALS [Advanced Life Support] Arrival"; (iii) "The pt arrests and BLS [Basic Life Support] is done prior to ALS arrival.  Pulses return and then the pt loses pulses again we get her loaded into the ambulance"; (iv) "Arrive [at 8:25:00 a.m.] to find the pt attended by the M10 Crew.  They report that the pt went pulseless and they did CPR.  The pt now has pulses and is being assisted via BVM"; (v) Darrow is "Mental Status Unresponsive" from 8:25:00 a.m. until 8:59:00 a.m.; (vi) Darrow is "Cyanotic" at 8:35:00 a.m.; and, finally, (vii) Carey explains in a narrative summary that "M10 was dispatched to Good Samaritan for a medical transport for a pt with a 'tube fell out.'  When they arrive they reportedly find the pt to be cyanotic, her trach tube displaced, and struggling to breath[e].  M10 immediately calls for ALS help."); San Juan Report at 1-2 (highlighting for the Court: (i) a statement by a physician that "[p]atient was changing clothes this morning and dislodged her trach.  The nursing home personnel was not able to put the trach back in, as a result, the patient became profoundly dyspneic and then apneic.  When EMS arrived, patient was blue and pulseless"; and (ii) another physician's impression of Darrow's vital signs being, "[t]he symptoms have been occurring for 30 minute(s).  The symptom(s) is/are

- 24 -

severe.  Context/precipitation: trach fell out.  59 year old female at the nursing home where staff was changing her clothing and her trach fell out.  EMS was called and a BLS unit arrived on scene and found pt apneic and pulseless")).  The Court considers Nicholson's same proffer of evidence supra nn.7-9, and concludes that the Court cannot consider the San Juan Report, and the EMT Carey Report, author's "[h]earsay testimony . . . because a third party's description of a witness' supposed testimony is 'not suitable grist for the summary judgment mill.'"  Wright v. Simmons v. City of Okla. City, 155 F.3d at 1268.  Because Nicholson has not, therefore, proffered admissible evidence supporting her assertion that, "[b]y the time EMS responded, they noted Ms. Darrow was cyanotic, shortly after which she became pulseless," Response ¶ 13, at 5, the Court deems that assertion is lacking evidentiary support in the record, agreeing with the Reply's dispute that the "Plaintiff has failed to support her AF 3," Reply ¶ AF 3, at 13.

Nicholson's Response also asserts: "According to the medical records, Ms. Darrow complained she was not able to breath[e] as soon as the trach came out."  Response ¶ 14, at 5 (citing Deposition of Dr. Jane Winston at 30 (taken December 1, 2016), filed March 10, 2017 (Doc. 48-6)("Winston Depo.")(testifying that Winston's "timeline assumes . . . that that's when she complained of difficulty breathing," at "0812 hours," and that it was Winston's interpretation "of the Good Samaritan records that it was at 8:12 or thereabouts that the nurse requested a nonemergent transfer to the hospital")).  The Reply first concedes that Darrow complained of difficulty breathing at 8:12 .a.m., but disputes this assertion in totality, arguing that the "Plaintiff improperly directs the Court to her expert witness' characterization of what the records supposedly show," and, additionally, that "Dr. Winston testified that she thought that Ms. Darrow complained of difficulty breathing beginning at 8:12 a.m. -- not from the time when the trach was dislodged that morning."  Reply ¶ AF 4, at 13.  Putting aside the discrepancy in Dr. Winston's testimony regarding the timeline, the Court considers Nicholson's similar proffer of evidence, see supra n.1, and concludes that Darrow's difficulty breathing is not the same as Darrow's ability to breathe and oxygenate.  The record, accordingly, indicates that Darrow was able to breathe and communicate with Greenamyer and the other Good Samaritan staff, despite not having her tracheostomy tube, for an extended period of time before the EMT arrival.  See supra n.1.  The Court concludes that Good Samaritan's Reply has successfully refuted Nicholson's assertion of fact -- "[a]ccording to the medical records, Ms. Darrow complained she was not able to breath[e] as soon as the trach came out," Response ¶ 14, at 5 -- because Dr. Winston testified as to Darrow's difficulty breathing at 8:12 a.m., and not "as soon as the trach came out," Response ¶ 14, at 5.  Nicholson's assertion of fact, as phrased, lacks support in the record evidence, and the Court will not adopt the asserted fact as undisputed.  The Court does, however, consider the record to reflect Darrow's complaint about her difficulty breathing occurring at 8:12 a.m., see supra n.1, and the Reply concedes the fact, see Reply ¶ AF 4, at 13.  To the extent that fact was asserted or was in dispute, the Court deems it undisputed that Darrow complained of difficulty breathing at 8:12 a.m.

Nicholson next asserts: "According to the medical records, Ms. Darrow was deprived of oxygen at 8:12 a.m., and by the time the non-emergent team arrived, she was found cyanotic and blue which is when advanced life support was called."  Response ¶ 15, at 5 (citing Winston Depo. at 33).  Dr. Winston testified that we

have at 8:12 difficulty breathing, her respiratory rate was elevated above normal,

damage . . . ."  Response ¶ 16, at 5 (asserting this fact)(citing Deposition of Dr. Jane Winston at

30 (taken December 1, 2016), filed March 10, 2017 (Doc. 48-6)("Winston Depo.")).[15]

_____

> her oxygen level was within normal range with oxygen recorded as being applied.
> Five minutes later, at 8:18, when the nonemergent transport team arrived, she was
> cyanotic or blue, recorded as struggling to breathe; ALS was contacted, advanced
> life support.  She was found to not have a pulse and CPR was started at 0823.
> That's the time period that until she -- I misspoke.  I would -- that's the time
> period that was probably the initial onset of lack of oxygen . . . when she began to
> complain of difficulty breathing [at 8:12 a.m.].

Winston Depo. at 33.  The Reply first takes issue with this assertion by arguing that "Plaintiff
has failed to introduce any admissible evidence that Ms. Darrow was blue when the first group of
EMTs arrived," an issue the Court considers supra nn.7-9,14.  Nicholson has not proffered
admissible evidence to support her assertion that Darrow was found to be cyanotic by the M10
EMTs who first arrived on scene.  The Court, accordingly, deems that assertion is lacking
support in the record evidence and will not adopt Nicholson's assertion in that regard.  The
Reply also argues that Dr. Winston testified that Darrow would "not have been able to talk once
she experienced severe anoxic brain damage," and that, "approximately one minute after the
EMTs arrived, Ms. Darrow stated that she could not breathe . . . Darrow thus could not have
experienced brain damage or been unconscious prior to the arrival of the EMTs."  Reply ¶ AF 5,
at 13-14 (citing Winston Depo. at 56:7-57:4, filed with the Reply on April 20, 2017 (Doc. 65-
4)(testifying that a patient undergoing anoxic brain damage generally would not gain the
neurological function to be able to speak)).  The Court, accordingly, must also deem that there is
no evidentiary support for the statement that Darrow was wholly "deprived of oxygen at 8:12
a.m.," because she continued to communicate with Good Samaritan and EMT personnel
thereafter.  Response ¶ 5, at 5.

      [15]See Reply ¶ AF 6, at 14 (not disputing this fact).  Nicholson further asserts, however,
that "Ms. Darrow was without adequate oxygenation to her brain for at least one half hour,"
Response ¶ 16, at 5 (citing Winston Depo. at 35 (testifying "I would determine that in this case,
as I stated, at 8:12 when she developed difficulty breathing and became anxious until the time
that her airway was secured at -- when the tube was replaced at 8:42 would represent a prolonged
period")).  The Reply disputes this assertion, stating that the "Plaintiff has no evidence that Ms.
Darrow stopped breathing at 8:12 a.m., and the undisputed evidence in fact establishes that Ms.
Darrow continued to breathe, have normal color, and normal oxygen saturation until after the
EMTs arrived."  Reply ¶ AF 6, at 14.  The Court considers the Reply's proffer of evidence supra
nn.1-6, and concludes that there is evidence of only one occasion where Darrow's oxygen
saturation dropped below normal in the time preceding the EMT's arrival.  The Court, also,
concludes, see supra n.7, that, once the EMTs arrived in the patient's room, care transferred to
them, and that, right as they arrived, there was no evidence of lower than normal oxygen
saturation, see supra nn.5-6.  To the extent, then, that the asserted fact relates to the time during
which Darrow was under Good Samaritan's care -- from 8:12:00 a.m. to 8:15:42, see 911

Regarding Darrow's eventual hypoxic state, the "most likely cause was inadequate airway and inadequate intake of oxygen which caused the cardia[c] arrest." Response ¶ 17, at 5 (asserting this fact).[16]    "[I]nadequate airway intake was the proximate cause of Ms. Darrow's

_____

Incident Report at 2 -- it is undisputed that the admissible record evidence presented to the Court indicates only "that Ms. Darrow continued to breathe, have normal color, and normal oxygen saturation until after the EMTs arrived," Reply ¶ AF 6, at 14, save for the occasion where her oxygen saturation dropped briefly to 85%, see supra nn.5-6. Accordingly, the Court will not adopt Nicholson's assertion as it is presently phrased, is lacking support in the record evidence.

[16]See Reply ¶ AF 7, at 14 (not disputing this fact regarding Dr. Winston's opinion). Nicholson also asserts, however, that "Ms. Darrow became hypoxic without [sic] one or two minutes after 8:12 a.m." Response ¶ 17, at 5 (citing Winston Depo. at 50). Dr. Winston testified that,

> it's my opinion that when the patient became anxious and complained of difficulty breathing at 0812 she exhibited an elevated respiratory rate and probably developed hypoxia which can develop quite quickly and was noted to be clinically hypoxic at 8:18 when the first crew arrived when she was noted to be cyanotic. . . .   Based on her -- the staff description of anxiety, that's a frequent sign of impeding respiratory failure or respiratory distress when a person become anxious. The fact that her respiratory rate was slightly elevated is -- those are both indicators to me that, based on my training and experience, I would judge she would become hypoxic within one to two minutes following 0812 hours.

Winston Depo. at 50. The Reply disputes Nicholson's assertion, because

> Dr. Winston's speculation about when Ms. Darrow began to develop hypoxia is not evidence, and contradicts the facts established in the record, that Ms. Darrow was normally oxygenated at 8:12 and 8:14 a.m. . . . and was normally oxygenated, normally colored, and able to communicate verbally when the EMTs arrived.

Reply ¶ AF 7, at 14. The Court, in contrast, considers that the nature of Nicholson's assertion is that, in her expert's opinion, and based upon the expert's review of the record evidence, Darrow's anxiety at 8:12 a.m. can be identified as a viable beginning point for Darrow's devolution into hypoxia. The Response has, in that regard, proffered evidence -- based upon her expert's consideration of Greenamyer's observations of anxiety and subsequent call to 911 to upgrade Darrow's transport -- that, although there is no evidence that Darrow was cyanotic upon the M10 EMT team's arrival, devolution into hypoxia may have occurred rapidly following Darrow's presentation of anxiety. Good Samaritan has not proffered evidence to suggest that Darrow did not present the symptoms of anxiety which prompted Greenamyer to upgrade Darrow's 911 transport; instead, Good Samaritan has also proffered that exact evidence for the

unconsciousness and hypoxia."[17]  "Defendant's employee, Nurse Green[amyer], was not aware of any policy implemented by Defendant as to what should be done when a patient's trach was dislodged."[18]

---

Court supra n.5.  See MSJ ¶ 8, at 5.  Whether Darrow became hypoxic, in accordance with Dr. Winston's expert opinion, as rapidly following the presentation of anxiety as Dr. Winston suggests, is nonetheless a matter that is in dispute.  The Court thus deems Nicholson's assertion that "Ms. Darrow became hypoxic without [sic] one or two minutes after 8:12 a.m," Response ¶ 17, at 5, disputed, because Nicholson proffers expert evidence regarding the interaction between Darrow's anxiety and her devolution into hypoxia which suggests a potentially rapid series of events.  The Court is not asked to weigh the evidence at this stage, and whether any disputed facts are material to the Court's eventual determination of the merits of the MSJ, however, is a matter the Court will address in its analysis.  See O'Brien v. Mitchell, 883 F. Supp. 2d at 1058 n.1.

[17]Response ¶ 18, at 6 (asserting this fact)(citing Winston Depo. at 50).   Again, Dr. Winston testified that,

> it's my opinion that when the patient became anxious and complained of difficulty breathing at 0812 she exhibited an elevated respiratory rate and probably developed hypoxia which can develop quite quickly and was noted to be clinically hypoxic at 8:18 when the first crew arrived when she was noted to be cyanotic. . . .  Based on her -- the staff description of anxiety, that's a frequent sign of impeding respiratory failure or respiratory distress when a person become anxious.  The fact that her respiratory rate was slightly elevated is -- those are both indicators to me that, based on my training and experience, I would judge she would become hypoxic within one to two minutes following 0812 hours.

Winston Depo. at 50.  See Reply ¶ AF 8, at 14 (disputing this fact as immaterial).  The Reply does not dispute Nicholson's assertion regarding her expert's opinion as to proximate cause, and only contests it as being "not material."  Reply ¶ AF 8, at 14   Whether or not this assertion is material to resolution of the dispute presently at issue, however, is a matter for the Court's analysis section.  See O'Brien v. Mitchell, 883 F. Supp. 2d at 1058 n.1.

[18]Response ¶ 19, at 6-7 (asserting this fact)(citing Greenamyer Depo. at 193 (testifying that "I don't know of any policy about" when "a trach comes out")).  See Reply ¶ AF 9, at 14-15 (disputing this fact as immaterial).  The Reply does not dispute Nicholson's assertion regarding Greenamyer's knowledge of a relevant policy at Good Samaritan, and only contests it as being "not material."  Reply ¶ AF 9, at 14-15.  Whether or not this assertion is material to resolution of the dispute presently at issue, however, is a matter for the Court's analysis section.  See O'Brien v. Mitchell, 883 F. Supp. 2d at 1058 n.1.

## PROCEDURAL HISTORY

Nicholson filed the Complaint in the United States District Court for the District of New Mexico on March 7, 2016.  By the Complaint, Nicholson asserts a claim, pursuant to New Mexico's Wrongful Death Act, N.M. Stat. Ann. § 41-2-1 et seq, as the personal representative of her daughter's estate, and for "the medical negligence and other negligence which led to the death of Plaintiff's daughter, Tia L. Darrow."  Complaint at 1; id. ¶ 12, at 3.  Nicholson asserts that Darrow's

> death was a direct result of the negligence of Defendant, its agents, representatives and employees.  These people and the Defendant failed to use appropriate procedures and care to ensure that Ms. Darrow could and would survive the conditions for which she was admitted to Defendant's Four Corner's Village facility.  Specifically, the Defendant's Four Corner's Village staff failed to act promptly and appropriately when Ms. Darrow's trache[os]tomy tube was dislodged.  This led to a prolonged period where Ms. Darrow was without oxygen which, in turn, led to anoxic encephalopathy, and ultimately her death.

Complaint ¶ 11, at 3.  In light of her assertions of Good Samaritan's negligence, Nicholson requests that the Court enter a judgment sufficient to compensate Plaintiff's Estate

> requests that the Court enter a judgment sufficient to compensate Plaintiff's Estate for all damages appropriate under the New Mexico Wrongful Death Act including but not limited to pain, suffering, emotional and mental distress, for lost earning and lost earning capacity, for loss of parental guidance and counseling, reasonable funeral expenses, medical and medically related expenses, enhanced damages as provided for by the New Mexico Wrongful Death Act due to aggravating circumstances related to Ms. Darrow's death, punitive damages against the Defendant, its agents and employees, costs of suit, pre- and post-judgment interest, and such further relief as the Court deems just and proper.

Complaint ¶ 12, at 3.

### 1.    The MSJ.

The MSJ begins by explaining that Nicholson is seeking to hold Good Samaritan "liable for the death of Decedent Tia Darrow, [because] Good Samaritan caused Ms. Darrow's death by failing to timely call 911 when Darrow's tracheostomy became dislodged."  MSJ at 1.  Good Samaritan argues, however, that "New Mexico law requires Plaintiff to prove that Good

Samaritan's alleged omission was the cause of Ms. Darrow's demise," and that the "Plaintiff has no evidence to satisfy this essential element of her claim, and summary judgment should be entered."  MSJ at 1.  Essentially, then, the MSJ previews its argument: the "Plaintiff has no evidence regarding Ms. Darrow's lapse in breathing on the day in question, and has no evidence that an earlier call to 911 would have made any difference in Ms. Darrow's outcome."  MSJ at 1.

> Regarding the applicable law, Good Samaritan explains:

> Under New Mexico law, a plaintiff must prove "the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based upon a standard of reasonable care, and the breach being a proximate cause arid cause in fact of the plaintiff s damages" in order to establish a prima facie case of negligence.  *Herrera v. Quality Pontiac*, 2003-NMSC-018, ¶ 6, 134 N.M. 43, 73 P.3d 181; *see also Tafoya v. Seay Bros. Corp.*, 119 N.M. 350, 352, 890 P.2d 803, 805 (1995)(noting that negligence consists of "duty, breach, proximate cause, and damages").  While breach of a duty and proximate cause are generally questions of fact for the jury, the Court is permitted to enter summary judgment when reasonable minds cannot differ regarding a particular set of facts.  *See Tanuz v. Carlberg*, 1996-NMCA-076, ¶ 14, 122 N.M. 113, 921 P.2d 309.

MSJ at 7.  Accordingly, Good Samaritan contends that there "are no facts under which Good Samaritan could be found to have breached a duty to Decedent or to have negligently caused Decedent's death."  MSJ at 7.  In support, Good Samaritan first avers that Nicholson cannot establish that Good Samaritan breached any duty it owed to Darrow.  See MSJ at 7.  In this medical malpractice resulting in wrongful death context, Good Samaritan provides Nicholson "must introduce expert testimony establishing Good Samaritan breached a duty," and that here Nicholson's theory is that "Good Samaritan had a duty to call for emergency transportation more quickly and that Good Samaritan breached this duty when it requested a non-emergency transport for Ms. Darrow (who was not in distress, breathing normally, and not in an emergency medical situation)."  MSJ at 8.  Good Samaritan then argues that Nicholson has not proffered

> admissible expert testimony that establishes that Good Samaritan had, and breached, a duty to procure emergency transportation for a resident who was

> exhibiting no signs of respiratory distress. Whether 911 should have been called earlier is not a subject within the scope of the jury's knowledge. Tracheostomy care, and the appropriate response when a tracheostomy is accidentally dislodged, is not within the scope of a lay juror's ordinary knowledge. And, the notion that an emergency response is required (as claimed by Plaintiff) when a patient is breathing normally, in no distress, and has normal oxygenation is not the type of issue that the jury can resolve without the assistance of expert nursing testimony.

MSJ at 8 (emphasis omitted). Good Samaritan then references another motion it filed to exclude Nicholson's expert's testimony, because she is only a doctor who has no experience "with nursing standards of care," and thus Nicholson fails to proffer the requisite expert testimony for her case. MSJ at 8.

Good Samaritan also argues that Nicholson cannot establish that Good Samaritan's alleged breach was the proximate cause of Darrow's death. See MSJ at 9. Here, Good Samaritan explains, while the

> Plaintiff has asserted various theories of how Good Samaritan was negligent -- supposed inadequate training, supposed inadequate response to the accidental removal of Tia Darrow's trach, and supposed lack of a proper care plan regarding how to respond to removal of the trach -- all of these theories boil down to an alleged failure by Good Samaritan to more quickly request an emergency response by EMS.

MSJ at 9-10. That is, Nicholson's "but-for causation theory is that Good Samaritan caused [Darrow's] death by not more quickly calling for emergency medical transportation to the hospital." MSJ at 10.

> Given that Plaintiff's claim centers entirely around Good Samaritan's alleged failure [to] call earlier for emergency transportation to the hospital, Plaintiff must introduce expert medical testimony that establishes to a reasonable medical probability that the alleged negligent acts of Good Samaritan caused Tia Darrow's death -- i.e., that if Good Samaritan had called earlier for emergency transportation to the hospital, Ms. Darrow would not have gone into respiratory distress and died.

MSJ at 10. Good Samaritan maintains that Nicholson has not identified expert medical testimony which establishes that "Darrow stopped breathing and died because of Good

- 31 -

Samaritan's alleged negligence," because, first, Nicholson cannot "prove the cause of Ms.
Darrow's lapse in breathing on the morning of September 9, 2014 and thus cannot prove that
Good Samaritan caused that lapse or Ms. Darrow's subsequent death."    MSJ at 10-11.
According to Good Samaritan:

> The causation questions in this case are . . . whether Good Samaritan's alleged
> negligence in not requesting an earlier emergency response caused Tia Darrow's
> cessation of breathing shortly after arrival of the EMTs and whether Good
> Samaritan's alleged negligence in not requesting an earlier emergency response
> caused Ms. Darrow's death.   The answer to both of these questions is
> unequivocally no.

MSJ at 12.

At this point in its argument, Good Samaritan concedes that something occurred which
caused Darrow "to go from being able to breathe normally without her trach, with no respiratory
distress, and able to communicate, to a situation in which she suddenly could not maintain an
adequate oxygenation level and lost consciousness," but maintains that the "change occurred
shortly *after* the 8:18 a.m. arrival of the EMTs on the morning of September 9 -- some time after
Ms. Darrow's trach was dislodged and after Ms. Darrow had been breathing without incident for
a period of time."  MSJ at 12.  The issue, then, that Good Samaritan identifies, is:

> In order for the jury to find that Good Samaritan's alleged negligence in not more
> quickly calling for emergency transportation was the cause of Ms. Darrow's
> sudden loss of the ability to breathe, Plaintiff must prove what caused Ms.
> Darrow's breathing loss.  But Dr. Winston, Plaintiff's retained expert witness,
> was unable to identify what caused Ms. Darrow to stop breathing after having
> been able to breathe without any problem for a period of time following the
> accidental dislodgement of Ms. Darrow's trach.  Instead, she testified only that
> Ms. Darrow had  inadequate  oxygenation.

MSJ at 12.  As to the medical cause of that inadequate oxygenation, Good Samaritan argues that
"Dr. Winston acknowledged that there were numerous things that could have caused Ms.
Darrow's breathing loss and the EMTs inability to revive her with an ambu bag, but that she

could not rule in or out any specific cause." MSJ at 13. Good Samaritan thus asserts "Plaintiff has no evidence of what caused Ms. Darrow to stop breathing after the arrival of EMTs," and is thus "missing an essential element of her claims -- proximate cause . . . ." MSJ at 14.

Good Samaritan also contends that Nicholson "has no evidence that an earlier call would have resulted in a different response by EMS," because it is undisputed

> that after it became apparent the Good Samaritan's staff could not reinsert Ms. Darrow's trach at Good Samaritan, Good Samaritan called 911 and asked for non-emergency transportation. . . . The purpose of this transportation was to take Ms. Darrow, who was breathing normally, had normal oxygenation, and had normal color, to the hospital for reinsertion of the trach. . . . It is also undisputed that as soon as Ms. Darrow began to exhibit signs of anxiety, Good Samaritan called 911 and asked for an emergency transport rather than the non-emergency transport that was already on the way. . . . Thus, at the time the call was made for emergency transportation, EMTs were already on their way to Good Samaritan.

MSJ at 14-15. Here, Good Samaritan identifies that Nicholson's theory of causation is that she would not have died,

> if, as we discussed and I stated earlier, 911 had been contacted at the time that the trach came out . . . and they responded within -- they responded in three minutes. If they had responded even within six or eight minutes, they would have arrived during the time where -- before she became anxious and experienced difficulty breathing.

MSJ at 15 (citing Winston Depo. at 182:11-21). Good Samaritan argues, alternatively, that,

> for Plaintiff to prevail on a theory that Good Samaritan caused Ms. Darrow's death by not calling more quickly for emergency transportation, Plaintiff must introduce evidence that an emergency call would have resulted in a faster arrival and a difference in . . . Ms. Darrow's outcome. If an earlier call would not have resulted in a faster arrival and a different outcome, then Plaintiff cannot establish that the alleged failure to make an earlier call caused Ms. Darrow's death. Plaintiff has no such evidence.

MSJ at 15. Good Samaritan notes, then, that Dr. Winston has conceded that she cannot speculate whether emergency personnel response time would have resulted in a sooner arrival had emergency help been initially requested. See MSJ at 16. Nonetheless, Good Samaritan also

- 33 -

notes that, in addition to Nicholson's lack of evidence that a quicker call would have yielded a quicker response, Nicholson also fails to provide evidence that an "earlier response time would have made a difference in Ms. Darrow's outcome," because "it is not genuinely disputed that the EMTs arrived before Ms. Darrow's loss of breathing, and were thus present to respond to the unidentified event that caused Ms. Darrow's inability to breathe." MSJ at 16. Good Samaritan admits that Dr. Winston testified that, should the first call have been for an emergency response, the first responders may have been a crew with advanced life support capability, unlike the M10 EMT team (the first EMT team to arrive, responding to the nonemergency transport request, and incapable of ALS response). See MSJ at 16. Yet, Good Samaritan argues, that is speculation, because it is not evident that Greenamyer -- in alternatively requesting an emergency response -- would have changed the substance of her description regarding Darrow's status. See MSJ at 16-17. That is, dispatch could have similarly concluded that advanced life support was unnecessary for the call. See MSJ at 17. Good Samaritan maintains that Dr. Winston's testimony as to the different speed, training, and capability of a hypothetically different first response team, should Greenamyer have made an emergency request initially, is speculative and does not prove the issue of proximate cause. See MSJ at 17-18. On that issue, Good Samaritan concludes that Nicholson fails to establish a proximate cause in Good Samaritan's failure to make an earlier emergency call, because there is no evidence suggesting that such a call would have altered Darrow's outcome. See MSJ at 19.

Good Samaritan also provides:

Plaintiff's claims are akin to a claim for lost chance -- a claim in which the "the injury is the loss of the patient's chance of survival, whatever that may be." *Baer v. Regents of University of California*, 1999-NMCA-005, ¶ 14, 126 N.M. 508, 972 P.2d 9. Under such an analysis, the proximate causation question changes from "'Did [d]efendant's negligence cause the death?' to 'Did [d]efendant's negligence cause the loss of a measurable chance of survival?'" *Id.*

MSJ at 19.  Good Samaritan contends, however, that "to prevail on a lost chance claim regarding an alleged failure to more quickly request emergency transportation, Plaintiff must prove, through qualified medical expert testimony, the probability that Ms. Darrow would not have died if there had been an earlier call."  MSJ at 19 (citing Alberts v. Schultz, 1999 NMSC-015, ¶ 29, 974 P.2d 1279).  Good Samaritan also contends that, in this case, Nicholson "cannot do that, because she has no evidence that an earlier response by EMTs would have resulted in any different outcome for Ms. Darrow."  MSJ at 19.  In sum, Good Samaritan concludes:

> It is not enough for Plaintiff to simply claim that Good Samaritan should have called 911 for an  emergency transport sooner.  Plaintiff was obligated to introduce evidence that an earlier call would have changed Ms. Darrow's outcome.  Plaintiff cannot do so, as she lacks evidence of what caused Ms. Darrow's breathing loss, she lacks evidence of response times for emergency calls, and she lacks evidence that an earlier response by EMTs would have in any changed what happened to Ms. Darrow on the morning of September 9, 2014.

MSJ at 19-20.

### 2.  __The Motion to Exclude__.

 Good Samaritan also filed its Motion to Exclude on March 10, 2017.  See Motion to Exclude at 1.  In it, Good Samaritan extrapolates from its arguments in the MSJ that Nicholson has failed to proffer testimony from a competent expert "on the ground that Dr. Winston's opinions on nursing standard of care, and regarding causation, fail to meet reliability and relevance requirements of Rule 702."  Motion to Exclude at 1.  Good Samaritan argues that Dr. Winston states: "It is my opinion, based on reviewing these records, that the Good Samaritan Society Four Corners staff failed to act promptly and appropriately when Ms. Darrow's tracheostomy tube was dislodged and she developed respiratory distress."  Motion to Exclude at 2 (citing Dr. Winston Report at 1-2).  Good Samaritan takes issue with Dr. Winston's testimony, because at her deposition she criticized "several aspects of the nursing care" that Darrow

received at Good Samaritan, amounting to an opinion that the "nursing staff . . . fell below the nursing standard of care in developing Ms. Darrow's care plan, training the nursing staff, and responding to the situation on September 9, 2014." Motion to Exclude at 2-3. Yet, Good Samaritan explains, Dr. Winston made "clear at her deposition that she is unqualified to render opinions about the nursing standard of care. Dr. Winston is not a nurse," and Dr. Winston has not trained as a nurse, published nursing textbooks, or "read the entire code of ethics for nurses." Motion to Exclude at 3 (citing Winston Depo. at 158:4-5, 21-22; 158:23-159:15). Further, Good Samaritan argues, Dr. Winston has not been directly involved in the administration and management of nursing staff at long-term care facilities, such as Good Samaritan. See Motion to Exclude at 3 (citing Winston Depo. at 162:19-165:12). Good Samaritan also provides: "Dr. Winston has never done tracheostomy care, training or supervision in a long-term care setting. . . . She has never performed day-to-day trach nursing care. . . . Dr. Winston testified that nursing is a separate profession from medicine." Motion to Exclude at 4 (citing Winston Depo. at 160:20-167:22).

Good Samaritan then identifies rule 702 of the Federal Rules of Evidence and contends that, in its gatekeeper function, the

> Court should exclude Dr. Winston from testifying to opinions regarding nursing care at the trial of this action. First, Dr. Winston is not a nurse, and New Mexico law plainly requires that a plaintiff establish nursing malpractice through the expert testimony of a nurse. Second, even if New Mexico did not require testimony by an expert in the same field of practice, Dr. Winston is unqualified to offer an expert opinion under Rule 702 because she does not have knowledge or experience regarding either tracheostomy care or general nursing practices in a long-term care facility.

Motion to Exclude at 5. Good Samaritan argues:

> Dr. Winston is unqualified to render opinion testimony about nursing care because she does not have scientific, technical, or other specialized knowledge about nursing that will help the trier of fact to understand the evidence or

determine a fact in issue in this case.  *See* Fed. R. Evid. 702.  Under New Mexico law, in order to prove that a health care provider breached a duty of care, the plaintiff must show that the provider did not observe the knowledge, skill and care of a reasonably well-qualified provider practicing in the same field, under similar circumstances, giving due consideration to the locality involved.

Motion to Exclude at 5.  In support, Good Samaritan explains:

> To be qualified to give opinion testimony about the standard of care and whether a defendant's actions met that standard, an expert witness must practice in the same field as the defendant. *See, e.g. Pharmaseal Labs*, 1977-NMSC-071, ¶ 15 ("Evidence of the standard of knowledge, skill and care owed by a physician to his patient can be provided by expert testimony of the knowledge, skill and care ordinarily used by reasonably well-qualified doctors of the same field of medicine practicing under similar circumstances.").

Motion to Exclude at 6.  This maxim, Good Samaritan suggests, is refined further by the "New Mexico jury instruction on the duty of a health care provider," which Good Samaritan -- having filled in the following bracketed information -- provides as being: "The only way in which you may decide whether the [nurses] in this case possessed and applied the knowledge and used the skill and care which the law required of [them] is from evidence presented in this trial by [nurses] testifying as expert  witnesses." Motion to Exclude at 6 (incorporating the language in the NMRA Civ. UJI).   According to Good Samaritan, it filled in the bracketed words in accordance with the "Directions for Use," on the instruction, which state: "In the . . . blanks, the type of health care provider, such as doctor, nurse, or chiropractor, should be inserted."  Motion to Exclude at 6-7 (same).

Good Samaritan then surveys other jurisdictions with case law supporting the proposition that, "in a case involving the conduct of nurses, the only way for the plaintiff to prove negligence is by presenting testimony by a nurse testifying as an expert witness."  Motion to Exclude at 7-8. Good Samaritan cites:

> *Smith v. Pavlovich*, 394 Ill. App. 3d 458, 464 (2009)("A pediatrician is not competent to testify to the standard of care applicable to advanced practice nurses,

even if those nurses are working in pediatrics, any more than an advanced practice nurse working in pediatrics is competent to testify to the standard of care applicable to a pediatrician."); *Dolan v. Jaeger*, 285 A.D.2d 844, 846, 727 N.Y.S.2d 784 (App. Div. 2001)(directed verdict for the defendant was appropriate where the plaintiff failed to show a breach of the nursing standard of care because the only proffered expert testimony was from an anesthesiologist not qualified to tender such an opinion); *Estate of Bradley v. Mariner Health, Inc.*, 315 F. Supp. 2d 1190, 1196-97 (S.D. Ala. 2004)(a physician is not a "similarly situated healthcare provider" qualified to testify to the nursing standard of care where the physician "is not a nurse, has never practiced as a nurse, has no nursing education, training, or experience," and has never "made rounds in a nursing home or supervised the provision of care in a nursing home").

Motion to Exclude at 7. Good Samaritan also highlights an opinion by the Supreme Court of Illinois which held that a physician could not be qualified to offer expert testimony as to the nursing standard of care, because the legislature had "set forth a unique licensing and regulatory scheme for the nursing profession through the Nursing and Advanced Practice Nursing Act." Motion to Exclude at 7 (citing Sullivan v. Edward Hospital, 209 Ill. 2d 100, 122 (2004); The American Association of Nurse Attorneys (TAANA), Position: Expert Testimony in Nursing Malpractice Actions, Approved June 27, 2007 ("The nurse is not a 'junior doctor' nor is the nurse a mere 'underling' of the physician. To so hold would negate the existence of nursing as a profession and would render the Nurse Practice Acts of every state, commonwealth and territory meaningless.")). In that regard, Good Samaritan then calls the Court's attention to N.M. Stat. Ann. § 61-3-1, the New Mexico Nursing Practice Act, which Good Samaritan explains is the New Mexico equivalent of the Illinois Nursing and Advanced Practice Nursing Act referenced in Sullivan v. Edward Hospital. Motion to Exclude at 7-8. Good Samaritan thus argues that Dr. Winston has belied a lack of experience, knowledge, and qualification as to the distinct nursing standard of care in her own deposition testimony, and, accordingly, has rendered herself unqualified under New Mexico law to support Nicholson's medical negligence accusations with the requisite expert testimony. See Motion to Exclude at 8-9.

Good Samaritan then proceeds to argue that

> New Mexico law requires Plaintiff to prove her claim for nursing negligence through expert testimony by a nurse. Even if New Mexico had not adopted this rule, however, Dr. Winston would still be unqualified to offer expert testimony on nursing care pursuant to Federal Rule 702 and the *Daubert* standard. Even in jurisdictions that do not strictly require expert witnesses to practice in the same field, a physician expert must show that she is qualified through experience to testify to the nursing standard of care. Dr. Winston cannot meet this requirement.

Motion to Exclude at 9. In that regard, Good Samaritan then surveys a variety of state cases wherein the state courts had excluded expert testimony as to a nursing standard of care where the proffered expert lacked specialized knowledge or experience in general nursing practices or the long-term care facility context, similar disqualifications to Good Samaritan's characterization of those of Dr. Winston's expertise -- a physician with only a few months experience in long-term care facilities. See Motion to Exclude at 9-13. Good Samaritan thus urges the Court, in its rule 702 gatekeeping role, to ensure that Dr. Winston has relevant "specialized knowledge that would aid the trier of fact, and her testimony on nursing standards of care" is reliable. Motion to Exclude at 12-13. Here, Good Samaritan argues, because Dr. Winston has "no training in the field of nursing, has never worked as a nurse, is not familiar with nursing practices in the long-term care setting, and has never done day to day trach nursing care or reinserted a trach." Motion to Exclude at 12-13.

Good Samaritan next requests that the Court exclude Dr. Winston's proffered testimony because she lacks "sufficient factual information to render opinions regarding Good Samaritan's actions or the cause of Ms. Darrow's death." Motion to Exclude at 13. Essentially, Good Samaritan argues:

> Dr. Winston conceded that she in fact could not recall ever having seen an emergency decannulation policy. . . . Having never seen Good Samaritan's policy or procedure regarding decannulation, Dr. Winston cannot give admissible testimony that Good Samaritan's policies or procedures were deficient. In order

> to reliably opine that Good Samaritan's policies were inadequate, Dr. Winston at
> a minimum needed to have actually reviewed Good Samaritan's policy.  She did
> not, and her opinion is entirely speculative and thus inadmissible.

Motion to Exclude at 14 (citing Winston Depo. at 92:2-13).  Further, Good Samaritan maintains

that Dr. Winston similarly has no factual basis to testify as to the adequacy of Good Samaritan's

training or its care plan for Darrow.  See Motion to Exclude at 14-16.  Last, Good Samaritan

contends that Dr. Winston has no factual basis upon which to opine "that an earlier request for an

emergency response would have resulted in an earlier response"; "that an earlier request for an

emergency response would have resulted in a different EMS crew being dispatched"; or "that an

earlier response by EMTs or by Paramedics would have changed Ms. Darrow's outcome."

Motion to Exclude at 16-18.  In support, Good Samaritan explains that Dr. Winston testified that

she had "no information about how long the response time would have been if a request for

emergency transportation had been made sooner," "no information about the responding

agency's staffing requests," and no "evidentiary basis to opine that less delay would have

changed Ms. Darrow's outcome," because she has "no factual information regarding what caused

Ms. Darrow to stop breathing."  Motion to Exclude at 16-18.  Good Samaritan thus requests that

the Court exclude Dr. Winston's testimony in totality, rendering Nicholson's arguments without

the support of expert testimony.  See Motion to Exclude at 18.

### 3.    **The Response**.

Nicholson argues that the MSJ, "at most, challenges nothing more than the weight of the

evidence which will be presented at trial."  Response at 1.

> Pursuant to the detailed expert opinions of Dr. Jane Winston, it is clear that the
> Defendant's staff was not adequately trained to deal with the emergency situation
> which arose when Plaintiff's daughter, Tia Darrow, had her tracheostomy tube . . .
> dislodged and they were not able to reinsert it.  It is clear the staff did not take
> prompt action to prevent the brain damage Ms. Darrow suffered and ultimately
> died from because of inadequate oxygen supply to her brain.  Ms. Darrow was

- 40 -

> absolutely reliant on the trach to keep her alive.  When the trach tube was
> dislodged and the Defendant's staff realized they could not replace it, an
> emergency response was needed as soon as possible.  It is well recognized by
> multiple medical institutions such as the United States National Library of
> Medicine that lack of oxygen to the brain will cause permanent brain damage in
> as little as four (4) minutes. Another four to six minutes without the brain
> receiving adequate oxygen will result in increased brain damage, coma and then
> death. Dr. Jane Winston, Plaintiff's expert, is eminently qualified to testify on the
> specific issues of negligence and causation.  After considering the response to
> Defendant's statement of facts and Plaintiff's statement of additional facts, this
> Court may consider entering summary judgment *sua sponte* for Plaintiff on the
> issue of causation.

Response at 1-2 (emphasis in original).  Specifically, Nicholson asserts that Good Samaritan has

doctored its facts, because the "concept that Ms. Darrow was breathing 'just fine' without the

trach, and that the only reason to change the 911 call from non-emergent to emergent was

because Darrow was 'anxious' is incredulous."  Response at 6.  Instead, Nicholson maintains,

"the true facts are that the Defendant's employees failed to realize the gravity of the situation

until it was way too late.  Ms. Darrow would have survived with prompt medical attention."

Response at 6.

In support, Nicholson argues that the jury "will be instructed that any 'healthcare

provider . . . treating [or] caring for a patient . . . is under the duty to possess and apply and use

the skill ordinarily used by reasonably well-qualified . . . healthcare providers.'"  Response at 6

(quoting Civil Uniform Jury Instruction 13-1101 NMRA).  The crux, Nicholson suggests, is that

"here, viewing the facts in the light most favorable to Plaintiff, there was a serious failure by

Defendant's employees to possess and apply the knowledge and to use the skill ordinarily used

by reasonably well qualified . . . healthcare providers."  Response at 6 (internal quotation marks

omitted).  Nicholson asserts that, by the time the M10 EMT team arrived in Darrow's room, she

was "in bad condition . . . was cyanotic, blue and pulseless."  Response at 7.  Nicholson's

conception of the facts, then, is as follows:

> Viewing the facts in the light most favorable to the Plaintiff . . . Ms. Darrow was in respiratory distress when the trach came out. Dr. Obisike has testified that the trach should have been in Ms. Darrow to ensure proper oxygenation. By the time the first non-emergent EMS team arrived, Ms. Darrow was cyanotic, blue and pulseless. This was confirmed when the advanced EMS team arrived three (3) minutes later. Ms. Darrow's cause of death has never been disputed by any credible expert testimony or medical records presented by Defendant.

Response at 8. In Nicholson's estimation, Good Samaritan "employees inexplicabl[y] waited for twenty (20) minutes before recognizing this was an emergency situation. It is undisputed that permanent brain damage occurs from lack of adequate oxygenation within four (4) to six (6) minutes." Response at 8-9. Nicholson also suggests that "it took the advanced life support team only three (3) minutes to arrive once they were called and notified of the gravity of the situation." Response at 9. In sum, Nicholson concludes:

> The liability facts asserted against Defendant and its employees are in serious dispute. There is no serious dispute regarding the facts showing that Ms. Darrow died because she did not have enough oxygen supplied to her brain after her trach was dislodged and after nursing staff was not able to replace the trach. Once again, Plaintiff asks that the Court enter summary judgment in her favor on causation. Otherwise, Plaintiff requests that the Defendant's motion be denied and that the Court grant such further relief as it deems just and proper.

Response at 9.

### 4.    **The Motion to Exclude Response**.

Nicholson then filed the Plaintiff's Response to Defendant's *Daubert* Motion and Memorandum to Exclude Testimony of Dr. Jane Winston (Doc. No. 49), filed April 7, 2017 (Doc. 56)("Motion to Exclude Response"). In it, Nicholson primarily argues:

> Dr. Winston's CV . . . establishes that she is more than eminently qualified to offer opinions in this case. She is board certified with the American Board of Family Medicine, Geriatric Medicine, and is a medical director with the Medical Director's Association for post-acute and long-term care medicine. She had been recertified in advance cardiac life support, trauma life support and respecting choices regarding advanced care planning facilitation. . . . [And w]hen this case goes to trial, the jury will be instructed to measure the level of care provided by Defendant's staff according to NMRA 13-1101. Specifically, the jury will be

- 42 -

> instructed to decide whether or not Defendant's employees applied and used the knowledge, skill and care "ordinarily used by reasonably well qualified . . . healthcare providers." The only way the jury can decide this issue is based upon the testimony of a licensed physician.

Motion to Exclude Response at 1-2. In support, Nicholson contends that Good Samaritan's argument

> [f]lies in the face of the specific requirements of NMRA 13-1101 and established medical case law that medical doctors can offer opinions outside of their specialized area of medicine so long as they are qualified based upon their education and experience to offer reliable opinions. *See*, Fed. R. Evid. 702; *see, also*, *Quintana v. Acosta*, 2014-NMCA-015 (an emergency room physician can testify regarding the cause of injury for failure to administer appropriate antibiotics).

Motion to Exclude Response at 2. Nicholson then turns to Good Samaritan's contentions regarding a factual basis for Dr. Winston's testimony, stating:

> Dr. Winston clear[ly] testified and opined that Ms. Darrow's death was the direct result of the inability of Defendant's staff to reinsert the trach. This lack of adequate, or any, training was confirmed by Nurse Greenam[]yer. The most likely cause of Ms. Darrow's death was inadequate airway and inadequate intake of oxygen which led to cardiac arrest.

Motion to Exclude Response at 3. Nicholson then maintains that "the time delay in recognizing the immediate need for advanced life support services when Ms. Darrow's trach could not be replaced is well documented," and, accordingly,

> [a]ll of the Defendant's argument go to the weight, not the admissibility, of Dr. Winston's opinions. As the Court can see, Dr. Winston has devoted most of her professional life to the evaluation and treatment of long term care patients in nursing homes, such as Tia Darrow. Defendant's challenges should be utterly denied. At the very least, the Court should schedule a *Daubert* hearing if the Court has any questions to ask Dr. Winston regarding the reliability of her testimony.

Motion to Exclude at 4.

## 5.    **The Reply**.

Good Samaritan's Reply begins by arguing that the "Plaintiff was required to show a

genuine evidentiary dispute[, and s]he has failed to do so."  Reply at 1.  Essentially, Good

Samaritan provides, the

> Plaintiff cannot refute the actual evidence establishing that Tia Darrow was
> conscious, breathing and adequately oxygenated when her care was transferred to
> EMTs on the morning of September 9, 2014, and Plaintiff thus cannot establish
> that any act or omission on the part of Good Samaritan resulted in Ms. Darrow's
> sudden and unexplained loss of consciousness and ability to breathe shortly after
> that transfer of care.

Reply at 1.  Specifically, Good Samaritan argues, Nicholson has not identified admissible

evidence that proves specific facts showing a genuine issue for trial as to the dispositive

causation issue in this case.  See Reply at 2.  First, Good Samaritan maintains that Nicholson

"ignores the undisputed evidence and contends that Ms. Darrow was not breathing when the

EMTs arrived."  Reply at 15.  Accordingly, Good Samaritan argues that Nicholson "failed to

address how Good Samaritan could have caused Darrow's death given that she was still

conscious and breathing when the EMTs arrived and took over her care."  Reply at 15.  Next,

Good Samaritan maintains that Nicholson "has failed to address what caused Ms. Darrow to stop

breathing," which it argues is necessary to address, because "it is not genuinely disputed that Ms.

Darrow was able to breathe for a significant period of time without her trach in place."  Reply at

16.  According to Good Samaritan, for Nicholson to prove it is liable for Ms. Darrow's sudden

loss of the ability to breathe and loss of consciousness, the "Plaintiff must show why that sudden

event occurred."  Reply at 16.  That is, Good Samaritan provides,

> Plaintiff confuses the result of the loss of breathing -- inadequate oxygenation and
> death -- with the cause of the loss of breathing. . . .  But Good Samaritan does not
> dispute that Ms. Darrow stopped breathing on September 9, 2014, and died as a
> result.  What is at issue in the Motion is how Good Samaritan can be held liable
> for Ms. Darrow's loss of breathing when Plaintiff cannot establish why Ms.
> Darrow stopped breathing, and thus, whether anything done by Good Samaritan
> or the EMT's could have prevented or rectified it.  Neither Plaintiff nor her expert
> have identified anything that Good Samaritan supposedly did or did not do that
> resulted in Ms. Darrow's sudden loss of the ability to breathe, or anything that the

- 44 -

EMTs could have done to prevent the sudden loss, and Plaintiff thus cannot move
forward to trial.

Reply at 16.  Essentially, according to Good Samaritan, Nicholson has shown only that Darrow

lost oxygen, and not how Good Samaritan supposedly caused and is responsible for that loss of

oxygen.  See Reply at 16-17.

Finally, Good Samaritan maintains that Nicholson does not "refute the absence of

evidence that an earlier call to 911 would have made a difference."  Reply at 17.  In that regard,

Good Samaritan first identifies the error in Nicholson's Response that "an ALS paramedic

arrived within three minutes of Good Samaritan's call for an emergency response," and suggests

that "it was in fact actually 11 minutes."  Reply at 17-18 (citing 911 Incident Report at 2).  In

light of that error, Good Samaritan maintains that there is no evidence to suggest that there

would have been a quicker or equivalent advanced life support response had Greenamyer made

the emergency call sooner.  See Reply at 18.  Good Samaritan, further, then reiterates for the

Court that, because Nicholson cannot establish that Darrow was cyanotic and pulseless when the

M10 EMT team arrived, she "cannot show that the same event would not have occurred if

paramedics had arrived ten minutes earlier, twenty minutes earlier, or even if Ms. Darrow had

already been at the hospital when she stopped breathing."  Reply at 18.

        6.      **The Motion to Exclude Reply.**

Good Samaritan supported its Motion to Exclude with the Defendant's Reply on Motion

to Exclude Testimony of Dr. Jane Winston, filed April 19, 2017 (Doc. 63)("Motion to Exclude

Reply").  Good Samaritan argues that Nicholson has "failed to meet her burden of establishing

that Dr. Winston is qualified or has admissible opinions," because she "does not offer the Court

*any* evidence that Dr. Winston has the proper qualifications."  Motion to Exclude Reply at 1

(emphasis in original).  Good Samaritan then reiterates that "Dr. Winston cannot testify about

nursing standards of care," because Nicholson has not established that Dr. Winston has "nursing training or experience" which qualifies her as an expert at New Mexico medical negligence law. Motion to Exclude Reply at 3.  Good Samaritan argues that the NMRA Civ. UJI 13-1101 "specifically requires: 'In the . . . blanks, the type of health care provider, such as doctor, nurse, or chiropractor, should be inserted.'"  Motion to Exclude Reply (quoting Use Note to NMRA Civ. UJI 13-1101).  According to Good Samaritan, then, "Dr. Winston is the wrong expert for this case."  Motion to Exclude Reply at 5.  Good Samaritan then restates its arguments that Dr. Winston lacks a sufficient factual basis on the record upon which to opine, asserting acquiescence on Nicholson's behalf, because she did not meaningfully respond in the Motion to Exclude Response.  See Motion to Exclude Reply at 5-10.  Good Samaritan concludes:

> Plaintiff failed to meet her burden to establish that Dr. Winston can offer admissible testimony.  Dr. Winston is not qualified to opine about nursing issues, and lacks the factual basis necessary to render opinions about the topics on which she intends to opine.  The Court should exercise its gatekeeping function by closing the gate to Dr. Winston and precluding her from testifying at trial.

Motion to Exclude Reply at 10-11.

### 7.    **The Hearing**.

The Court held a hearing on June 27, 2017.  See Transcript of Hearing (taken June 27, 2016)("Tr.").[19]  When the Court took up the MSJ, Good Samaritan began argument by stating:

> After rereading our briefs and the fact record that's before the Court I wanted to sharpen a couple of points right up front which I'll cover in more detail as we go through it.  First Dr. Winston, Jane Winston plaintiff's sole expert a medical doctor, qualification to provide a standard of care opinion against the nurses in this case is belied by her failure to be able to give an opinion that the standard of care was violated by the patient's own doctor, Dr. Uche Obisike, who was called and spoke with the nurse during the critical period, 8:00 in the morning on September 9.

---

[19]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

Tr. at 8:17-9:2 (Brown).   Because Dr. Obisike was not a Good Samaritan employee, Good

Samaritan then argued that, when Greenamyer received his consultation, the causal chain was

broken.  See Tr. at 9:17-10:1 (Brown).  The Court was not convinced, however, positing that a

doctor's call would not break the chain, to which Good Samaritan responded, that, here,

Nicholson's expert Dr. Winston has testified whether an earlier call to the doctor, or different

course of action altogether, "would have made a difference."  Tr. at 10:13-11:1 (Brown).  Good

Samaritan continued, asserting next that there is an issue -- which Good Samaritan considers to

be a Daubert v. Merrel Dow Pharm. issue or fall under rule 702 to the Federal Rules of Evidence

-- inherent in Dr. Winston testifying as to the standard of care Greenamyer, a nurse, was bound

to follow.  See Tr. at 12:7-14:10 (Brown).  Regarding the relevant UJI in New Mexico, Good

Samaritan argued it "is under the duty to possess and apply the knowledge and to use the skill

and care ordinarily used by a reasonably well qualified nurse practice[ing] under similar

circumstances, giving due consideration to the locality involved."  Tr. at 12:21-13:3 (Brown).

Essentially, Good Samaritan continued, "there is case law that contemplates that even where,

regardless of what the training is, the qualifications of the expert need to be related to the specific

issue that is opined about," and Dr. Winston is out of her element.  Tr. at 15:20-16:15 (Brown).

The Court then mused:

> I guess I'm trying to think and maybe I can't think of any other analogies but I
> guess I'm thinking that the greater includes maybe the lesser here.  I guess I'm
> really trying to thing would [the Supreme Court of New Mexico], would they
> really kick out Dr. Winston and say a medical doctor cannot testify about the
> malpractice of a nurse.   I'm having a hard time with that.

Tr. at 16:16-23 (Court).  Good Samaritan then explained that there was a Court of Appeals of

New Mexico case wherein the Court of Appeals struggled with whether

> one ER doctor could completely testify about another ER doctor, thus completely

> parallel disciplines [and] the Court struggled with whether or not that ER doctor expert was qualified to talk about the effect of failing to prescribe an antibiotic in the ER for a puncture wound to a diabetic.  So clearly standard of care, would you typically do that, yes, you [would and] he was allowed the talk about that.  The question was whether or not he was able to talk about the effect of that antibiotic and what would likely have [happened and] the Court said we don't really need to go there because he's actually not offering a full, complete medical causation opinion as to that further extension that's being questioned here, and that is what the result would be of having given the ant[biotic,] . . . instead he's only opining about less of a chance that it would have made some difference.  So I think [this is the] Court recognizing that even someone in the same discipline may not have the experience, even a doctor in the same discipline[,] necessary in order to provide a medical causation opinion or even though it was not [an issue] in that case that he could provide a standard of care opinion.

Tr. at 17:14-18:13 (Brown).  Even should the Court consider a doctor qualified to give expert testimony as to nurses generally, Good Samaritan also suggested that here, specifically, Dr. Winston is nonetheless not qualified, because although she "worked for a period of some months in a nursing home . . . as a medical director," "she didn't supervise nurses . . . [and] she has no direct knowledge of nurse standards or specific familiarity with the New Mexico nursing standards."  Tr. at 19:25-20:11 (Brown).  The Court then inquired "what do we have to gain by saying a doctor shouldn't be able to testify about a nurse," because the Court considered the scenario akin to that of lawyers and paralegals.  Tr. at 22:21-23:11 (Court).  Good Samaritan distinguished that analogy, suggesting that there is "no practice act in New Mexico for paralegals[,] there is no licensure for paralegals, and there [are] no abilities for paralegals to be providing services independent of a lawyer whereas in a nursing home, nurses do not have a supervising doctor."  Tr. at 23:15-19 (Brown).  At this point, Good Samaritan stopped argument against Dr. Winston's qualifications, and addressed its argument regarding causation, stating:

> Of course, if the plaintiff were unable to establish with expert, qualified expert testimony, the breach of the standard of care by the nurse[,] summary judgment would be entered for the defendant and we wouldn't proceed to this a[rgument] but if the Court doesn't [] exclude Dr. Winston's testimony about breach of duty by the nurses, the uncontroverted evidence in the record establishes that plaintiff

> can't sho[w,] hasn't been able to show any breach of duty, and again, that breach of duty is failure to call 911 for ALS assistance either [when the] trach came out or[,] alternatively[,] when it could [not] be replaced [and] that that breach caus[ally] resulted in injury and death to a reasonable medical probability. With regard to causes saying there is nothing bullet proof for summary judgment purposes of course in having a nominal opinion of a medical doctor saying the words for a reasonable medical probability unless it is fa[ctually] supported and that is one of the problems with Dr. Winston's causation testimony here.

Tr. at 24:8-25:3 (Brown). Because, according to Good Samaritan, Nicholson relies on inadmissible facts in her Response, "the undisputed facts relating to causation in the summary judgment record are that throughout the period after Tia Darrow's trach became dislodged she was provided with supplemental objection," "[a]fter the charge nurse was unable to reinsert [the] trach she called for nonemergent transport and described to the dispatcher the patient's status," "Dr. Obisike [thereafter] confirmed . . . nonemergency transfer to the ER for trach replacement was appropriate because Ms. Darrow could breathe," and

> Ms. Darrow remained oxygenated at 90 percent or higher on September 9 until the EMTs arrived at 8:14 except for a brief period from 8:00 and 8:12, when a reposition and readjustment of her physical position [un]cover[ed] her [stoma and] immediately afterward [--] undisputed evidence is [--] her oxygen rose back up to 93 percent.

Tr. at 26:1-27:16 (Brown). Further, Good Samaritan argues, the "facts establish that Tia Darrow was able to speak and her skin color was normal and her oxygen saturation was as an acceptable level over 90 percent and she was attended personally by a CAN[,] a trained certified nursing assistant[,] at all times [when the] trach was unable to be reinserted." Tr. at 27:10-16 (Brown). Good Samaritan than reiterated that Nicholson has not proffered evidence suggesting that Darrow's dehabilitation occurred before the EMTs arrived. See Tr. at 27:21-28:1 (Brown).

Good Samaritan next argued why the Carey EMT Report contained hearsay and thus rendered inadmissible Nicholson's proffer of evidence that the EMTs discovered Darrow already cyanotic and pulseless. See Tr. at 28:18-19 (Brown). Good Samaritan explains that it is

undisputed that EMT Carey, the author of the only EMT report about this incident, did not arrive

at Good Samaritan until 8:24 a.m. and that, in the Carey EMT Report, Carey makes declarations

about events of which he has no personal knowledge and which were purportedly just relayed to

him by the first M10 EMT team.  See Tr. at 28:22-30:19 (Brown).  Accordingly, "there is

nothing to refute that she had an acceptable oxygen saturation" or that she was otherwise

conscious when the EMTs arrived.  Tr. at 30:19-31:9 (Brown).  The San Juan Report, Good

Samaritan explained, also contains the same hearsay statements regarding the first M10 EMT

team's statements that they discovered Darrow cyanotic.  See Tr. at 31:10-33:2 (Brown, Court).

In response to Good Samaritan's argument that Nicholson had failed to proffer admissible

evidence that Darrow was cyanotic and pulseless before EMTs arrived, the Court inquired

"where does that leave us for the purposes of plaintiff's causation argument."  Tr. at 34:9-10

(Court).  Good Samaritan explained that, accordingly:

> We don't have evidence that the patient was cyanotic, . . . , [had a] lack of oxygen
> or [was] unconscious, or had a lower O[xygen] SAT or was pulseless at the time
> of arrival [of] M10 and therefore we don't have any evidence of the facts or
> suppose[d] facts relied upon by plaintiff's expert to opine that [hypoxia] was
> underway at the time the EMTs arrived and assumed car[e of the] patient rather
> than occurring after they were on the scene in charge.  The but for causation
> argument plaintiff makes is [that] Good Samaritan caused Tia Darrow's death
> again by not calling more quick[ly for] emergency medical transport.  Nobody
> disputes expert medical testimony is necessary to establish medical causation.  So
> the question is whether or not the evidence []establishes the undisputed facts
> allow[ing] a conclusion [by] the expert that the alleged breach [of] duty causally
> resulted in injury.

Tr. at 34:11-35:3 (Brown).  Good Samaritan continued, detailing why Dr. Winston cannot testify

as to causation, because she cannot identify the cause of Darrow's quick lapse into a cyanotic

state, and she cannot demonstrate that any of Good Samaritan staff's change in conduct --

particularly calling 911 for emergency transport sooner -- would have resulted in a different

outcome.  See Tr. at 35:5-16 (Brown).  Regarding Dr. Winston's inability to identify the precise

medical cause for Darrow's rapid change in state, Good Samaritan maintains that to "say that she [probably] had inadequate intake or inadequate airway is not a sufficient opinion to establish medical causation because it fails to explain why those conditions occurred."  Tr. at 36:19-23 (Brown).  Regarding Dr. Winston's inability to testify as to a different outcome should Greenamyer have requested earlier emergency transport, Good Samaritan maintains that all Dr. Winston has proffered is,

> well, less delay in implementation of basic protocols and ALS protocols generally improves outcomes.  And by generally, I mean that more likely than not would it have changed the outcome here.  There are no facts or evidence to support this speculation in this case. And general[l]y [it] is not a reliable basis for providing an expert opinion about medical causation.

Tr. at 37:23-38:4 (Brown).  Good Samaritan also noted that Dr. Obisike, after hearing Greenamyer had requested nonemergency transport, had the opportunity to counsel Greenamyer otherwise; that is, "we do have an interruption of causation."  Tr. at 39:13-25 (Brown).  In conclusion, Good Samaritan fielded a question from the Court regarding whether New Mexico's rules regarding necessity of a particular kind of expert binds the federal court, responding that, "even though federal rule of evidence 702 unquestionably applies in lieu of the state rule, when we get to what the substantive rule of evidentiary sufficiency is, we look to New Mexico State law."  Tr. at 41:5-9 (Brown).

Nicholson then responded, and first addressed Good Samaritan's suggestion that the telephone call with Dr. Obisike was an event which interrupted the causal chain of events on Good Samaritan's part, and maintained that "Dr. Obisike's acts and failures to act . . . ha[ve] nothing to do with Dr. Winston's qualifications, it has nothing to do with her opinion.  Her qualifications are based on her extensive experience in family practice, and specifically her extensive experience regarding geriatric[] care."  Tr. at 42:2-8 (Lyle).  At the Court's request,

Nicholson then addressed why she chose a doctor, like Dr. Winston, to serve as the main expert, to which she responded:

> Because we wanted somebody who could testify clearly not as[] only to what should have been done, and if the Court will note carefully the deposition testimony of Ms. Greenamyer, the nurse . . . , Ms. Greenamyer was asked why did she have a trach, why was the call made to Dr. Obisike about what to do, and her testimony essentially is well the doctor has to make that d[ecision,] likewise a doctor we felt had to put all the pieces together, not just in terms of [nursing] but also in terms of causation.

Tr. at 42:13-24 (Lyle).  The Court posited, however, "maybe [you] need two experts, don't you maybe need a nurse to[o], you need a doctor to testify about the trach and you need to have a nurse that testifies about when you have, when you make a call for an emergency 911."  Tr. at 43:10-14 (Court).  Nicholson disagreed, arguing essentially that the issue was a red herring, because "Dr. [Winston] has been the medical director for nursing homes.  She has helped formulate the policies that apply to nursing homes, and she has extensive experience regarding proper level of care that should be rendered regarding, by people who are in charge of patients like [Darrow]."  Tr. at 45:11-16 (Lyle).  The Court then noticed Nicholson had not brought Dr. Winston to the hearing to testify as to her qualifications, and inquired whether Nicholson was, "if I decide this is a Daubert ruling or Daubert hearing, comfortable [with] me making that ruling without your expert testifying?"  Tr. at 46:7-10 (Court).  Nicholson was not comfortable, however, and essentially requested "another hearing where [she can] bring in [he]r expert and [the Court can] hear from them before [it] make[s] a ruling on that."  Tr. at 47:12-14 (Court, Lyle).  The Court then pressed Nicholson as to the merits of her Response, positing:

> The basis of her opinions is that you don't wait this long and you don't try to cover up the fact that the patient is not able to breathe . . . and correct me if I'm wrong but I thought part of your case and part of her testimony was that are she was critical of Good Samaritan for not having adequate policies.

Tr. at 48:22-49:4 (Court).  Nicholson agreed, but continued it also involved a lack of training,

"so that nurse Greenamyer knew what to do and failed to recognize that this was an emergency situation that required immediate call for advanced life support."   Tr. at 49:5-8 (Lyle). Nicholson then identified the evidence in the record that Darrow was having trouble breathing, and stated "this was an emergency situation.   But it was not treated that way, it was treated somewhat casually."  Tr. at 50:11-13 (Lyle).  Nicholson then, again, addressed the import of Dr. Winston's expert testimony in this case, and suggested that "it's well established in Federal Court that the facts that form the b[asis] of an expert's opinions or inferences need not be admissible in evidence if of the type reasonably relied on by experts in the particular field," and that here Dr. Winston is relying on the "medical record," which is what "experts in the field who testif[y] in these matters typically rely on."   Tr. at 50:17-51:5 (Lyle).   The Court was not persuaded, because in this case the doctors completing the medical record -- with respect to the occurrences about which Dr. Winston is seeking to testify -- did not have personal knowledge of the facts at the time the first EMTs arrived.  See Tr. at 51:6-24 (Court).  To that point, Nicholson then generally argued that Dr. Winston is testifying as to the likely chain of events which lead to hypoxia and the speed at which this generally occurs, meaning that she can rely on these medical records, because they reflect that the facts jive with the general timeline of Darrow's death.  See Tr. at 51:25-53:24 (Lyle).   The Court then, again, resisted, musing that -- as it pertains to Darrow's state as her care transferred to the EMTs -- "I guess I'd feel a lot more comfortable if I had some EM[T] people coming in and saying that rather than a doctor who has no personal [knowledge], and we don't know where this statement came from coming in and creating a factual issue."  Tr. at 52:19-23 (Court).  Nicholson responded that

> it took about 20 minutes to get Ms. Darrow to the hospital [and by then] she had suffered had ir[]reversible brain damage. . . .  We do know that that was caused by a lack of oxygen to the brain, and Dr. [Winston] has explained in her report how the timing of that causal connection works.  You know, within four to six minutes

without oxygen, you start to suffer brain damage.  Here according to the record viewing the facts in the light most favorable to the plaintiff Ms. Darrow is 20 minutes without o[xygen] again.  20 minutes since the tube came out.  And the claim that while she was being bagged her O[xygen SATs] were just fin[e,] I'm sorry that is just the defendants saying we'll pay attention to the evidence that favors our portion of the case and disregard all the evidence that supports Dr. Winston's opinion.  Disregard the fact that Dr. Winston is entitled to rely upon the medical records to garner support for her opinions as has  been recognized time and time again both in federal and state court.  Whether or not statements made by other people . . . are consistent or inconsistent[,] or make sense or don't make sense, once again is a matter for trial it's not a matter for summary judgment.  The Court should [view] facts in the light most favorable to the nonmoving party. And once again that includes those facts that form the basis of Dr. Winston's opinion whether or not they are independently admissible or not.

Tr. at 52:23-54:5 (Lyle).  Further, Nicholson maintained and concluded, it is her position that Dr.

Winston is qualified to testify as to the necessary issues of causation in this case.  See Tr. at

54:6-56:14 (Lyle).

Good Samaritan then argued:

It's clear that we have a disagreement with the role of the record on summary judgment, and the facts that are in it or not in it.  I understand counsel for plaintiff doesn't like the record, but it is what it is, and he had the opportunity to provide an affidavit of Dr. Winston before this hearing should he have thought that was important.  He didn't do that.  He did supply us with some additional opinions on paper which didn't find their way to the record so I know that he would have been able to do that if it were important.  So we have what we have in front of us, and [what] we have is not enough information to believe that Dr. Winston had any experience in actually providing nursing care, and the type of nursing care and on the issues that are specifically involved in this case.

Tr. at 57:3-18 (Brown).  Further,

With regard to relying upon information that is the type that's normally relied upon by a doctor, of course medical records are of the kind of thing that experts look[,] but that doesn't remove the requirement in the summary judgment context in the case law that we cited which plaintiff didn't respond to in his argument with regard to the role [of] hearsay evidence on summary [judgment] and we certainly are all familiar with the situation where an expert proffers an opinion and it turns out [the expert doesn't have the] ability to qualify the underlying evidence that they're relying upon and another expert is required to do that.  That would have been appropriate here if there were such evidence and again there was plenty of opportunity for plaintiff to come up with the testimony of these

witness[es] through affidavit.

Tr. at 58:6-22 (Brown).  Good Samaritan then rested its argument regarding the MSJ.  <u>See</u> Tr. at

58: 23 (Brown).  The Court heard various other motions at the hearing, but closed the hearing by

agreeing to work first on the MSJ, after taking it under advisement, and providing:

> [I]f you []don't want me to rule on the <u>Daubert</u> issue . . . then I think you better
> get with Ms. Behning[, the Court's Court Room Deputy Clerk,] as soon as
> possible and try to get a [d]ate set up for you to bring that person [i]n[, but] if
> you're comfortable with me going ahead and making a ruling on the depositions
> and the record [as it is], then I can go ahead and try to.  Not try but I could put
> together an opinion and order on the re[cord] that I have.  It's kind of your ca[ll,] I
> was in your shoes many times and sometimes I didn't want [the] expense of
> bringing my expert in and the record is [what it is,] and it wasn't going to change
> [a] whole lot[,] seems like the defendant is comfortable with some res[olution] on
> the, just on the deposition and the arguments here. . . .  I'll probably go ahead and
> started working and if we end up between now and the 17th able to get the expert
> worked in we'll work her in, and I can add that to my opinion [i]f we're on the
> verge of the mediation on the 17[th][20] I may get on the phone with you and at
> least tell you where I am as much as possible.  So that you have maximum
> guidance going into the mediation, so it will be as useful to you as it can.

Tr. at 122:18-123:25 (Court).

## LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the

initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving

party's case.'"  <u>Herrera v. Santa Fe Pub. Sch.</u>, 956 F. Supp. 2d 1191, 1221 (D.N.M.

2013)(Browning, J.)(quoting <u>Bacchus Indus., Inc. v. Arvin Indus., Inc.</u>, 939 F.2d 887, 891 (10th

Cir. 1991)).  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

---

[20]The parties alerted the Court to their mediation scheduled July 17, 2017, earlier in the hearing.

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, <u>or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."</u>  <u>Celotex</u>, 477 U.S. at 323-25.  On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment." <u>Cardoso v. Calbone</u>, 490 F.3d 1194, 1197 (10th Cir. 2007).

<u>Plustwik v. Voss of Norway ASA</u>, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.) (emphasis added).  "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[21]  Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. at 324; <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 256.

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." <u>Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.</u>, 912 F.2d 1238, 1241 (10th Cir. 1990).  <u>See</u> <u>Vitkus v. Beatrice Co.</u>, 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth

---

[21]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme Court of the United States of America, dissented in <u>Celotex Corp. v. Catrett</u>, this sentence is widely understood to be an accurate statement of the law.  <u>See</u> 10A Charles Allen Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.")(internal quotation marks omitted).    Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (citation omitted)(internal quotation marks omitted)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."  Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (D. Kan. 2008)(Robinson, J.)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539. "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted). Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party, there is no genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). See also Am. Mech. Sols., L.L.C. v. Northland Process Piping, Inc., 184 F. Supp. 3d 1030, 1061 (D.N.M. 2016)(Browning, J.)(considering the nuance of a motion for summary judgment, and the interplay between state and federal law, and providing -- in part -- that "New Mexico, along with other jurisdictions, has required expert testimony when the issue of causation is presented in a context which is not a matter of common knowledge").

When reviewing a motion for summary judgment, the court should keep in mind certain principles. First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249. Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court

must "bear in mind the actual quantum and quality of proof necessary to support liability."
Anderson v. Liberty Lobby, Inc., 477 U.S. at 254. Third, the court must resolve all reasonable
inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most
favorable to the nonmoving party. See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999);
Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be
believed, and all justifiable inferences are to be drawn in his favor."). Fourth, the court cannot
decide any issues of credibility. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's
version of the facts. This doctrine developed most robustly in the qualified immunity arena. In
Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment was
appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts.
550 U.S. at 378-81. The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most
> favorable to the nonmoving party only if there is a "genuine" dispute as to those
> facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving
> party has carried its burden under Rule 56(c), its opponent must do more than
> simply show that there is some metaphysical doubt as to the material facts . . . .
> Where the record taken as a whole could not lead a rational trier of fact to find for
> the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec.
> Industrial Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote
> omitted). "[T]he mere existence of *some* alleged factual dispute between the
> parties will not defeat an otherwise properly supported motion for summary
> judgment; the requirement is that there be no *genuine* issue of *material* fact."
> Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . . When opposing
> parties tell two different stories, one of which is blatantly contradicted by the
> record, so that no reasonable jury could believe it, a court should not adopt that
> version of the facts for purposes of ruling on a motion for summary judgment.
>
> That was the case here with regard to the factual issue whether respondent
> was driving in such fashion as to endanger human life. Respondent's version of
> events is so utterly discredited by the record that no reasonable jury could have
> believed him. The Court of Appeals should not have relied on such visible
> fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (emphasis in original).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County and explained:

[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts." York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008) (quoting Scott, 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (brackets omitted). "The Tenth Circuit, in Rhoads v. Miller, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),[22]] explained that the blatant contradictions of the record must be supported by more than other witnesses' testimony[.]" Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.)(citation omitted), aff'd, 499 F. App'x 771 (10th Cir. 2012).

In evaluating a motion for summary judgment based on qualified immunity, we take the facts "in the light most favorable to the party asserting the injury." Scott v. Harris, 550 U.S. 372, 377 (2007). "[T]his usually means adopting . . . the plaintiff's version of the facts," id. at 378, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," id. at 380. In Scott, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of the events. 550 U.S. at 379. Here, there is no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads'

---

[22]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court finds that Rhoads v. Miller has persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

testimony. There is only other witnesses' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury. And given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not its admissibility . . . . Mr. Rhoads alleges that his injuries resulted from a beating rendered without resistance or provocation. If believed by the jury, the events he describes are sufficient to support a claim of violation of clearly established law under Graham v. Connor, 490 U.S. 386, 395-96 (1989), and this court's precedent.

Rhoads v. Miller, 352 F. App'x at 291-92 (internal quotation marks omitted). See Lymon v. Aramark Corp., 728 F. Supp. 2d at 1249-50 (quoting Rhoads v. Miller, 352 F. App'x at 291-92). In a concurring opinion in Thomson v. Salt Lake County, the Honorable Jerome A. Holmes, United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal question of qualified immunity and "determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the legal question before the court," before inquiring into whether there are genuine issues of material fact for resolution by the jury. 584 F.3d at 1326-27 (Holmes, J., concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770 (11th Cir. 1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes are irrelevant to the qualified immunity analysis because that analysis assumes the validity of the plaintiffs' facts").

## NEW MEXICO LAW REGARDING NEGLIGENCE

Generally, a negligence claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based on a standard of reasonable care, and the breach being a cause-in-fact and proximate cause of the plaintiff's damages. See Coffey v. United States, 870 F. Supp. 2d 1202, 1225 (D.N.M. 2012)(Browning, J.)(citing Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 6, 73 P.3d 181, 185-86). "In New Mexico, negligence encompasses the concepts of foreseeability of harm to the person injured and of a duty of care

toward that person." Ramirez v. Armstrong, 1983-NMSC-104, ¶ 8, 673 P.2d 822, 825, overruled on other grounds by Folz v. State, 1990-NMSC-075, ¶ 3, 797 P.2d 246, 249. Generally, negligence is a question of fact for the jury. See Schear v. Bd. of Cnty Comm'rs, 1984-NMSC-079, ¶ 4, 687 P.2d 728, 729. "A finding of negligence, however, is dependent upon the existence of a duty on the part of the defendant." Schear v. Bd. of Cnty. Comm'rs, 1984-NMSC-079, ¶ 4, 687 P.2d at 729. "Whether a duty exists is a question of law for the courts to decide." Schear v. Bd. of Cnty Comm'rs, 1984-NMSC-079, ¶ 4, 687 P.2d at 729 (citation omitted). Once courts recognize that a duty exists, that duty triggers "a legal obligation to conform to a certain standard of conduct to reduce the risk of harm to an individual or class of persons." Baxter v. Noce, 1988-NMSC-024, ¶ 11, 752 P.2d 240, 243.

New Mexico courts have stated that foreseeability of a plaintiff alone does not end the inquiry into whether the defendant owes a duty to the plaintiff. See Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 7, 73 P.3d at 186. New Mexico courts have recognized that, "[u]ltimately, a duty exists only if the obligation of the defendant [is] one to which the law will give recognition and effect." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 9, 73 P.3d at 187 (internal quotation marks omitted). To determine whether the defendant's obligation is one to which the law will give recognition and effect, courts consider legal precedent, statutes, and other principles of law. See Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 9, 73 P.3d at 186.

"As a general rule, an individual has no duty to protect another from harm." Grover v. Stechel, 2002-NMCA-049, ¶ 11, 45 P.3d 80, 84. "[C]ertain relationships, however, that give rise to such a duty [include]: (1) those involving common carriers, innkeepers, possessors of land; and (2) those who voluntarily or by legal mandate take the custody of another so as to deprive the other of his normal opportunities for protection." Grover v. Stechel, 2002-NMCA-049, ¶ 11,

45 P.3d at 84.  "[W]hen a person has a duty to protect and the third party's act is foreseeable, 'such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the [person who has a duty to protect] from being liable for harm caused thereby.'"  Reichert v. Atler, 1994-NMSC-056, ¶ 11, 875 P.2d 379, 382.

"[T]he responsibility for determining whether the defendant has breached a duty owed to the plaintiff entails a determination of what a reasonably prudent person would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all the surrounding circumstances."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 33, 73 P.3d at 194.  "The finder of fact must determine whether Defendant breached the duty of ordinary care by considering what a reasonably prudent individual would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all surrounding circumstances of the present case . . . ."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 33, 73 P.3d at 195.

"A proximate cause[23] of an injury is that which in a natural and continuous sequence [unbroken by an independent intervening cause] produces the injury, and without which the injury would not have occurred."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195.  "It need not be the only cause, nor the last nor nearest cause."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195.  "It is sufficient if it occurs with some other cause acting at the same time, which in combination with it, causes the injury."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195.

---

[23]The 2004 amendments to Uniform Jury Instruction 13-305 eliminated the word "proximate" within the instruction.  See Use Note, NMRA Civ. UJI 13-305.  The drafters added, however, that the change was "intended to make the instruction clearer to the jury and do[es] not signal any change in the law of proximate cause."  Editor's Notes, N.M. Rul. Amend. Civ. UJI 13-305.

**NEW MEXICO LAW REGARDING EXPERT TESTIMONY IN PROFESSIONAL MALPRACTICE CASES**[24]

New Mexico law generally requires expert testimony to establish professional malpractice. "In professional negligence cases, both breach of the implied warranty to use reasonable skill under contract law and negligence resulting in a finding of malpractice must be proved by expert testimony *unless* the case is one where exceptional circumstances within the common experience or knowledge of a layman are present." Adobe Masters, Inc. v. Downey, 1994-NMSC-101, ¶ 9, 883 P.3d 133, 135 (italics in original)(stating that no expert is needed to determine whether a party has totally breached a specific term of a professional service contract which does not call into question the performance standards of the profession and noting no error where the district court instructed jury to consider evidence presented by architects testifying as expert witnesses to determine whether architect applied the knowledge and skill required by law); Cantrell v. Dendahl, 1972-NMCA-035, ¶ 15, 494 P.2d 1400, 1403 ("[P]laintiff, Mr. Cantrell, who is an architect, was permitted to express his opinion that the step was not consistent with standard architectural practice because it was unsafe."). The Supreme Court of New Mexico has stated in the context of doctors, for instance, that "[n]egligence of a doctor in a procedure which is peculiarly within the knowledge of doctors, and in which a layman would be presumed to be uninformed, would demand medical testimony as to the standard of care." Pharmaseal Labs., Inc. v. Goffe, 1977-NMSC-071, ¶ 17, 568 P.2d 589, 594. Similarly, when

---

[24]In this diversity action, the Court realizes that it must apply its own rules of evidence governing the admissibility of expert testimony, see Sims v. Great Am. Life Ins. Co., 469 F.3d 870, 883 (10th Cir. 2006), but also finds that whether a plaintiff must provide expert testimony to establish the elements of his claims is a matter governed by the state's substantive law, see Redland Soccer Club, Inc. v. Dep't of Army of U.S., 55 F.3d 827, 852 (3d Cir. 1995)("[T]he requirement of expert testimony on issues of the type involved here is a matter of substantive law governing a plaintiff's burden of proof.").  See also Wheeler Peak, LLC v. L.C.I.2, Inc., 2010 WL 611039, at *2 (D.N.M. 2010)(Browning, J.).

other professional activities, peculiarly within the knowledge of such professionals, are alleged to have been performed negligently, New Mexico law appears to demand expert testimony to establish the appropriate reasonable standard of care.  See Adobe Masters, Inc. v. Downey, 1994-NMSC-101, ¶ 9, 883 P.3d at 136 (citing Pharmaseal Labs., Inc. v. Goffe in a non-medical professional-negligence context).

## NEW MEXICO LAW REGARDING INTERVENING CAUSE

Under New Mexico law, an intervening force may interrupt the chain of causation and thereby supersede the original alleged negligence, product defect, or other grounds for liability, and relieve the defendant of liability.  See Johnstone v. City of Albuquerque, 2006-NMCA-119, ¶ 21, 145 P.3d 76, 83.  "Contributory negligence and independent intervening cause are questions for the jury, unless, as a matter of law, there is no evidence upon which to submit the issue to the jury."  City of Belen v. Harrell, 1979-NMSC-081, ¶ 17, 603 P.2d 711, 714.  "An intervening force is a superseding cause if the intervening force was not foreseeable at the time of the primary negligence."  Johnstone v. City of Albuquerque, 2006-NMCA-1191, ¶ 21, 145 P.3d at 83.

New Mexico law identifies suicide as an independent intervening cause that absolves a defendant of liability.  See, e.g., City of Belen v. Harrell, 1979-NMSC-081, ¶ 17, 603 P.2d at 714.  For example, in New Mexico, suicide is a voluntary, deliberate, and intentional act of self-destruction by someone of sound mind.  See Solorzano v. Bristow, 2004-NMCA-136, ¶ 14, 103 P.3d 582, 586.  "The voluntary, willful act of suicide is a new or intervening agency that breaks the chain of causation."  Johnstone v. City of Albuquerque, 2006-NMCA-119, ¶ 22, 145 P.3d at 83.  Consequently, where the record reveals such a deliberate, intentional act of suicide, summary judgment is appropriate because proximate causation cannot be proven.  See Johnstone

v. City of Albuquerque, 2006-NMCA-119, ¶ 28, 145 P.3d at 85.

In Johnstone v. City of Albuquerque, the Court of Appeals of New Mexico rejected the claim that the decedent's stepfather was responsible for her suicide because the decedent used his gun and he was a police officer. See 2006-NMCA-119, ¶¶ 1-2, 145 P.3d at 78. The Court of Appeals stated:

> When an individual commits suicide using a gun owned by someone else, the owner of the gun is not liable for the death under settled negligence principles. In the absence of intentional conduct that creates the risk of suicide, or a legally recognized special relationship and knowledge of a specific likelihood of harm that gives rise to a duty to avoid harm, suicide operates as an independent intervening cause of death. In this case, we decline Plaintiff's invitation to abrogate this long-standing precedent. Defendant's sixteen year-old stepdaughter used his firearm to commit suicide. Her estate sued him individually, together with his employer the City of Albuquerque, alleging that Defendant was grossly negligent in leaving his firearm unattended. Summary judgment was entered for Defendant in his individual capacity, dismissing Plaintiff's suit. We affirm.

2006-NMCA-119, ¶ 1, 145 P.3d at 78. The Court of Appeals noted: "Courts generally decline to impute a duty to the defendant when he neither caused the decedent's uncontrollable suicidal impulse nor had custody of the decedent and knowledge of her suicidal ideation." 2006-NMCA-119, ¶ 10, 145 P.3d at 81 (internal quotation marks omitted).

There are two exceptions to this general rule. See 2006-NMCA-119, ¶ 11, 145 P.3d at 81. One is when the actor's tortious conduct "induces a mental illness in the decedent from which the death results." 2006-NMCA-119, ¶ 11, 145 P.3d at 81. The other is when there is a duty that results "from a special relationship between the decedent and the defendant, that presumes or includes knowledge of the decedent's risk of suicide." 2006-NMCA-119, ¶ 11, 145 P.3d at 81. The Court of Appeals noted that "special relationships are set forth in the Restatement (Second) of Torts §§ 314A, 315-319 (1999)." 2006-NMCA-119, ¶ 11, 145 P.3d at 81. The Court of Appeals found that neither exception was applicable to the facts in Johnstone

v. City of Albuquerque.  See 2006-NMCA-119, ¶ 12, 145 P.3d at 81.  The Court of Appeals rejected the argument that the defendant had a special relationship with the decedent because "New Mexico has not found such a special relationship to exist between parent and child." 2006-NMCA-119, ¶ 12, 145 P.3d at 82.  The Court of Appeals distinguished the relationship between a mental health professional and a patient and the relationship between a parent and child, because of the professional's "knowledge of the patient, a layperson could not reasonably be expected to anticipate the mental health consequences of their acts or omissions."  2006-NMCA-119, ¶ 12, 145 P.3d at 82.

In Solorzano v. Bristow, 2004-NMCA-136, 103 P.3d 582, the Court of Appeals of New Mexico held that a specific duty could exist between a decedent and a defendant who had directly observed the decedent's behavior.  See 2004-NMCA-135, ¶ 21, 103 P.3d at 587.  The decedent in Solorzano v. Bristow began acting erratically while her mother, the *1201 defendant, drove. See 2004-NMCA-135, ¶¶ 2-5, 145 P.3d at 583-84.  The decedent "either fell or jumped from a van being driven by [the d]efendant." 2004-NMCA-135, ¶ 2, 103 P.3d at 583.  The Court of Appeals would not "indulge" a presumption in favor of suicide because the decedent "fell from the vehicle without any intervention from anyone else."  2004-NMCA-135, ¶ 16, 103 P.3d at 586.  The Court of Appeals held, on the facts presented in Solorzano v. Bristow that the harm to the decedent was foreseeable.  See 2004-NMCA-135, ¶ 21, 103 P.3d at 587.

## ANALYSIS

The Court denies the MSJ.  Nicholson has met her burden to overcome Good Samaritan's arguments in the MSJ, and establish genuine factual issues, by proffering sufficient evidence to support her claims of medical negligence.  The Court also grants in part and denies in part the Motion to Exclude, excluding Dr. Winston's testimony only to the extent she explicitly relies on

hearsay statements that Darrow was "cyanotic" and pulseless before EMTs arrived.

## I.  NICHOLSON MUST ESTABLISH THE ELEMENTS OF HER MEDICAL NEGLIGENCE CLAIM WITH TESTIMONY BY A QUALIFIED EXPERT AS TO BREACH AND PROXIMATE CAUSE.

To conceptualize Good Samaritan's argument that Nicholson has failed to adduce sufficient evidence to refute its MSJ's assertions of material fact, the Court must first describe the strictures of a medical negligence claim in New Mexico.  Nicholson brings suit against Good Samaritan for medical negligence resulting in Darrow's wrongful death.  See Complaint at 1. Specifically, Nicholson's claim appears to be, in short, that Good Samaritan breached its duty to Darrow to procure emergency transportation by not procuring such emergency transportation earlier than it eventually did, and that this breach proximately caused Darrow's death.  See Complaint ¶ 11, at 2-3.  Compare MSJ at 7-11 ("While Plaintiff has asserted various theories of how Good Samaritan was negligent -- supposed inadequate training, supposed inadequate response to the accidental removal of Tia Darrow's trach, and supposed lack of a proper care plan regarding how to respond to removal of the trach -- all of these theories boil down to an alleged failure by Good Samaritan to more quickly request an emergency response by EMS."), with Response at 1 ("When the trach tube was dislodged and the Defendant's staff realized they could not replace it, an emergency response was needed as soon as possible.").  Nicholson has also explained the nuance of her theory giving rise to her Complaint:

> Pursuant to the detailed expert opinions of Dr. Jane Winston, it is clear that the Defendant's staff was not adequately trained to deal with the emergency situation which arose when Plaintiff's daughter, Tia Darrow, had her tracheostomy tube . . . dislodged and they were not able to reinsert it.  It is clear the staff did not take prompt action to prevent the brain damage Ms. Darrow suffered and ultimately died from because of inadequate oxygen supply to her brain.  Ms. Darrow was absolutely reliant on the trach to keep her alive.  When the trach tube was dislodged and the Defendant's staff realized they could not replace it, an emergency response was needed as soon as possible.  It is well recognized by multiple medical institutions such as the United States National Library of

> Medicine that lack of oxygen to the brain will cause permanent brain damage in as little as four (4) minutes. Another four to six minutes without the brain receiving adequate oxygen will result in increased brain damage, coma and then death.  Dr. Jane Winston, Plaintiff's expert, is eminently qualified to testify on the specific issues of negligence and causation.

Response at 1-2 (emphasis in original).

To state a claim for medical negligence under New Mexico law, then, Nicholson must establish the existence of a duty from Good Samaritan to Darrow, and Good Samaritan's breach of that duty, with that breach being a cause-in-fact and proximate cause of Nicholson's damages. See Coffey v. United States, 870 F. Supp. 2d at 1225 (citing Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 6, 73 P.3d 181, 185-86).  Determining whether a duty, or a specific standard of care, has been breached is generally accomplished by reference to "what a reasonably prudent person would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all the surrounding circumstances."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 33, 73 P.3d at 194.  Where the claim is specifically made for medical negligence, as opposed to ordinary negligence -- which is the case in Nicholson's Complaint -- Nicholson must establish that Good Samaritan breached its specific medical standard of care owed to Darrow by using "expert medical testimony unless the fact finder can resort to common knowledge."  Tanuz v. Carlberg, 1996-NMCA-076, ¶ 14, 921 P.2d 309 (citing Pharmaseal Labs., Inc. v. Goffe, 1977-NMSC-071, ¶ 17, 568 P.2d 589, 594 ("Negligence of a doctor in a procedure which is peculiarly within the knowledge of doctors, and in which a layman would be presumed to be uninformed, would demand medical testimony as to the standard of care.")).  Accordingly, New Mexico courts instruct juries in medical negligence litigation with the following New Mexico Uniform Jury Instruction:

> In [treating] [operating upon] [making a diagnosis of] [caring for] a patient, _____ (name of defendant) is under the duty to possess and apply the

knowledge and to use the skill and care ordinarily used by reasonably well-qualified [doctors] [_____s (other health care provider)] practicing under similar circumstances, giving due consideration to the locality involved.  A [doctor] [_____ (other health care provider)] who fails to do so is negligent.

[The only way in which you may decide whether the [doctors] [_____s (other health care provider)] in this case possessed and applied the knowledge and used the skill and care which the law required of [him] [her] is from evidence presented in this trial by (doctors) [_____s (other health care provider)] testifying as expert witnesses. In deciding this question, you must not use any personal knowledge of any of the jurors.]

NMRA Civ. UJI 13-1101.[25]  No party in this case disputes that Darrow's tracheostomy tube reinsertion constitutes a procedure beyond a layman's knowledge and thus demands medical testimony as to Good Samaritan's requisite standard of care under the aforementioned jury instruction.

Assuming she can establish breach in that manner, Nicholson must, thereafter, further establish that Good Samaritan's breach was the proximate cause of Darrow's injury, where proximate cause is the cause-in-fact that, in a natural and continuous sequence, and unbroken by an independent intervening cause, produces the injury.  See NMRA Civ. UJI 13-305.  To establish such proximate causation, in this medical malpractice context, Nicholson must similarly use expert medical testimony, because, where "the cause and effect of a physical condition lies in a field of knowledge in which only a medical expert can give a competent opinion," a plaintiff must introduce expert medical testimony that establishes causation.  Woods v. Brumlop, 1962-NMSC-133, ¶ 15, 377 P.2d 520, 523.  See O'Banion v. Owens Corning Fiberglass Corp., 968 F.2d 1011, 1013 (10th Cir. 1992)(affirming an order that excluded evidence of cancer where plaintiff presented  no evidence "from a qualified  medical  expert

---

[25]"The Supreme Court of New Mexico's adoption of uniform jury instructions proposed by standing committees of the Court establishes a presumption that the instructions are correct statements of law."  Back v. ConocoPhillps Co., 2012 WL 6846397, at *15 n.2 (D.N.M. 2012) (Browning, J.)(citing State v. Wilson, 1994-NMSC-009, ¶ 5, 867 P.2d 1175, 1178).

stating that there is a reasonable medical probability the Plaintiff will have a cancer condition from his asbestos related disease"). Suffice it to say, the plaintiff in a medical negligence action is tasked with employing the support of a medical expert when bringing their claims against an allegedly negligent tortfeasor.

Accordingly, Good Samaritan first takes issue with Nicholson's proffer of only Dr. Winston's expert testimony to support her medical negligence claim. See Motion to Exclude at 1. Good Samaritan, specifically, argues that Nicholson cannot "establish that Good Samaritan breached any duty," nor can she establish that "Good Samaritan's alleged breach was the proximate cause" of Darrow's death. MSJ at 7-11. Regarding Nicholson's inability to establish breach of duty, Good Samaritan argues that "Dr. Winston lacks the necessary qualifications -- namely any experience whatsoever with nursing standards of care -- to give any opinions regarding the actions that Good Samaritan was required to take." MSJ at 7-8. And, regarding Nicholson's inability to establish proximate causation, Good Samaritan argues:

> Given that Plaintiff's claim centers entirely around Good Samaritan's alleged failure call earlier for emergency transportation to the hospital, Plaintiff must introduce expert medical testimony that establishes to a reasonable medical probability that the alleged negligent acts of Good Samaritan caused Tia Darrow's death -- i.e., that if Good Samaritan had called earlier for emergency transportation to the hospital, Ms. Darrow would not have gone into respiratory distress and died. See e.g., Woods, 71 N.M. at 225, 377 at 523. Even under the summary judgment standard applied by New Mexico courts, which is more stringent than that applied by the federal courts, courts routinely grant summary judgment in favor of defendants where the plaintiff fails to offer expert testimony establishing proximate cause.

MSJ at 10-11. As to proximate causation, Good Samaritan also argues that -- should the Court accept Nicholson's proffer of Dr. Winston's testimony -- Nicholson nonetheless fails to establish with admissible evidence that Good Samaritan caused Darrow's lapse in breathing before EMTs arrived, or that an earlier call for emergency transport would have resulted in a different

emergency response and outcome.  See MSJ at 11-20.  The Court, first, will address the viability

of Dr. Winston's testimony, as she appears to be Nicholson's linchpin in this case.  The Court's

analysis in that regard, essentially, must primarily address the necessary expert qualifications for

expert's testifying in medical-negligence diversity cases in New Mexico.

The Court's examination of the admissibility of standard-of-care expert testimony hinges

on both state substantive law and federal procedural law: "[I]f a witness is deemed competent to

testify to the substantive issue in the case [under state law], such as the standard of care, his or

her testimony should then be screened by Rule 702 to determine if it is otherwise admissible

expert testimony." Adams v. Lab. Corp. of Am., 760 F.3d 1322, 1338 (11th Cir. 2014)(Garza, J.,

specially concurring)(quoting McDowell v. Brown, 392 F.3d 1283, 1286-87 (11th Cir. 2004)).

See Wheeler Peak, LLC v. L.C.I.2, Inc., 2010 WL 611039, at *2.  In Wheeler Peak, LLC v.

L.C.I.2, Inc., the Court considered whether an expert was qualified to testify regarding the

standard of care for architects.  See 2010 WL 611039, at *2.  The Court conducted its analysis as

follows:

> In this diversity action, the Court realizes that it must apply its own rules of
> evidence governing the admissibility of expert testimony, see Sims v. Great Am.
> Life Ins. Co., 469 F.3d [at] 883 [], but also finds that whether a plaintiff must
> provide expert testimony to establish the elements of his claims is a matter
> governed by the state's substantive law, see Redland Soccer Club, Inc. v. Dep't of
> Army of U.S., 55 F.3d [at] 852 []("[T]he requirement of expert testimony on
> issues of the type involved here is a matter of substantive law governing a
> plaintiff's burden of proof.").

2010 WL 611039, at *2.  See Holley v. Evangelical Lutheran Good Samaritan Soc., 588 F.

App'x 792, 794-96 (10th Cir. 2014).

The Eleventh Circuit, similarly, in McDowell v. Brown, considered Georgia law, which

requires a standard-of-care expert in a medical malpractice case to possess "knowledge of the

standard of care applicable to the defendant-professional as to at least one of the matters on

- 72 -

which the plaintiff's malpractice claim is based." McDowell v. Brown, 392 F.3d at 1283. See

Adams v. Lab. Corp. of Am., 760 F.3d at 1338-39 (internal quotation marks and citations

omitted). In McDowell v. Brown, the Eleventh Circuit reasoned that, because "[a] physician's

area of expertise necessarily encompasses the standard of care applicable to nurses . . . the

experts [were] competent to render opinions as to the applicable standard of care for Wexford's

nurses." 392 F.3d at 1297. Accordingly, the Eleventh Circuit concluded that "the district court

erred in excluding the experts' testimony as to the applicable standard of care." 392 F.3d at 1301.

Judge Garza, then, in Adams v. Lab. Corp. of Am., described the McDowell v. Brown opinion as

follows:

> To be sure, the panel did not expressly assess the standard-of-care testimony
> under either Rule 702 or Daubert.[] However, the panel's earlier conclusion that
> these federal evidentiary rules govern the standard-of-care expert testimony in
> addition to state substantive law . . . can only mean that the doctors' competency
> under Georgia law was also sufficient to satisfy both Rule 702 and Daubert.

Adams v. Lab. Corp. of Am., 760 F.3d at 1339.

In this regard, as a matter of state substantive law, Good Samaritan argues that Dr.

Winston -- a doctor -- is unqualified to testify as to the substantive standard of care that applies

to Good Samaritan's nursing staff. Good Samaritan contends that, because Nicholson has not

proffered a competent expert to testify to the issues in her medical negligence claim, the record is

devoid of evidence which rebuts the MSJ's arguments. Nicholson, of course, disagrees, citing

generally to NMRA Civ. UJI 13-1101 in the following manner:

> When this case goes to trial, the jury will not be given any instruction regarding a
> "standard of care." Instead the jury will be instructed that any "healthcare
> provider . . . treating [or] caring for a patient . . . is under the duty to possess and
> apply and use the skill ordinarily used by reasonably well-qualified . . . healthcare
> providers . . ." NMRA 13-1101. There is no "standard of care" rule or case law
> in New Mexico which governs jury deliberations in these types of cases. Here,
> viewing the facts in the light most favorable to Plaintiff, there was a serious
> failure by Defendant's employees to "possess and apply the knowledge and to use

the skill ordinarily used by reasonably well qualified . . . healthcare providers."

Response at 6.  The Court notes that this statement is a generally inaccurate representation of NMRA Civ. UJI 13-1101, which instead requests trial courts to fill in certain blanks on a case-by-case basis, by providing, in part:

> In [treating] [operating upon] [making a diagnosis of] [caring for] a patient, _____ (name of defendant) is under the duty to possess and apply the knowledge and to use the skill and care ordinarily used by reasonably well-qualified [doctors] [_____s (other health care provider)] practicing under similar circumstances, giving due consideration to the locality involved.

NMRA Civ. UJI 13-1101.  NMRA Civ. UJI 13-1101's Use Note for the instruction then explains: "In the . . . blanks, the type of health care provider, such as doctor, nurse, or chiropractor, should be inserted."  Use Note, NMRA Civ. UJI 13-1101.  At first glance it might appear that only a nurse can testify to the standard of care in a medical negligence case involving nurses.  The Court doubts, however, that New Mexico courts would ascribe to such a narrow and constricting view of expert qualification in medical negligence actions in New Mexico, suggesting to the Court that it may not be so simple to conclude that a doctor, like Dr. Winston, is per se disallowed from testifying under NMRA Civ. UJI 13-1101 as to the standard of care in a medical negligence case involving nurses, like Good Samaritan's nursing staff.  The Court finds little in the body of New Mexico case law specifically considering NMRA Civ. UJI 13-1101; only twenty-four New Mexico cases have cited the UJI, but only seven of those twenty-four specifically analyzed the UJI, and none addressed this precise issue of first impression.

The Court first looks for answers in Vigil v. Miners Colfax Medical Center, where the Court of Appeals of New Mexico faced a "single issue on appeal . . . [:] whether the trial court committed reversible error by giving the jury the medical specialist instruction, SCRA 1986, 13-1102 (Repl. 1991), rather than the general practitioner instruction, SCRA 1986, 13-1101, under

the facts of this case."  1994-NMCA-054, ¶ 1, 875 P.2d 1096, 1097.  The Court of Appeals of

New Mexico was faced with the import of NMRA Civ. UJI 13-1102, which provides the

standard of care instruction applicable to a healthcare practitioner who holds himself or herself

out to be a specialist as follows:

> _____ (name of defendant), who held [himself] [herself] out as a specialist
> in _____ (area of specialty), having undertaken to [treat] [operate on] [make
> diagnosis of] [care for] a patient in this specialized field, is under the duty to
> possess and apply the knowledge and to use the skill and care ordinarily used by
> reasonably well-qualified specialists practicing under similar circumstances,
> giving due consideration to the locality involved. A doctor who fails to do so is
> negligent.
>
> [The degree of knowledge, skill, and care required of a specialist is usually higher
> than that required of a non-specialist, but it is never lower. Specialists are
> responsible for a certain base of knowledge in common with general practitioners,
> as well as additional knowledge in the field of their specialty.]
>
> [The only way in which you may decide whether the doctor in this case possessed
> and applied the knowledge and used the skill and care which the law required of
> [him] [her] is from evidence presented in this trial by doctors testifying as expert
> witnesses. In deciding this question, you must not use any personal knowledge of
> any of the jurors.]

NMRA Civ. UJI 13-1102 (according to the Committee Commentary, the second paragraph was

added to NMRA Civ. UJI 13-1102 in response to this case).  NMRA Civ. UJI 13-1102's Use

Note for the instruction, the Court notes for clarity, provides:

> This is the standard of care instruction applicable to a specialist. UJI 13-1101
> NMRA sets forth the duty of a non-specialist general practitioner. The name of
> the defendant should be inserted in the first blank in the first paragraph. The area
> of specialty should be inserted in the second blank in the first paragraph.
> Bracketed language should be chosen as appropriate. The bracketed middle
> paragraph should be omitted unless the court determines that the issues in the case
> require that the jury be instructed regarding a medical specialist's responsibility
> for basic general knowledge in areas outside the specific area of specialty. The
> bracketed final paragraph should be omitted in those cases in which the court
> determines that expert testimony is not required and negligence can be determined
> by resort to common knowledge ordinarily possessed by the average person.

Use Note, NMRA Civ. UJI 13-1102.  In its consideration of the distinctions between NMRA

Civ. UJI 13-1101 and NMRA Civ. UJI 13-1102, the Court of Appeals of New Mexico explained

that the defendant in that case was holding himself out to be a "specialist in general surgery,"

however, the issue was the claim for medical negligence involved this specialist "miss[ing] a

heart attack that no medical student should have missed." <u>Vigil v. Miners Colfax Medical</u>

<u>Center</u>, 1994-NMCA-054, ¶ 15, 875 P.2d at 1099-1100.  The Court of Appeals of New Mexico

mused:

> There appear to be two types of non-specialist and specialist instructions: two-tier instructions which are to be given together, and alternative instructions of which only one is to be given to the jury.  Oklahoma is a state with the first type of instruction.  The Oklahoma Supreme Court has determined that when the defendant is a specialist, the non-specialist and specialist instructions should be given together because the specialist instruction is a refinement of, and not an alternative to, the more general duty instruction.  *Sisson By and Through Allen v. Elkins*, 801 P.2d 722, 726 (Okla. 1990)(non-specialist instruction addresses knowledge and skill required and specialist instruction addresses required degree of care).
>
> We believe that the New Mexico instructions belong to the second group, and the instructions were drafted as alternatives.  This interpretation is based on the similarity of language of the statutes and the directions for use of SCRA 13-1101, which we discussed previously.  The Colorado non-specialist and specialist instructions also have similar language, although it is not the same language as the New Mexico instructions.  The Colorado Supreme Court held that the trial court can commit reversible error by giving both the specialist and the non-specialist instructions when there was undisputed evidence that the defendant was a specialist because it would be impossible to determine that the jury used the correct (specialist) standard.  *Jordan v. Bogner*, 844 P.2d 664, 667-68 (Colo. 1993)(en banc).  Thus, giving both SCRA 13-1101 and -1102 is not a satisfactory option for making sure the jury understands that a specialist is held to a higher standard.

<u>Vigil v. Miners Colfax Medical Center</u>, 1994-NMCA-054, ¶¶ 16-17, 875 P.2d at 1100.  The

Court of Appeals of New Mexico, after determining that the trial court could give either the

general or specialist instruction -- but not both -- then explored the maxims of New Mexico law

that "an expert testifying regarding medical malpractice need not be in the same area of practice

as the defendant," and that "a general practitioner may provide expert testimony relevant to the

performance of a specialist as long as the general practitioner's experience or training provides a sufficient foundation for his testimony."  1994-NMCA-054, ¶ 20, 875 P.2d at 1101.  In that sense, the Court of Appeals of New Mexico held that, while a specialist is held to a higher standard of care under NMRA Civ. UJI 13-1102 -- no matter the nature of the alleged injury at issue -- expert testimony may be had by a general practitioner as to that area of common knowledge which the specialist necessarily shares with general practitioners.  See 1994-NMCA-054, ¶¶ 20-25, 875 P.2d at 1101-02.  The Court notes, then, that the Court of Appeals of New Mexico -- in the specialist context -- has allowed some flexibility as to the similarity between that professional designation of a medical-negligence defendant and the plaintiff's proffered expert, so long as the "general practitioner's experience or training provides a sufficient foundation for his testimony."  1994-NMCA-054, ¶ 20, 875 P.2d at 1101.

The Court is extremely cautious about not adhering strictly to the plain language of NMRA Civ. UJI 13-1101 and its Use Note's plain language, which clearly contemplate a distinction between experts in accordance with the nature of the profession.  NMRA Civ. UJI 13-1101's bracketed language does not otherwise divulge any intent suggesting a top-down type scheme, wherein a doctor could testify as to a nursing standard of care or a chiropractic standard of care, but not vice versa.  While Vigil v. Miners Colfax Medical Center appears to signify the Court of Appeals of New Mexico's willingness to be flexible as to the expert qualified to testify as to a specialist physician's breach under NMRA Civ. UJI 13-1102, the Court has no evidence that the Supreme Court of New Mexico would reach a similar conclusion regarding NMRA Civ. UJI 13-1101.  The Court also recognizes that, in Vigil v. Miners Colfax Medical Center, the expert in question was technically less qualified than the specialist defendant in some regard.  The Court also notes, however, that strict adherence to NMRA Civ. UJI 13-1101's plain

language would disqualify a large swath of healthcare professionals -- read, physicians -- who might be, in reality, competent to testify as to both nursing standards of care and physician standards of care.  The Supreme Court of New Mexico would not likely seek to bar a plaintiff's claims simply because the plaintiff retained a physician, and not a nurse, in pursuit of a medical negligence claim alleging fault by a nurse, where the physician's "experience or training provides a sufficient foundation for [their] testimony."  Vigil v. Miners Colfax Medical Center, 1994-NMCA-054, ¶ 20, 875 P.2d at 1101.

Other jurisdictions -- like Illinois -- have maintained a rule that is strikingly different. Illinois state courts have restricted expert testimony in medical malpractice actions to experts who are qualified in a "given school of medicine."  Specifically,

> [i]n medical malpractice suits such as the one at bar, the plaintiff must establish the applicable standard of care through expert testimony. . . .    It is well-established that, in order to testify as an expert on the standard of care in a given school of medicine, the witness must be licensed therein. . . .  A defendant has the right to have his competence judged by the standards of his own distinct profession and not by those of any other. . . .  Accordingly, a practitioner of one school of medicine is not competent to testify as an expert in a malpractice action against a practitioner of another school of medicine.

In Dolan, 77 Ill.2d at 283, the Supreme Court explained as follows:

> "The rationale of the general rule restricting expert testimony regarding the standard of care owed by a practitioner of a certain school of medicine is that 'there are different schools of medicine with varying tenets and practices[] and that inequities would be occasioned by testing the care and skill of a practitioner of one school of medicine by the opinion of a practitioner of another school' [citation]."

The court further explained as follows:

> "Illinois statutes [citations] provide for the regulation of practitioners of medicine and surgery, physical therapy, nursing, pharmacy, dental surgery, podiatry, optometry, etc. This is a clear expression by the legislature of public policy to recognize and regulate various schools of medicine. The various acts regulating

> the health professions [citations] provide for different training[] and regulate the treatment each profession may offer.  We simply are not disposed to provide for what, in effect, may result in a higher standard of care when the legislature, by recognizing various schools of medicine, has not done so."
>
> *Dolan*, 77 Ill.2d at 284.  While the court in *Dolan* barred the expert testimony of an orthopedic surgeon regarding the standard of care applicable to a podiatrist, the same rationale has been applied to bar the expert testimony of a physician regarding the standard of care applicable to the nursing profession. . . .  In *Sullivan*, the plaintiff offered the expert testimony of a board-certified physician specializing in internal medicine to establish the standard of care applicable to nurses.  The circuit court struck the expert's testimony and the supreme court affirmed.

Smith v. Pavlovich, 394 Ill. App. 458, 462 (internal quotation marks and citations omitted in places).  See J. Vance, Annotation, Competency of Physician or Surgeon of School of Practice Other Than That to Which Defendant Belongs to Testify in Malpractice Case, 85 A.L.R. 2d 1022, 1023 (1962).

The Court also concludes that New Mexico Courts would not summarily conclude that a physician would be competent as an expert regarding all matters involved in nursing standards of care simply by virtue of being a physician.  See Vigil v. Miners Colfax Medical Center, 1994-NMCA-054, ¶ 20, 875 P.2d at 1101.  Each discipline has its own peculiarities and standards, and through their symbiotic relationships hospitals and the like operate with distinct efficiency, much the same way that the symbiotic relationships in the legal profession -- amongst paralegals, lawyers, and legal assistants -- presently operates.  Indeed, the Court is impressed with the hypothesis that, quite possibly, there would be occasions where a physician's more-educated view of, say, the science underlying a medical procedure -- such as a tracheostomy tube reinsertion -- could result in overlooking the practicalities of that medical procedure in patient-specific scenarios affected by age, gender, size, etc.  Yet, much the same way that specialized physicians share common knowledge with general practice physicians, the Court cannot soundly

conclude that the Supreme Court of New Mexico would per se bar a physician expert from testifying as to shared nursing standards of care which they might have in common.

This conclusion brings the Court to Dr. Winston's qualifications beyond those of simply being a physician. Whether and what expert testimony is needed to establish a medical negligence claim is a matter of New Mexico substantive law, but the Court must police the admissibility of expert testimony under rules 701 and 702 of the Federal Rules of Evidence. Rule 701 of the Federal Rules of Evidence provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701. Rule 702, then, further provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. "[W]ithin the scope of [rule 702] are not only experts in the strictest sense of the word, e.g., physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses such as bankers or landowners testifying to land values." Fed. R. Evid. 702 advisory committee's note. In New Mexico, regarding medical negligence claims, a competent expert witness is needed to establish breach and proximate causation. Here, Good Samaritan provides that Dr. Winston essentially states: "It is my opinion, based on reviewing these records, that the Good Samaritan Society Four Corners staff failed to act promptly and appropriately when Ms. Darrow's tracheostomy tube was dislodged and she developed respiratory distress."

Motion to Exclude at 2 (citing Dr. Winston Report at 1-2). Good Samaritan takes issue with Dr. Winston's testimony under rule 702, because, at her deposition, she criticized "several aspects of the nursing care" that Darrow received at Good Samaritan, amounting to an opinion that the "nursing staff" "fell below the nursing standard of care in developing Ms. Darrow's care plan, training the nursing staff, and responding to the situation on September 9, 2014." Motion to Exclude at 2-3. Good Samaritan explains that Dr. Winston made "clear at her deposition that she is unqualified to render opinions about the nursing standard of care. Dr. Winston is not a nurse," and Dr. Winston has not trained as a nurse, published nursing textbooks, or "read the entire code of ethics for nurses." Motion to Exclude at 3 (citing Winston Depo. at 158:4-5, 21-22; 158:23-159:15). Further, Good Samaritan argues, Dr. Winston has not been directly involved in the administration and management of nursing staff at long-term care facilities, such as Good Samaritan. See Motion to Exclude at 3 (citing Winston Depo. at 162:19-165:12). Good Samaritan also provides: "Dr. Winston has never done tracheostomy care, training or supervision in a long-term care setting. . . . She has never performed day-to-day trach nursing care. . . . Dr. Winston testified that nursing is a separate profession from medicine." Motion to Exclude at 4 (citing Winston Depo. at 160:20-167:22). Thus, Good Samaritan argues, "Dr. Winston is unqualified to render opinion testimony about nursing care because she does not have scientific, technical, or other specialized knowledge about nursing that will help the trier of fact to understand the evidence or determine a fact in issue in this case." Motion to Exclude at 1 (citing Fed. R. Evid. 702). The question then becomes whether Dr. Winston is competent to testify as to the standard of care that Good Samaritan owed to its patients in a tracheostomy tube reinsertion situation in a long-term care facility as New Mexico law requires. In reviewing the record, the Court is not convinced that Good Samaritan's characterization of Dr. Winston's

credentials is entirely accurate, and concludes that under rule 702 Dr. Winston is qualified to offer an expert opinion in this case, because she appears to have the necessary knowledge and qualifications regarding general nursing practices and geriatric practice in a long-term care facility for the reasons that follow.

In considering Good Samaritan's Daubert v. Merrell Dow Pharms., Inc.-framed challenge to Nicholson's expert Dr. Winston, the Court is careful to maintain the proper balance between the court's role as gatekeeper and the jury's role as the ultimate fact finder. Cf. McDowell v. Brown, 392 F.3d at 1299-1300. Here, Good Samaritan's primary challenge to Dr. Winston's testimony regards her qualifications to give an expert opinion and does not necessarily challenge, for example, the methods employed by Dr. Winston in reaching her conclusions in the Dr. Winston Report. In their MSJ and Motion to Exclude, however, Good Samaritan generally conflates Daubert v. Merrell Dow Pharms., Inc.'s reliability test with rule 702's threshold inquiry regarding an expert's qualifications. See Fed. R. Evid. 702. Whether a witness is qualified as an expert under rule 702 turns on the witness' "knowledge, skill, experience, training, or education," Fed. R. Evid. 702; Daubert v. Merrell Dow Pharms., Inc.'s reliability test, by contrast, applies to the "reasoning and methodology" underlying the expert's opinion, United States v. Avitia-Guillen, 680 F.3d 1253, 1256 (10th Cir. 2012)(quoting United States v. Nacchio, 555 F.3d 1234, 1241 (10th Cir. 2009)(citing Fed. R. Evid. 702)). See United States v. Harry, 20 F. Supp. 3d 1196, 1222-26 (D.N.M. 2014)(Browning, J.)(treating expert qualifications and reliability under Daubert v. Merrell Dow Pharms., Inc. as separate inquiries). In Hernandez v. City of Albuquerque, the Court held that a witness was not qualified under rule 702 to testify to "opinions that involve medical expertise," because the witness had "no medical training or experience on which to base his opinion." Hernandez v. City of Albuquerque, 2003 LEXIS

26585, at *9 (D.N.M. 2003)(Browning, J.).  The Court then proceeded to analyze the proffered

expert's opinions under <u>Daubert v. Merrell Dow Pharms., Inc.</u>'s reliability test.  <u>See</u> <u>Hernandez</u>

<u>v. City of Albuquerque</u>, 2003 U.S. Dist. LEXIS 26585, at *10-12.  The Court concluded that a

witness was not qualified under rule 702, because the witness had only "basic first-aid training,"

and did not have the medical expertise to opine on the origin of a plaintiff's head wound.  2003

U.S. Dist. LEXIS 26585, at *3, 9-10.  Here, by contrast, Dr. Winston seeks to opine on the

emergency medical procedures and decisions that a nurse working in a long-term care facility

takes after a patient lost a tracheostomy tube, and argues that the Court should permit testimony

regarding such specialized knowledge if it assists the trier of fact to understand the evidence.

<u>See</u> <u>United States v. Muldrow</u>, 19 F.3d 1332, 1337 (10th Cir. 1994).  Here, Dr. Winston has

more expertise and specialized knowledge about emergency medical procedures and decisions

that a nurse working in a long-term care facility takes than most laypersons or even the Court,

and thus, her testimony would assist the trier of fact in understanding the evidence.  Her

knowledge about tracheostomy tubes is not zero.  She may have less experience than some

doctors or nurses, but she does -- as a medical doctor -- have knowledge, experience, education

and training with which she can consider the circumstances with more expertise than a

layperson.  Thus, the attack on her qualifications goes more to the weight of her expertise than it

goes to her qualifications.  <u>Cf.</u> <u>Vigil v. Miners Colfax Medical Center</u>, 1994-NMCA-054, ¶ 20,

875 P.2d at 1101.

More to the point, the Court concludes that Dr. Winston is qualified by training,

education, and experience to render an opinion on the circumstances of Darrow's death.  <u>See</u>

<u>United States v. Nacchio</u>, 555 F.3d at 1241 (citing Fed. R. Evid. 702).  Dr. Winston, as a

threshold matter: (i) is a Doctor of Medicine with a medical degree from the University of North

Dakota School of Medicine; (ii) completed a Geriatric Fellowship after graduation; (iii) serves as a Clinical Assistant Professor in the Department of Geriatrics at the University of North Dakota School of Medicine and Health Sciences; (iv) holds Board Certification of Added Qualifications from the American Board of Family Medicine in Geriatric Medicine (certified in 2001, recertified in 2011); (v) holds Board Certification as a Certified Medical Director, American Medical Doctor's Association, American Board of Post-Acute and Long-Term Care Medicine (certified in 2004, recertified in 2010 and 2016); (vi) holds certification in Advanced Cardiac and Trauma Life Support, as well as certification in Respecting Choices Advanced Care Planning Facilitator; (vii) was employed in General and Family Practice facilities from 1985 through 2003; (viii) was employed in Geriatrics Practice in Long-Term Care in 2004 in Arizona; (ix) was employed as a physician at Sanford Health in Minnesota from 2009-2015; (x) is presently employed as a physician at Sanford Health in North Dakota; (xi) has served as an expert witness and consultant in family medicine, long-term care, nursing home, assisted living and other geriatric medicine cases; (xii) is affiliated with the American and Arizona Geriatrics Society; and (xiii) has made various presentations to long term care and other medical professionals on geriatric topics including: polypharmacy, dementia care staff training, fall prevention, and end-of-life care.  See Curriculum Vitae of Jane Winston, M.D., at 1-3 (dated August 16, 2016), filed April 7, 2017 (Doc. 56-1)("Dr. Winston CV").  While her deposition, resume, and report do not talk specifically about her experience with tracheostomy tubes, it is unlikely that she has no experience, training, or schooling on tracheostomy tubes, especially given her expertise in geriatrics.  Taken together, this experience qualifies Dr. Winston as an expert regarding emergency medical procedures and decisions a nurse working in a long-term care facility takes.  Cf. Hernandez v. City of Albuquerque, 2003 U.S. Dist. LEXIS 26585, at *9-10 (witness not

qualified to testify because he had only "basic first-aid training"). An expert "'should not be required to satisfy an overly narrow test of his own qualifications.'" United States v. Harry, 20 F. Supp. 3d at 1223 (quoting Gardner v. Gen. Motors Corp., 507 F.2d 525, 528 (10th Cir. 1974)). Expert testimony should be liberally admitted under rule 702, see United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995), and the trial court has broad discretion in deciding whether to admit or exclude such testimony, see Werth v. Makita Elec. Works, Ltd., 950 F.2d 643, 647 (10th Cir. 1991). The Court concludes that, under rule 702, in light of her extensive training and experience in geriatrics, Dr. Winston is qualified to testify to her knowledge related to this medical negligence case and tracheostomy tubes.

As noted, the Court does not analyze expert qualifications under Daubert v. Merrell Dow Pharms., Inc.'s reliability test. See United States v. Harry, 20 F. Supp. 3d at 1222-26. Having established Dr. Winston's qualifications, however, the Court must still decide whether the proffered evidence will be reliable under Daubert v. Merrell Dow Pharms., Inc.. See United States v. Avitia-Guillen, 680 F.3d at 1256 ("If the expert is sufficiently qualified, then 'the court must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology.'")(quoting United States v. Nacchio, 555 F.3d at 1241 (citing Fed. R. Evid. 702)). Expert opinion testimony is reliable if: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. Although rule 702 enshrines a "liberal standard," Werth v. Makita Elec. Works, Ltd., 950 F.2d at 647, "[t]he trial court's gatekeeping function requires more than simply taking the expert's word for it," Hernandez v. City of Albuquerque, 2003 U.S. Dist. LEXIS 26585, at *8 (citing Daubert v. Merrell Dow Pharms., Inc., 43 F.3d at 1319). Here, the Court has no reason to question

whether Dr. Winston's proffered testimony is "the product of a reliable methodology" and sound reasoning.     United States v. Gutierrez-Castro, 805 F. Supp. 2d 1218, 1224 (D.N.M. 2011)(Browning, J.).   Good Samaritan has not challenged whether the Dr. Winston Report is grounded in scientifically valid methodologies, and, accordingly, the Court has no sound reason to question its legitimacy.  See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. at 593 n.11; Fed. R. Evid. 702 (allowing expert opinion testimony if "the witness has applied the principles and methods reliably to the facts of the case").   Again, under Daubert v. Merrell Dow Pharms., Inc. and rule 702, the Court notes that its role is to serve as a gatekeeper to keep scientific and other expert testimony that is not reliable and relevant out of the courtroom.  See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. at 596-97.  The Court must, therefore, ensure that the expert is sufficiently qualified to give the opinion, the expert's methodology must be sufficiently reliable, and the testimony must assist the trier of fact to understand an issue in the case.  See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. at 596-97.  Good Samaritan has not retained its own expert. It does not offer expert testimony showing any flaws in Dr. Winston's opinion.  Good Samaritan offers the only argument against her, and not peer critique.  The Court has no reason to consider that her opinion is not methodologically sound.  Because Dr. Winston's proffered testimony as to the Dr. Winston Report meets both rule 702 and the Daubert v. Merrell Dow Pharms., Inc. standards at this stage in the litigation, the Court notes that Dr. Winston may testify, and it is the jury that must decide how much weight, if any, to give that testimony.  Zuchowicz v. United States, 140 F.3d 381, 387 (2d Cir. 1998).

There is, however, one other major issue regarding Dr. Winston's proffered testimony, as the Winston Depo. foreshadowed, because Dr. Winston in part relies on hearsay statements in the EMT Carey Report to suggest that Darrow was cyanotic before the EMTs arrived.  See

Winston Depo. at 50:7-11 ("[W]hen the first crew arrived when she was noted to be cyanotic."). The Court, seeing no better opportunity than the present to address this issue, will consider it next.  The Court recognizes that rule 703 provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.  But if the facts or data would otherwise be admissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703.  Indeed, the Tenth Circuit has observed that "the expert may rely on facts outside the record and not personally observed, but of the kind that experts in his or her field reasonably rely on in forming opinions."  Werth v. Makita Elec. Works, Ltd., 950 F.2d at 648. Further, an expert's reliance upon facts or data pursuant to rule 703 does not require that the expert also conduct independent tests before offering an expert opinion based upon the facts or data upon which the expert relies.  Instead, rule 703 contemplates an "opinion" and not merely a recitation of the facts observed from independent testing.  The issue here, however, is that the undisputed record evidence completely undermines the reliability of certain statements within the EMT Carey Report and the San Juan Report which suggest that the first M10 EMT team discovered Darrow already cyanotic and, perhaps, pulseless (the Court notes that the undisputed proffers of evidence by all parties indicate that Darrow went cyanotic before pulseless, cf. EMT Carey Report at 5, which is why the Court has focused on the inquiry whether she was cyanotic before EMT arrival in tandem with a lack of pulse, because the record suggests that the cyanotic state preceded Darrow's lack of a pulse, or occurred concurrently, and should thus be considered in tandem).  See EMT Carey Report at 1-6; San Juan Report at 1-2; Response ¶ 13, at 5, Reply ¶ 11, at 6-11.  For one thing, as the undisputed facts provide, everyone with personal knowledge of

Darrow's state at the time that the M10 EMT team arrived has affied that Darrow was not cyanotic -- and that she was generally fine -- until some modicum of time after the M10 EMT team had arrived.  See Greenamyer Depo. at 95:18-96:13; Shriver Decl. ¶ 4, at 1; Pontious Decl. ¶ 8, at 2.  Seeing no testimony from the M10 EMT team members to the contrary, the Court cannot take at face value statements in the EMT Carey Report about the time period before EMT Carey arrived on scene as part of the second EMT ALS team.  The Court, accordingly, concludes that the unattributed statements in the EMT Carey Report suggesting that the M10 EMT team had discovered Darrow cyanotic and pulseless are out-of-court statements that Dr. Winston -- and Nicholson -- offer for the truth of the matter -- by their inclusion in the EMY Carey Report and the San Juan Report (wherein Darrow's attending physicians at the hospital parrot Carey's account) -- and are therefore inadmissible.  See EMT Carey Report at 1-6; San Juan Report at 1-2.  By analogy, the Court has, in the criminal context, provided: "Under Rule 703, experts can testify to opinions based on inadmissible evidence, including hearsay, if 'experts in the field reasonably rely on such evidence in forming their opinions.'"  United States v. Rodriguez, 125 F. Supp. 3d 1216, 1248 (D.N.M. 2015)(Browning, J.)(quoting United States v. Mejia, 545 F.3d 179, 197 (2d Cir. 2008)).  The Court continued:

> The expert may not, however, simply transmit that hearsay to the jury.  Instead, the expert must form his own opinions by "applying his extensive experience and a reliable methodology" to the inadmissible materials.  Otherwise, the expert is simply "repeating hearsay evidence without applying any expertise whatsoever," a practice that allows the Government "to circumvent the rules prohibiting hearsay."

United States v. Rodriguez, 125 F. Supp. 3d at 1248 (quoting United States v. Mejia, 545 F.3d 179, 197 (2d Cir. 2008)).  The Court will draw on this logic in considering the unique situation at hand regarding the EMT Carey Report, and its replication of hearsay statements from members of the M10 EMT team that Darrow was cyanotic, and, will -- to the extent that Dr. Winston

might rely on the fact that Darrow was cyanotic or pulseless before the EMTs arrived -- not consider those facts to be ones upon which "experts in the field reasonably rely . . . in forming their opinions." United States v. Rodriguez, 125 F. Supp. 3d at 1248.  Experts can rely on hearsay, but if everything suggests the hearsay is wrong, the expert cannot rely on an incorrect statement.  The speaker will have to find something else on which to rely.  The Court, then, considers its analysis of the Motion to Exclude complete; in its consideration of the MSJ, the Court will credit the Dr. Winston Report and the Winston Depo., because she is a physician qualified to testify in this case under NMRA Civ. UJI 13-1101 and rule 702 of the Federal Rules of Evidence.  Further, having no reason to otherwise question the majority of Dr. Winston's proffered opinions under Daubert v. Merrell Dow Pharms., Inc., the Court will grant the Motion to Exclude testimony by Dr. Winston only to the extent that she asserts or relies upon the fact that Darrow was cyanotic and pulseless before the M10 EMT team arrived, because the Court cannot soundly conclude that she should be able to consider such hearsay evidence on this record, or, eventually, simply parrot those statements to the jury.  The Court, accordingly, must now -- by reference to Dr. Winston's testimony and opinions -- turn to its analysis of the MSJ regarding Good Samaritan's argument that Nicholson has failed to amass any evidence of breach or proximate causation.

## II.    THE COURT DENIES GOOD SAMARITAN'S MSJ, BECAUSE THERE ARE GENUINE DISPUTES OF MATERIAL FACT WHICH FORECLOSE JUDGMENT AS A MATTER OF LAW.

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of

ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Anderson v. Liberty Lobby, Inc., 477 U.S. at 254. Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party. See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). Fourth, the court cannot decide any issues of credibility. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

To prevail on its MSJ, Good Samaritan seeks to establish that there is a lack of evidence supporting an essential element of Plaintiffs' medical malpractice claim. Based on the undisputed material facts, however, Nicholson has produced evidence from which a reasonable juror could conclude by a preponderance of the evidence that Good Samaritan breached the applicable standard of care and that the alleged breach proximately caused Darrow's death. Consequently, the Court will not enter summary judgment, and will deny the MSJ. Good Samaritan accordingly provides that in this medical malpractice resulting in wrongful death context, Nicholson "must introduce expert testimony establishing Good Samaritan breached a duty," and that here Nicholson's theory is that "Good Samaritan had a duty to call for emergency transportation more quickly and that Good Samaritan breached this duty when it requested a non-emergency transport for Ms. Darrow (who was not in distress, breathing normally, and not in an emergency medical situation)." MSJ at 8. Nicholson disagrees, arguing that, "[h]ere, viewing the facts in the light most favorable to Plaintiff, there was a serious failure by Defendant's employees to 'possess and apply the knowledge and to use the skill ordinarily used by reasonably well qualified . . . healthcare providers.'" Response at 6.

Good Samaritan essentially argues that Nicholson has not proffered

> admissible expert testimony that establishes that Good Samaritan had, and
> breached, a duty to procure emergency transportation for a resident who was
> exhibiting no signs of respiratory distress. Whether 911 should have been called
> earlier is not a subject within the scope of the jury's knowledge. Tracheostomy
> care, and the appropriate response when a tracheostomy is accidentally dislodged,
> is not within the scope of a lay juror's ordinary knowledge. And, the notion that
> an emergency response is required (as claimed by Plaintiff) when a patient is
> breathing normally, in no distress, and has normal oxygenation is not the type of
> issue that the jury can resolve without the assistance of expert nursing testimony.

MSJ at 8 (emphasis omitted). Good Samaritan's argument in this regard is primarily dependent

on its contention that Dr. Winston cannot testify in this case. The Court has already concluded

otherwise, and notes that, regarding Nicholson's theories of standard of care and breach, Dr.

Winston has testified:

> Looking, again, at the timeline of the events of September 9 that I created, it's my
> opinion that when the patient became anxious and complained of difficulty
> breathing at 0812 she exhibited an elevated respiratory rate and probably
> developed hypoxia which can develop quite quickly . . . . Based on her -- the staff
> description of anxiety, that's a frequent sign of impe[n]ding respiratory failure or
> respiratory distress when a person becomes anxious. The fact that her respiratory
> rate was slightly elevated is -- those are both indicators to me that, based on my
> training and experience, I would judge she would become hypoxic within one to
> two minutes following 0812 hours.

Winston Depo. at 50:3-8, 13-20. Further, Dr. Winston, when asked about the type of policy and

procedure which she believed Good Samaritan owed Nicholson and other Good Samaritan

patients whom experience tracheostomy tube dislodgment, testifies: "tracheal dislodgement

would warrant emergency response, calling out a code," Winston Depo. at 85:14-16, and

> calling a code would mean calling together the team who would respond to a
> cardiac arrest, respiratory arrest. ALS is how the higher level team was described
> in the EMS staffing in this community that we referred to earlier. So it would be
> to call emergent. They seem to differentiate between nonemergency medical
> transport and emergent,

Winston Depo. at 87:10-18. Dr. Winston reiterates: "I'm referring to my education, training and

experience and the literature I provided, and my proposed accidental decannulation policy would be first step is to call emergency response." Winston Depo. at 88:10-13. The Court also notes that, in the Dr. Winston Report, Dr. Winston affies, with a reasonable degree of medical certainty, that:

> It is my opinion, based on reviewing these records, that the Good Samaritan Society Four Corners staff failed to act promptly and appropriately when Ms. Darrow's tracheostomy tube was dislodged and she developed respiratory distress. Staff members interviewed indicated that they were not aware of the facility's policies and procedures regarding tracheostomy dislodgment management, and did not receive formal training in tracheostomy care and management. It is also my opinion that Good Samaritan Society Four Corners had no plan of care for Ms. Darrow related to possible tracheostomy dislodgment and respiratory distress. Their actions led to the prolonged period without oxygen that caused Ms. Darrow's severe anoxic brain damage and death.

Dr. Winston Report at 2-3. The Court, in looking at the undisputed material facts in the context of this MSJ, and construing them in Nicholson's favor, concludes that Nicholson has proffered sufficient evidence -- by Dr. Winston's testimony and report -- to rebut Good Samaritan's assertion that Nicholson has proffered no evidence in support of Good Samaritan's breach of a standard of care, establishing a genuine issue of material fact for the jury's consideration.

Good Samaritan next seeks summary judgment by arguing that the undisputed facts establish that Good Samaritan's alleged breach of its standard of care did not proximately cause Darrow's death. See MSJ at 11. Good Samaritan argues that "unless Plaintiff can establish that Ms. Darrow stopped breathing and died because of Good Samaritan's alleged negligence, judgment should be entered in Good Samaritan's favor." MSJ at 11. In this regard, Good Samaritan contends:

> The causation questions in this case are thus whether Good Samaritan's alleged negligence in not requesting an earlier emergency response caused Tia Darrow's cessation of breathing shortly after arrival of the EMTs and whether Good Samaritan's alleged negligence in not requesting an earlier emergency response caused Ms. Darrow's death. The answer to both of these questions is

unequivocally no.

MSJ at 12.  Good Samaritan, then, is asserting that the undisputed facts reflect an absence of evidence supporting proximate causation as to its alleged liability for Darrow's death, because: (i) the "Plaintiff cannot prove the cause of Ms. Darrow's lapse in breathing on the morning of September 9, 2014 and thus cannot prove that Good Samaritan caused that lapse or Ms. Darrow's subsequent death"; and (ii) the "Plaintiff has no evidence that an earlier call would have resulted in a different response by EMS."  MSJ at 11-14.

In the Response, Nicholson argues that she has proffered evidence to dispute Good Samaritan's asserted facts and that the evidence sufficiently supports proximate causation.  See Response at 6.  Specifically, Nicholson argues:

> The concept that Ms. Darrow was breathing "just fine" without the trach, and that the only reason to change the 911 call from non-emergent to emergent was because Ms. Darrow was "anxious" is incredulous. The true facts are that the Defendant's employees failed to realize the gravity of the situation until it was way too late.  Ms. Darrow would have survived with prompt medical attention.

Response at 6.  Nicholson also explains, as to the causation issue, that,

> [v]iewing the facts in the light most favorable to the Plaintiff, this hurdle is easily cleared. . . .  She was denied adequate oxygenation for as much as one half an hour.   She died from trauma caused by lack of adequate oxygenation. Defendant's employees inexplicabl[y] waited for twenty (20) minutes before recognizing this was an emergency situation.   It is undisputed that permanent brain damage occurs from lack of adequate oxygenation within four (4) to six (6) minutes.  It took the advanced life support team only three (3) minutes to arrive once they were called and notified of the gravity of the situation.

Response at 8-9.  The Court agrees, to an extent, with Nicholson's characterization of the facts of her case.  The Court first addresses Good Samaritan's contention that the "Plaintiff cannot prove the cause of Ms. Darrow's lapse in breathing on the morning of September 9, 2014 and thus cannot prove that Good Samaritan caused that lapse or Ms. Darrow's subsequent death."  MSJ at 11.  The Court muses that, on the morning of September 9, 2014, Greenamyer, upon recognizing

that she and her nursing staff could not reinsert Darrow's tracheostomy tube themselves, made a nonemergency request for Darrow's transport to the hospital so that Darrow's tracheostomy tube could be replaced in the emergency room. See 911 Incident Report at 2. This decision is what Dr. Winston has identified as Good Samaritan's conduct which falls below the standard of care. See Response at 8-9. As Greenamyer awaited the nonemergency transport, three other things happened which bear mentioning in the Court's proximate cause analysis. First, Dr. Obisike, returned Greenamyer's telephone call about Darrow's tracheostomy tube and confirmed that Darrow needed transport to the emergency room. The Court notes that Dr. Obisike -- a doctor whom is not a Good Samaritan employee -- has not testified that he alternatively suggested to Greenamyer that she upgrade the call for nonemergency transport, although he testified that he considered reinsertion of her tracheostomy tube to be an issue that should be resolved as quickly as would be practical and possible. See Obisike Depo. at 49-51. Second, Darrow's oxygen saturation dropped to an unacceptable "85%," at which point Greenamyer repositioned Darrow's body to rectify the situation and bring Darrow's oxygen saturation back to "93%." Greenamyer Depo. at 73:13-21. Third, soon thereafter, Greenamyer noticed Darrow presenting symptoms of anxiety, a symptom that Greenamyer considered would exasperate Darrow's condition, causing Greenamyer to upgrade her request for Darrow's nonemergency transport. See 911 Incident Report at 2. Nicholson proffers Dr. Winston's expert opinion to establish that Good Samaritan owed a duty of care to Darrow to treat the tracheostomy tube reinsertion as an emergency, and that Greenamyer and Good Samaritan's staff breached that duty of care by requesting nonemergency transport, and that, further, it was that breach which proximately caused Darrow's death, because the lack of emergency response -- and subsequent prolonged period without her tracheostomy tube -- caused Darrow's rapid debilitation into hypoxia. See Dr. Winston Report at

1-2.

The Court also notes that the record evidence establishes that, once the first EMT team arrived, Darrow had normal oxygen saturation readings, and that she was not pulseless or cyanotic and blue.  Had Darrow become cyanotic before EMT support arrived, the Court would have no trouble concluding that a faster request for emergency help would likely have been advisable.  Good Samaritan appears to rely on this fact -- that Darrow was not pulseless and cyanotic until after EMTs arrived -- to argue against causation.  See MSJ at 11-14.  The Court is not asked to weigh the evidence, however, and Nicholson has proffered evidence suggesting that

> when the patient became anxious and complained of difficulty breathing at 0812 she exhibited an elevated respiratory rate and probably developed hypoxia which can develop quite quickly . . . .  Based on her -- the staff description of anxiety, that's a frequent sign of impe[n]ding respiratory failure or respiratory distress when a person becomes anxious.  The fact that her respiratory rate was slightly elevated is -- those are both indicators to me that, based on my training and experience, I would judge she would become hypoxic within one to two minutes following 0812 hours.

Winston Depo. at 50:3-8, 13-20.  Viewing the facts in the light most favorable to Nicholson, the Court is persuaded that Nicholson has identified a genuinely disputed issue regarding proximate causation of Darrow's hypoxia and eventual death by failing to call emergency transport and secure Darrow's airway before it was too late.  As the Court understands it, Dr. Winston has testified that, with a reasonable degree of medical certainty, hypoxia can "develop quite quickly," and any unnecessary delay in "secur[ing] her airway" would be a breach of a standard of care which could proximately cause hypoxia.  Winston Depo. at 50:8; id. At 133:18.  See Winston Depo. at 52:20-24 ("I think to a reasonable degree of medical probability I -- it is my opinion that it was inadequate airway, inadequate intake of oxygen which led to her subsequent cyanosis and cardiorespiratory arrest."); Winston Depo. at 56:2-6 ("You are confident to a medical degree of probability that nothing other than inadequate airway intake led to Tia

Darrow's unconsciousness and hypoxia that day? Yes."). The Court concludes, in that regard, that Good Samaritan's alleged breach by delaying emergency transport can reasonably be said to be the cause-in-fact that, in a natural and continuous sequence unbroken by an independent intervening cause, produced Darrow's hypoxia and eventual death. See NMRA Civ. UJI 13-305. Nicholson has proffered evidence that supports her theory of proximate cause sufficient to defeat summary judgment.

Regarding Good Samaritan's second contention disputing proximate cause, the Court notes that Dr. Winston has also testified, and Nicholson has proffered, that according to her "education, training and experience . . . my proposed accidental decannulation policy would be first step is to call emergency response," and that, in her certification, education, training, and experience in long-term care facilities, "[i]f [Darrow] would have been transferred immediately upon her trach dislodging, which was charted at 7:55 that morning, there would have been, in my opinion, less delay in her care," and that, if emergency personnel "had responded even within six or eight minutes, they would have arrived during the time where -- before she became anxious and experienced difficulty breathing." Winston Depo. at 182:11-21. Dr. Winston has also reviewed the 911 Incident Report, as has the Court, and it is readily identifiable that the emergency transport ALS team responded faster than the nonemergency transport. See 911 Incident Report at 2 (identifying that nonemergency transport was requested by 7:44:37 a.m., that emergency transport was requested by 8:14:33 a.m., that nonemergency transport arrived at 8:15:42 a.m., and that the emergency transport paramedic arrived at 8:24:22 a.m.). Although there appears to be a dispute about how quickly emergency response arrived, the quicker response was that of the emergency transport. See 911 Incident Report at 2. This undisputed fact is consistent with Dr. Winston's expert opinion that, in such a circumstance where she

opines emergency transport should be requested, "[l]ess delay in response and implementation of basic and advanced life support protocols generally improves outcome," and that there would have been less delay in getting Darrow care if emergency ALS response had been requested. Winston Depo. at 124:1-16. At this stage, the Court is not asked to weigh the evidence. Instead, the Court looks to whether there is evidence to support Nicholson's claim of medical negligence as to proximate causation, and the Court notes that Nicholson has -- by reference to the Winston Depo. and the 911 Incident Report -- made a sufficient showing that had Greenamyer requested emergency transport at the first recognition that she could not reinsert the tracheostomy tube, EMT response would have been different. Cf. O'Banion v. Owens Corning Fiberglass Corp., 968 F.2d at 1013 (affirming an order that excluded evidence of cancer where plaintiff presented no evidence "from a qualified medical expert stating that there is a reasonable medical probability the Plaintiff will have a cancer condition from his asbestos related disease"). Nicholson has provided evidence, by the qualified expert's testimony, which indicates that a policy of requesting emergency transport in an emergency situation is based upon the common notion that an emergency response will yield quicker outcomes. See Winston Depo. at 182:11-21. Essentially, as Nicholson argues, Dr. Winston has supported the contention that the

> Defendant's staff was not adequately trained to deal with the emergency situation which arose when Plaintiff's daughter, Tia Darrow, had her tracheostomy tube ("trach") dislodged and they were not able to reinsert it. It is clear the staff did not take prompt action to prevent the brain damage Ms. Darrow suffered and ultimately died from because of inadequate oxygen supply to her brain. . . . . When the trach tube was dislodged and the Defendant's staff realized they could not replace it, an emergency response was needed as soon as possible.

Response at 1. This testimony, in the Court's estimation, supports Nicholson's allegations -- taken in the light most favorable to Nicholson -- regarding proximate causation, thus defeating Good Samaritan's MSJ.

The Court concludes that there is a material dispute whether Good Samaritan breached a duty of care to Darrow which proximately caused her death.  In contrast to Good Samaritan's arguments in the MSJ that the undisputed facts establish that Nicholson has proffered no evidence to demonstrate Good Samaritan breached a standard of care, or to demonstrate that the alleged breach proximately caused Darrow's hypoxia and death, the Court concludes that Nicholson has identified sufficient evidence on those issues to create a material dispute of fact for resolution by the jury.  Nicholson has "go[ne] beyond the pleadings and designate[d] specific facts to make a showing sufficient to establish the existence of" a standard of care and of proximate causation, which are "element[s] essential to h[er] case in order to survive summary judgment." Cardoso v. Calbone, 490 F.3d at 1197.  The Court will deny the MSJ.

**IT IS ORDERED** that: (i) the requests in the Motion and Brief for Summary Judgment on all Claims Asserted by Plaintiff, filed March 10, 2017 (Doc. 48), are denied; and (ii) the requests in the Good Samaritan's *Daubert* Motion and Memorandum to Exclude Testimony of Dr. Jane Winston, filed March 10, 2017 (Doc. 49), are granted in part and denied in part, and the Court will only exclude Dr. Winston's testimony to the extent that she relies upon hearsay statements suggesting Plaintiff Tia Darrow was cyanotic and pulseless before the first Emergency Medical Technicians arrived on scene.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

James P. Lyle
Law Offices of James P. Lyle P.C.
Albuquerque, New Mexico

>  *Attorney for the Plaintiff*

Emily Paige Chase-Sosnoff
Jeremy K. Harrison
Martha G. Brown
Modrall Sperling Roehl Harris & Sisk, P.A.
Albuquerque, New Mexico

>  *Attorneys for the Defendant*